**SENATOR ADLAH DONASTORG, JR., BENEDICTA DONASTORG, ADLAH DONASTORG, SR., JOSEFINA DONASTORG, ELLA MORON, and NORMA DURAN, Plaintiffs**

**v.**

**DAILY NEWS PUBLISHING CO., INC., LOWE DAVIS, HOLLAND "DYKE" REDFIELD, VITELCO, and OAKLAND BENTA, Defendants**

Case No. ST-2002-CV-117

Superior Court of the Virgin Islands

Division of St. Thomas and St. John

August 19, 2015

198

199

200

201

202

203

204

205

206

209

210

LEE J. ROHN, ESQ., Lee J. Rohn and Associates, LLC, Christiansted, St. Croix, USVI, *Attorney for Plaintiffs.*

KEVIN RAMES, ESQ., K.A. Rames, P.C., Christiansted, St. Croix, USVI, *Attorney for Defendants Daily News Publishing Co., Inc. and Lowe Davis.*

OAKLAND BENTA, Frederiksted, St. Croix, USVI, *Pro se.*

JOEL B. HOLT, ESQ., Law Offices of Joel Holt, Christiansted, St. Croix, USVI, *Attorney for Defendant Holland "Dyke" Redfield.*

MARK ECKARD, ESQ., Christiansted, St. Croix, USVI, *Attorney for Defendant VITELCO.*

FRANCOIS, *Judge*

## MEMORANDUM OPINION

(August 19, 2015)

### TABLE OF CONTENTS

INTRODUCTION..................................................................... 215
PROCEDURAL HISTORY ........................................................ 217
SUMMARY JUDGMENT STANDARD ...................................... 221
ANALYSIS................................................................................ 222
 I. DEFAMATION................................................................... 222

 a. Applicable law ............................................................. 222
 b. Daily News is entitled to summary judgment
 in its favor on Senator Donastorg's defamation claim.......... 224

 i. *Senator Donastorg is a public figure..*....................... 225
 ii. *With one exception, all twenty-two of the allegedly de-
 famatory statements made by Daily News implicate
 matters of public concern*........................................... 225
 iii. *Plaintiffs have not produced clear and convincing evi-
 dence from which a reasonable jury could conclude
 that any of the allegedly-defamatory statements made
 by Daily news that implicate matters of public con-
 cern were made with actual malice.*............................ 233

211

iv. *The February 6, 2002 article titled "Sen. Donastorg and wife face foreclosure on their Wintberg home" is not actionable.* ........................................................ 262

**c. Redfield is entitled to summary judgment in his favor on Senator Donastorg's defamation claim.** ................................ 265

i. *All of the allegedly-defamatory statements made by Redfield implicate matters of public concern.* ............... 265

ii. *Plaintiffs have not introduced clear and convincing evidence from which a reasonable jury could conclude that any of the allegedly-defamatory statements made by Redfield were made with actual malice.* .......... 267

**II. INTERFERENCE WITH BUSINESS RELATIONSHIPS** ..................... 279

**a. Applicable law** ................................................................ 279

i. *This jurisdiction recognizes a distinction between claims for intentional interference with existing contractual relations and intentional interference with prospective business relations.* .................................... 281

ii. *This jurisdiction recognizes a cause of action for intentional interference with existing contractual relations.* ................................................................. 282

iii. *This jurisdiction recognizes a cause of action for intentional interference with prospective business relations.* ................................................................. 289

**b. To the extent that Plaintiffs have stated a claim for intentional interference with existing contractual relations against Daily News and Redfield on behalf of any of the Plaintiffs, Daily News and Redfield are entitled to summary judgment in their favor on those portions of Plaintiffs' Complaint** ................................................................. 294

**c. To the extent that Plaintiffs have stated a claim for intentional interference with prospective business relations against Daily News and Redfield on behalf of any of the Plaintiffs, Daily News and Redfield are entitled to summary judgment in their favor on those portions of Plaintiffs' Complaint** ................................................................. 294

III. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS ............. 294

a. Applicable law ................................................................. 294

b. To the extent that Plaintiffs have stated a claim for intentional infliction of emotional distress on behalf of Senator Donastorg against Daily News, Daily News is entitled to summary judgment in its favor on those portions of Plaintiffs' Complaint.................................................................................. 295

c. To the extent that Plaintiffs have stated a claim for intentional infliction of emotional distress on behalf of Senator Donastorg against Redfield, Redfield is entitled to summary judgment in his favor on those portions of Plaintiffs' Complaint.................................................................................. 297

d. To the extent that Plaintiffs have stated a claim for intentional infliction of emotional distress on behalf of Senator Donastorg's family againstDaily News and Redfield, Daily News and Redfield are entitled to summary judgment in their favor on those portions of Plaintiffs' Complaint. ................................................................................. 299

IV. NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS ................. 302

a. Applicable law ................................................................. 302

b. To the extent that Plaintiffs have stated a claim for negligent infliction of emotional distress againstDaily News and Redfield on behalf of any Plaintiff, Daily News and Redfield are entitled to summary judgment in their favor on those portions of Plaintiffs' Complaint............................ 315

V. INVASION OF PRIVACY ........................................................... 316

a. Applicable law ................................................................. 316

 i. This jurisdiction recognizes a cause of action for intrusion upon seclusion. ............................................... 317

 ii. This jurisdiction does not recognize a cause of action for false light invasion of privacy. ............................... 319

b. To the extent that Plaintiffs have stated a claim for intrusion upon seclusion on behalf of any Plaintiff against Daily News, Daily News is entitled to summary judgment in its favor on those portions of Plaintiffs' Complaint.......... 325

213

c. To the extent that Plaintiffs have stated a claim for intrusion upon seclusion on behalf of any Plaintiff against Redfield, Redfield is entitled to summary judgment in his favor on those portions of Plaintiffs' Complaint. .................. 326

VI. PLAINTIFFS' CONCERTED ACTION THEORIES ......................... 328

 a. Applicable law ................................................................ 329

 i. *Civil conspiracy* ...................................................... 329
 ii. *Plaintiffs' corporate law theories* ............................... 330

 1. *Traditional veil piercing* ........................................ 331
 2. *Reverse veil piercing* ............................................. 334
 3. *The single enterprise theory of liability* .................. 339

 iii. *Plaintiffs' employment law theories:*
 *'single employer' and 'joint employer' liability*............. 344

 b. Plaintiffs' allegations of conspiracy do not save their putative causes of action against Daily News and Redfield from summary judgment.................................................... 344

 c. Plaintiffs' veil-piercing theories do not save their putative causes of action against Daily News and Redfield from summary judgment. .......................................................... 345

CONCLUSION ...................................................................... 346

## INTRODUCTION

Before the Court is a Motion for Summary Judgment (the "Motion") filed by Defendants Daily News Publishing Co., Inc. and Lowe Davis ("Davis"). Defendants Daily News Publishing Co. Inc. and Davis are collectively referred to as "Daily News" throughout this Memorandum Opinion.[1] On November 19, 2014, Plaintiffs filed their Response to Defendants' Motion for Summary Judgment and Brief in Support (Plaintiffs' "Opposition"). On January 7, 2015, Daily News filed its Reply to Plaintiffs' Opposition. By filing dated January 12, 2015, Defendant Holland "Dyke" Redfield ("Redfield") joined Daily News' Motion, "adopting the arguments set forth therein in full."[2] None of the other Defendants have joined Daily News' Motion. The parties came before the Court for oral argument on January 23, 2015.

 Daily News and Redfield move for summary judgment on all claims asserted by Plaintiffs. Plaintiffs' Fourth Amended Complaint[3] purports to state five causes of action against Daily News and Redfield: (1) defamation; (2) interference with business relationships; (3) intentional infliction of emotional distress; (4) negligent infliction of emotional distress;[4] and (5) invasion of privacy.[5] As to Plaintiffs' defamation claim: no reasonable jury could find in Plaintiffs' favor

---

[1] Although named as separate defendants, Plaintiffs do not allege that Davis engaged in any tortious activity distinct from the tortious activity allegedly perpetrated by Daily News Publishing Co., Inc. Because Plaintiffs have not asserted an independent basis for liability against Davis, this Memorandum Opinion analyzes Plaintiffs' claims against Daily News Publishing Co., Inc. and Davis, together. This approach mirrors Plaintiffs' treatment of their own claims. *See generally* Pls.' Am. Resp. to Defs.' Stml. of Facts 9-46 (discussing the allegedly-actionable conduct of all Defendants without differentiating between Daily News Publishing Co., Inc. and Davis).

[2] Def. Redfield's Joinder in VITELCO's Rule 12 Mot. 1.

[3] Unless otherwise stated, all references to the Complaint contained in this Memorandum Opinion refer to Plaintiffs' Fourth Amended Complaint.

[4] Count III of Plaintiffs' Complaint purports to state a claim for intentional infliction of emotional distress. Fourth Am. Compl. ¶ 31. In the alternative, Count III purports to state a claim for negligent infliction of emotional distress. *Id.* ¶ 32. Each putative cause of action is analyzed in a separate portion of this Memorandum Opinion for the sake of clarity.

[5] Count V of Plaintiffs' Complaint purports to state a claim for punitive damages. *Id.* ¶¶ 37-38. A claim for punitive damages is not recognized as an independent cause of action in this jurisdiction. *Anthony v. FirstBank Virgin Islands*, 58 V.I. 224, 227 n.4 (V.I. 2011). Consequently, this Memorandum Opinion does not treat Plaintiffs' request for punitive damages as a separate cause of action.

against Daily News or Redfield because Senator Donastorg is a public figure and Plaintiffs have failed to adduce clear and convincing evidence that all but one of the allegedly-defamatory statements made by either Daily News or Redfield were made with actual malice. As to the last allegedly-defamatory statement, no reasonable jury could find in Plaintiffs' favor against Daily News or Redfield because the parties do not dispute that the factual content of that statement is true.

As to Plaintiffs' interference with business relationships claim: no reasonable jury could find in Plaintiffs' favor against either Daily News or Redfield because, regardless of how the Court conceptualizes this tort, Plaintiffs have not produced evidence that any of the Plaintiffs had a specific contract or a prospective business relation about which either Daily News or Redfield knew and with which either Daily News or Redfield intentionally interfered.

As to Plaintiffs, intentional infliction of emotional distress claim: no reasonable jury could find in Plaintiffs' favor against Daily News or Redfield. The alleged wrongdoing attributed to Daily News consists of the publication of allegedly-defamatory articles and the alleged intrusion upon the seclusion of Plaintiff Senator Adlah Donastorg, Jr. ("Senator Donastorg"). No reasonable jury could conclude that Daily News' allegedly-defamatory publications represented an intentional infliction of emotional distress because Plaintiffs have not adduced clear and convincing evidence that Daily News' articles were published with actual malice or otherwise constitute actionable defamation, and no reasonable jury could conclude that the questioning of a public official in a public office about an unidentified senator by a reporter from *The Virgin Islands Daily News* constitutes extreme and outrageous conduct that exceeds all possible bounds of decency such that it is regarded as atrocious and utterly intolerable in a civilized society. No reasonable jury could conclude that Redfield's allegedly-defamatory statements constitute an intentional infliction of emotional distress because no reasonable jury could find that those statements were made with actual malice. Finally, no reasonable jury could conclude that Redfield, engaged in extreme and outrageous conduct that exceeds all possible bounds of decency such that it is regarded as atrocious and utterly intolerable in a civilized society by speaking about the private investigation of Senator Donastorg (the "Sheraw Investigation") with private investigator Dennis Sheraw ("Sheraw") on one occasion, approximately four years after the

216

investigation took place, when Redfield did not commission the investigation.

As to Plaintiffs' negligent infliction of emotional distress claim: no reasonable jury could find in Plaintiffs' favor against either Daily News or Redfield because Plaintiffs have failed to produce any evidence that Daily News or Redfield owed any of the Plaintiffs a duty of care to ensure their mental wellbeing.

As to Plaintiffs' invasion of privacy claim: the common law of this jurisdiction only recognizes one of the two variations of this tort advanced by Plaintiffs. No reasonable jury could conclude that Daily News intruded upon Plaintiffs' seclusion by asking questions of a public official in a public office about an unidentified senator. No reasonable jury could conclude that Redfield intruded upon Plaintiffs' seclusion by discussing the Sheraw Investigation with Sheraw approximately four years after the investigation took place, or by allegedly following Senator Donastorg.

Plaintiffs also argue that Daily News and Redfield are liable for the alleged misconduct of each other, as well as that of Defendant VITELCO ("VITELCO") and Defendant Oakland Benta ("Benta"). The common law of this jurisdiction only recognizes some of the theories advanced by Plaintiffs to sustain this claim, but no reasonable jury could find for Plaintiffs on any of the theories recognized in this jurisdiction. Plaintiffs have not introduced evidence that either Daily News or Redfield exercised sufficient control over VITELCO to justify holding either Daily News or Redfield liable for VITELCO's alleged misconduct. Further, since no reasonable jury could find either Daily News or Redfield liable for the claims asserted against them, no reasonable jury could conclude that Daily News nor Redfield participated in a conspiracy with VITELCO or Benta.

Having considered the premises set forth by the parties in their filings and oral arguments, the Court will grant Daily News' Motion, and enter summary judgment in favor of Daily News and Redfield on all counts of Plaintiffs' Complaint.

## PROCEDURAL HISTORY

This case was filed on March 1, 2002 by Senator Donastorg and his wife, Defendant Benedicta Donastorg, against Daily News, Innovative Communication Corporation ("ICC"), and ICC's owner, Jeffrey Prosser

("Prosser"). At the time, VITELCO was the recipient of certain tax-related benefits from the Government of the Virgin Islands. Plaintiffs allege that ICC, Daily News' parent company, acting at the behest of Prosser through Daily News, set out to defame Senator Donastorg due to Senator Donastorg's efforts to have VITELCO audited. According to Plaintiffs, Senator Donastorg's attempts to audit VITELCO made him "a Prosser enemy."[6] Plaintiffs attribute Prosser's motivation to the fact that, at the time this action was filed, ICC owned both Daily News and VITELCO. Plaintiffs also allege that Prosser caused Sheraw to undertake a private investigation in order to "find dirt" on Senator Donastorg,[7] and that this investigation yielded information from confidential sources, information from sources in law enforcement, information concerning the criminal and employment histories of various Plaintiffs, and bank account information, among other things.[8]

ICC and Prosser were severed as defendants in this action. ICC entered bankruptcy and no longer owns either Daily News or VITELCO. VITELCO and Redfield would later be added as Defendants. Senator Donastorg's father, Adlah Donastorg, Sr.; Senator Donastorg's mother, Josefina Donastorg; and Senator Donastorg's sisters, Ella Moron and Norma Duran, would be added as Plaintiffs. Excluding Senator Donastorg, the Plaintiffs in this case are sometimes collectively referred to as "Senator Donastorg's family."

Although Plaintiffs purport to state multiple causes of action against Defendants, the Plaintiffs' theories of liability distill into two categories. Under the first category, Plaintiffs allege that a specific defendant took a specific action, which in turn harmed a specific plaintiff. As an example, Plaintiffs allege that Daily News published certain articles and editorials, thereby defaming Senator Donastorg.[9] Under the second category, Plaintiffs allege that all Defendants in this case were acting in concert,

---

[6] Pls.' Am. Resp. to Defs.' Stmt. of Facts 20.

[7] Fourth Am. Compl. ¶ 18.

[8] Pls.' Am. Resp. to Defs.' Stmt. of Facts 17-18.

[9] *See, e.g.*, Fourth Am. Compl. ¶ 12b (alleging that Daily News "printed a false story that Senator Donastorg voted against his own bill . . ."); Pls.' Resp. to Defs.' Mot. for Summ. J. and Br. in Supp. 43-44 (arguing that Daily News published a "false and defamatory" story concerning a foreclosure action that had been filed against Senator Donastorg); Pls.' Am. Resp. to Defs.' Stmt. off acts 45 (alleging that Daily News published an editorial that defamed Senator Donastorg by implying that Senator Donastorg endorsed cockfighting).

218

such that any Defendant's allegedly-tortious conduct may be imputed to any or all of the other Defendants.[10] In order to analyze Plaintiffs' second theory, it is helpful to identify the allegedly-tortious conduct perpetrated by each Defendant individually. Only once a defendant's liability for its own alleged misconduct can be ascertained may that liability be imputed to other defendants.

Daily News is alleged to have published defamatory articles and editorials concerning Senator Donastorg.[11] Daily News is also alleged to have invaded Senator Donastorg's privacy by inquiring into the status of child support payments.[12]

Redfield is alleged to have made defamatory statements concerning Senator Donastorg while speaking on a local radio show, in a press release issued by ICC,[13] in several articles published in the *St. Croix Avis*, and in one article published in *The Virgin Islands Daily News*.[14] Redfield is also alleged to have invaded Plaintiffs' privacy by "being a contact person[ ] for Sheraw," by being a person with whom Sheraw discussed his investigation of Senator Donastorg,[15] and by being one of "the primary principals charged with defending VITELCO by attacking Senator Donastorg."[16]

Although Plaintiffs have pled that defamatory statements were made "on behalf of VITELCO,"[17] Plaintiffs have not alleged that VITELCO

---

[10] Pls.' Resp. to Defs.' Mot. for Summ. J. and Br. in Supp. 26-28; Pls.' Am. Resp. to Defs.' Stmt. of Facts 10-15.

[11] *See* Pls.' Am. Resp. to Defs.' Stmt. of Facts 4-6 (listing the articles and editorials that Plaintiffs claim are actionable); *id.* at 7 (explaining that, by listing the allegedly-defamatory articles in the preceding pages, Plaintiffs "have identified defamatory and/or false-light publications contained in the pleading and discovery record"); *id.* at 8 (same). Plaintiffs allege that twenty-three of these articles were published in *The Virgin Islands Daily News*, and that another four of these artic les were published in the *St. Croix Avis*, a nonparty to this suit. The final three instances of allegedly-defamatory conduct proffered by Plaintiffs are portions of the Sheraw Investigation, a press release from ICC dated March 1, 2002, and a copy of a transcript of a local radio broadcast.

[12] Pls.' Am. Resp. to Defs.' Stmt. of Facts 18-19.

[13] *Id.* at 88.

[14] *Id.* at 31-36.

[15] *Id.* at 16.

[16] *Id.* at 80.

[17] Fourth Am. Compl. ¶¶ 12(a)-(c), 20. *See also* Pls.' Mem. of Law in Opp. to Def. VITELCO's Mot for J. on the Pleadings Dismissing Sen. Donastorg's Defamation Claim

published a single defamatory statement concerning Plaintiffs.[18] Plaintiffs have alleged that VITELCO used rate payers' funds to fund the private investigation conducted by Sheraw.[19] It is also alleged that VITELCO cut Senator Donastorg's personal telephone service for over three weeks, failed to respond to calls to repair his lines for over three weeks, and called Senator Donastorg's business clients to ask about the clients' business dealings with Senator Donastorg.[20] Plaintiffs allege that, as a result of these calls, a client of Senator Donastorg's company "wanted to discontinue doing business with Donastorg's company."[21]

Plaintiffs allege that Benta "did security work for Prosser, ICC, VITELCO, and the subsidiaries that commissioned an investigation into Senator Donastorg and his family's private life."[22] Plaintiffs further allege that "ICC and its related companies, through [Benta]" instructed Sheraw to investigate Senator Donastorg, Senator Donastorg's family, and Senator Donastorg's associates.[23] Plaintiffs allege that Benta, among others, was an "ICC contact person[ ] for Sheraw" or was a person with whom Sheraw discussed his investigation.[24] Plaintiffs also claim that the report provided by Sheraw to Benta constitutes actionable defamation.[25]

---

18-20 (arguing that Redfield made defamatory statements on VITELCO's behalf); *id.* at 26-36 (arguing that the allegedly-defamatory material published by Daily News should be attributed to VITELCO).

[18] In opposition to VITELCO's Motion for Judgment on the Pleadings Dismissing Senator Donastorg's Defamation Claim, Plaintiffs identify a memorandum allegedly circulated by VITELCO the day before an election, which memorandum alleged that Senator Donastorg was trying to obtain the private information of VITELCO employees. *Id.* at 5-6. However, nowhere in any filing in the Court's record have Plaintiffs claimed that this memorandum is defamatory. Plaintiffs' Amended Response to Defendants' Statement of Material Facts sets forth thirty (30) allegedly-defamatory publications. Plaintiffs have not alleged that VITELCO authored a single one of these publications.

[19] Fourth Am. Compl. ¶ 22.

[20] Pls.' Am. Resp. to Defs.' Stmt. of Facts 19.

[21] *Id. But see* Pls.' Resp. to Defs.' Mot. for Summ. J. and Br. in Supp. App. Vol. VI, Ex. 3, at Bates No. D. 1298 (indicating that, although MD McCauley Company was identified as a supplier for Senator Donastorg's business, Sheraw and his team were unable to contact that company).

[22] *Id.* at 16.

[23] *Id.*

[24] *Id.*

[25] Portions of the Sheraw Investigation are attached as Exhibits 3 and 4 to Volume VI of the appendix to Plaintiffs' Opposition.

The actions described in the preceding paragraphs are the foundation for the counts of Plaintiffs' Complaint. Although not set forth in a separate count, Plaintiffs also allege that the Defendants "have set out a concerted effort to slander, defame, and cast in a bad light Senator Donastorg,"[26] and that the Defendants' actions "constitute a conspiracy to discredit Senator Donastorg's reputation in the community."[27] In their Opposition and at oral argument, Plaintiffs set forth several theories in an attempt to justify imposing liability on all Defendants for the actions of any one Defendant.

## SUMMARY JUDGMENT STANDARD

"A party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought."[28] The party moving for summary judgment bears the burden of demonstrating that there is no genuine issue of any material fact and that it is entitled to judgment as a matter of law.[29] This burden may be met by pointing out that there is an absence of evidence to support a particular element of the nonmoving party's case.[30]

Once the moving party makes its showing, the opposing party must "make a showing sufficient to establish existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial."[31] The opposing party "may not rest on mere allegations but must present actual evidence showing a genuine issue for trial."[32] The

---

[26] Fourth Am. Compl. ¶ 10.

[27] *Id.* ¶ 25.

[28] FED. R. CIV. P. 56(a). Federal Rule of Civil Procedure 56 applies to this case through the operation of Superior Court Rule 7.

[29] *Id.*

[30] *Id.* 56(c)(1)(B). *Accord Boudreaux v. Swift Transportation Co.*, 402 F.3d 536, 544 (5th Cir. 2005); *Martinez v. CO2 Services, Inc.*, 12 Fed. Appx. 689, 694 (10th Cir. 2001); *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 531 (9th Cir. 2000); *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996); *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995).

[31] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

[32] *Williams v. United Corp.*, 50 V.I. 191, 194-95 (V.I. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).

opposing party must provide more than a scintilla of supporting evidence to survive a motion for summary judgment.[33]

The Court will consider the evidence provided by both parties and view all inferences to be drawn from that evidence in a light most favorable to the nonmoving party before ruling.[34] If the Court does not grant all of the relief requested by the motion, it "may enter an order stating any material fact — including an item of damages . . . that is not genuinely in dispute and [treat] that fact as established in the case."[35] "A fact is material if it can affect the outcome of the case,"[36] and a genuine dispute of material fact exists if the evidence is such that a reasonable jury could find in favor of the nonmoving party on the disputed fact.[37] Summary judgment shall be granted if there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law.[38]

## ANALYSIS

### I. DEFAMATION

Count I of Plaintiffs' Complaint purports to state a claim for defamation on behalf of Senator Donastorg.[39]

#### a. Applicable law

In *Joseph v. Daily News Publishing Company, Inc.*,[40] the Supreme Court of the Virgin Islands adopted the principles of law summarized in the Restatement (Second) of Torts pertaining to defamation.[41] *Joseph* was rendered in acknowledgment of the Supreme Court's decision in *Banks v. international Rental & Leasing Corp.*[42] Consequently, the principles of

---

[33] *Joseph v. Hess Oil Virgin Islands Corp.*, 54 V.I. 657, 664 (V.I. 2011).

[34] *Id.*

[35] FED. R. CIV. P. 56(g).

[36] *Burd v. Antilles Yachting Services, Inc.*, 57 V.I. 354, 360 (V.I. 2012) (quoting *Anderson*, 477 U.S. at 254) (internal quotation marks omitted).

[37] *Anderson*, 477 U.S. at 248.

[38] FED. R. CIV. P. 56(a).

[39] Fourth Am. Compl. ¶¶ 24-26.

[40] 57 V.I. 566 (V.I. 2012).

[41] *Id.* at 585.

[42] *Id.* at 585 n.10 (citing *Banks v. International Rental & Leasing Corp.*, 55 V.I. 967, 979 (V.I. 2011)).

222

law summarized in the Restatement (Second) of Torts pertaining to defamation represent the point of departure for analyzing Senator Donastorg's defamation claim.

■ In accordance with those principles, a plaintiff may only prevail on a defamation claim by proving: (1) the existence of "a false and defamatory statement concerning another;" (2) the existence of "an unprivileged publication [of the false and defamatory statement] to a third party;" (3) "fault amounting to at least negligence on the part of the publisher;" and (4) "either the actionability of the statement irrespective of special harm or the existence of special harm caused by the publication."[43]

■ In certain circumstances, the First Amendment imposes an additional burden on a plaintiff that seeks to recover for defamation. Beginning with the case of *New York Times, Co. v. Sullivan*,[44] the Supreme Court of the United States has held that "[a] public figure may not recover damages for a defamatory falsehood without clear and convincing proof that the false 'statement was made with actual malice. . . .' "[45] When the allegedly-defamatory statement has only a defamatory meaning, 'actual malice' must be established with clear and convincing evidence that the defendant knew that a statement was false at the time he or she made the statement, or that the defendant made the statement with reckless disregard for whether it was false.[46] "Recklessness is shown by demonstrating that 'the defendant in fact entertained serious doubts as to the truth of the statement or that the defendant had a subjective awareness of probable falsity.' "[47] When the allegedly-defamatory statement has competing meanings — one that is defamatory, and one that is not — a plaintiff has alleged defamation by implication.[48] Defamation by implication occurs when one "juxtaposes a

---

[43] *Id.* at 585-88.

[44] 376 U.S. 254, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964).

[45] *Harte-Hanks Communications v. Connaughton*, 491 U.S. 657, 659, 109 S. Ct. 2678, 105 L. Ed. 2d 562 (1989) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964)).

[46] *Kendall v. Daily News Publishing Co.*, 716 F.3d 82, 89 (3d Cir. 2013) (quoting *Schiavone Construction Co. v. Time, Inc.*, 847 F.2d 1069, 1089 (3d Cir. 1988)).

[47] *Id.* (quoting *Schiavone Construction Co.*, 847 F.2d at 1089).

[48] *Id.*

series of facts to imply a defamatory connection between them."[49] To survive summary judgment, a plaintiff that has alleged defamation by implication must introduce clear and convincing evidence from which a reasonable jury could conclude that the defendant not only knew that the statement was false, but also that the defendant intended to communicate the defamatory meaning over the non-defamatory meaning.[50] In either instance, the 'actual malice' standard "is a subjective one, based on the defendant's actual state of mind" at the time the statement was made.[51]

■ Proof of "ill will, evil motive, [or] intent to injure" does not constitute actual malice.[52] "Debate on public issues will not be uninhibited if the speaker must run the risk that it will be proved in court that he spoke out of hatred; even if he did speak out of hatred, utterances honestly believed contribute to the free interchange of ideas and the ascertainment of truth."[53] Indeed, "in charges against a popular political figure . . . it may be almost impossible to show freedom from ill-will or selfish political motives."[54]

### b. Daily News is entitled to summary judgment in its favor on Senator Donastorg's defamation claim.

■ Senator Donastorg's defamation claim against Daily News is premised on twenty-two allegedly-defamatory articles and editorials published in *The Virgin Islands Daily News.*[55] Senator Donastorg is a public figure, and twenty-one of the twenty-two articles implicate matters of public concern. Of the twenty-one articles that implicate matters of public concern, Plaintiffs have not provided clear and convincing

---

[49] *Id.* (quoting 50 AM. JUR. 2D *Libel and Slander* § 158 (West 2015)).

[50] *Id.* at 90.

[51] *Id.* at 89 (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S. Ct. 1323, 20 L. Ed. 2d 262 (1968)) (internal quotations omitted).

[52] *Rosenblatt v. Baer*, 383 U.S. 75, 84, 86 S. Ct. 669, 15 L. Ed. 2d 597 (1966) (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74, 85 S. Ct. 209, 13 L. Ed. 2d 125 (1964)).

[53] *Garrison*, 379 U.S. at 73.

[54] *Garrison*, 383 U.S. at 74 (quoting Dix W. Noel, *Defamation of Public Officers and Candidates*, 49 COL. L. REV. 875, 893 n.90 (1949)) (internal quotations omitted).

[55] *See* Pls.' Am. Resp. to Defs.' Stmt. of Facts 5-6 (listing the allegedly-defamatory publications). Of the thirty publications listed, only twenty-two of them have been attributed to Daily News. Seven of the remaining eight publications pertain to Plaintiffs' defamation claim against Redfield. The last allegedly-defamatory publication is Sheraw's investigative report, which was published by neither Daily News nor Redfield.

224

evidence that Daily News published any of these twenty-one articles with actual malice. The parties do not dispute the truth of the statements contained in the one article that does not implicate matters of public concern. Consequently, no reasonable jury could find Daily News liable for defamation against Senator Donastorg.

### i. *Senator Donastorg is a public figure.*

■ "In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts."[56] Senator Donastorg is one such individual. In his deposition, Senator Donastorg testified that be assumed office as a Virgin Islands senator in 1996 and maintained that position through 2006.[57] The first allegedly-defamatory publication was made in March 21, 1997, and the last was made on August 22, 2004, all during the period that Senator Donastorg served the Virgin Islands as a public official. Plaintiffs have also introduced evidence that Senator Donastorg first ran for public office in 1992,[58] and that Senator Donastorg ran for governor 2006.[59] As an elected official that served this territory for approximately a decade, Senator Donastorg is a public figure.[60]

### ii. *With one exceptior, all twenty-two the allegedly-defamatory statements made by Daily News implicate matters of public concern.*

■ "[S]peech on public issues occupies the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection."[61] Debate on p.iblic issues "should be uninhibited, robust, and wide-open, and . . . it may well include vehement, caustic, and sometimes

---

[56] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 n.3 246, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974)).

[57] Pls.' Opp. to Defs.' Mot. for Summ. J. and Br. in Supp. App. Vol. III, Donastorg Dep. Tr. at 11:4-14.

[58] *Id.* App. Vol. III, Benedicta Donastorg Dep. Tr. 12:24-25; *id.* at 13:15-19.

[59] *Id.* at 15:3-5.

[60] *See New York Times Co. v. Sullivan*, 376 U.S. 254, 256, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964) (observing that the plaintiff was an elected commissioner of Montgomery, Alabama).

[61] *Connick v. Myers*, 461 U.S. 138, 145, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983) (citations omitted).

unpleasantly sharp attacks on government and public officials."[62] A determination of whether speech addresses matters of public concern "must be determined by [the expression's] content, form, and context . . . as revealed by the whole record."[63]

### 1. March 21, 1997 article titled "Senator: no conflict of interest with firm selling to hospital"

This article implicates matters of public concern because it discusses how funds of a public institution are being used. The article explains that the Roy L. Schneider Hospital purchased goods from a company owned by a Virgin Islands senator. The article provides specific figures: the hospital paid $36,682 to the company in December of 1995 in exchange for a three-month supply of infectious-waste bags; the hospital paid $47,261 to the company in May of 1996 in exchange for a three-month supply of infections-waste bags and trash-can liners; the hospital paid a total of $104,938 to the company in 1996; and, as of March 31, 1997, the hospital had paid $11,485 to the company in 1997. The manner in which the Government of the Virgin Islands spends its money is a matter of public concern,[64] as is the relationship between public institution and a public official's business interests.

### 2. May 29, 1988 editorial titled "The public's right to know"

This editorial implicates matters of public concern because it discusses the operation of Virgin Islands' utilities and the impact of those operations on residents of this Territory. The editorial suggests that the costs of reports concerning VITELCO's telephone rates — and reports concerning rates of the Virgin Islands Water and Power Authority and the ferry boats — are ultimately passed on to the consumers of those utilities. The

---

[62] New York Times Co., 376 U.S. at 270 (citing Terminiello v. Chicago, 337 U.S. 1, 4, 69 S. Ct. 894, 93 L. Ed. 1131 (1949)).

[63] Dun & Bradstreet v. Greenmoss Builders, 472 U.S. 749, 761-62, 105 S. Ct. 2939, 86 L. Ed. 2d 593 (1985) (quoting Connick, 461 U.S. at 147-48) (internal quotations omitted). Accord Snyder v. Phelps, 562 U.S. 443, 453, 131 S. Ct. 1207, 179 L. Ed. 2d 172 (2011) (quoting Dun & Bradstreet, 472 U.S. at 761).

[64] See, e.g., Chaklos v. Stevens, 560 F.3d 705, 708 (7th Cir. 2009) (explaining that a letter concerning government spending addressed a matter of public concern); Weeks v. Bayer, 246 F.3d 1231, 1236 (9th Cir. 2001) (holding that "[d]iscussions about the funding and finances of public programs are sometimes matters of public concern").

editorial also opines on how one Virgin Islands senator is addressing the regulation of public utilities in the Territory. Both the operation of this Territory's utilities and the Legislature's opinions in response thereto are matters of public concern.

### 3. July 15, 1998 article titled "Vitelco disputes PSC study"

This article implicates matters of public concern because it discusses the operation of Territorial utilities and the Legislature's response thereto. The article discusses the relationship between VITELCO's Industrial Development Commission ("IDC") tax credits and the possibility of rate increases for VITELCO's customers. The article also states that the Legislature mandated an examination into the possibility of a rate reduction. The article specifically observes that one Virgin Islands senator "continued to question the strength of VITELCO's arguments and the validity of its IDC benefits."[65] As with the preceding editorial, an article that discusses the operation of public utilities and the Legislature's response thereto implicate matters of public concern.

### 4. June 9, 2000 article titled "ICC, Donastorg square off over Vitelco tax breaks"

As with the July 15, 1998 article discussed above, this article implicates matters of public concern because it discusses the operation of a public utility and the response of a Virgin Islands senator to the operation of that utility.

### 5. August 17, 2000 article titled "Sen. Donastorg demands data on Vitelco's JDC compliance"

This article implicates matters of public concern because it discusses the criticisms leveled by a Virgin Islands senator against the director of the IDC over whether VITELCO has complied with the employment guidelines in its IDC certificate. The compliance of a utility with local law and the Legislature's opinion on whether that utility has complied with local law are both matters of public concern.

---

[65] Norberto Santana Jr., *Vitelco disputes PSC study*, THE VIRGIN ISLANDS DAILY NEWS, July 15, 1998, at page 1.

*6. September 8, 2000 article titled "Donastorg asks court to make Vitelco open employee records"*

This article implicates matters of public concern for the same reasons as the preceding articles. Specifically, this article further chronicles the efforts of a Virgin Islands senator to determine whether VITELCO had complied with its IDC certificate.

*7. November 1, 2000 article titled "Donastorg, JDC director wrangle over accusations of abuses"*

This article implicates matters of public concern because it discusses how a Virgin Islands senator had questioned the leadership of the IDC. The article explains that the senator criticized the IDC's director for not penalizing any IDC beneficiaries since assuming her role in April of 1999. The article also explains that the senator accused the IDC's director of using her position as director to solicit funds for a foundation that she chairs. The article explains that this accusation was contained in a letter dated October 24, 2000, sent by the senator to then-Governor Charles W. Turnbull. The article concludes by quoting the portion of that letter in which the senator calls for the IDC director's resignation. The operation of the IDC and the criticism thereof by a Virgin Islands senator are both matters of public concern.

*8. June 12, 2001 article titled "Legislation reduction on agenda for Rules Committee"*

This article implicates matters of public concern because it discusses a bill introduced in the Legislature of the Virgin Islands, and how several senators voted on that bill.

*9. June 14, 2001 article titled "Setting the record straight"*

This article implicates matters of public concern because it clarifies an error that was printed in the June 12, 2001 article discussed in the preceding paragraph. Specifically, this article clarifies how a Virgin Islands senator voted in relation to a particular bill.

*10. February 6, 2002 article titled "Sen. Donastorg and wife face foreclosure on their Wintberg home"*

 This article does not implicate a matter of public concern. Due to "a strong interest in debate about those persons who are in a position

228

significantly to influence the resolution of [public] issues,"[66] speech relating to a public official's "conduct, fitness, or role in that capacity"[67] is constitutionally protected.[68] "[S]ociety's interest in the officers of government is not strictly limited to the formal discharge of official duties,"[69] and "[p]ublic discussion about the qualifications of a candidate for elective office presents what is probably the strongest possible case for application of the *New York Times* rule."[70] Quoting the Kansas Supreme Court, the Supreme Court of the United States has observed that

> a candidate must surrender to public scrutiny and discussion so much of his private character as affects his fitness for office, and the liberal rule requires no more. But in measuring the extent of a candidate's profert of character it should always be remembered that the people have good authority for believing that grapes do not grow on thorns nor figs on thistles.[71]

However, while "a charge of criminal conduct against an official or a candidate, no matter how remote in time or place, is always relevant to his fitness for office for purposes of applying the *New York Times* rule of knowing falsehood or reckless disregard of the truth,"[72] the Court has discovered no authority that a civil foreclosure action carries the same weight. Nor has Daily News advanced such a claim. Consequently, the fact that a foreclosure action was filed against a Virgin Islands senator does not constitute a matter of public concern for purposes of determining whether the New York Times standard applies to this article.

---

[66] *Rosenblatt v. Baer*, 383 U.S. 75, 85, 86 S. Ct. 669, 15 L. Ed. 2d 597 (1966).

[67] *Joseph v. Daily News Publishing Co., Inc.*, 57 V.I. 566, 588 (V.I. 2012) (citing RESTATEMENT (SECOND) OF TORTS § 580A).

[68] *See Joseph*, 57 V.I. at 589 (citing RESTATEMENT (SECOND) OF TORTS § 580B (explaining that the Restatement — and consequently, the Virgin Islands — does not apply First Amendment protections to statements that do not implicate a public official's "conduct, fitness, or role in his public capacity").

[69] *Gertz v. Robert Welch*, 418 U.S. 323, 344, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974).

[70] *Ocala Star-Banner Co. v. Damron*, 401 U.S. 295, 300-01, 91 S. Ct. 628, 28 L. Ed. 2d 57 (1971).

[71] *Garrison v. Louisiana*, 379 U.S. 64, 77, 85 S. Ct. 209, 13 L. Ed. 2d 125 (1964) (quoting *Coleman v. MacLennan*, 78 Kan. 711, 98 P.2d 281, 291 (1908)).

[72] *Ocala Star-Banner Co.*, 401 U.S. at 300 (internal quotations omitted).

*11. February 7, 2002 editorial titled "Insolvent V.I. Senators"*

This editorial implicates matters of public concern because it invites discussion concerning the qualifications of Virgin Islands senators to perform their jobs. The editorial also invites discussion about the relationship between then-Governor Charles W. Turnbull and the Virgin Islands senators due to the fact that the editorial chastises the former governor for criticizing Virgin Islands senators for passing costly legislation.

*12. April 25, 2003 article titled "Big money title fight rings up big gamble on marketing in the V.I."*

This article implicates matters of public concern because it discusses how the Legislature of the Virgin Islands appropriated funds to bring a boxing event to the Virgin Islands. These actions are germane to the public interest as they involve the use of public funds by publically-elected officials to produce a sporting event that would be held in the Territory.

*13. May 30, 2013 article titled "V.I.-backed boxing event called off, future uncertain"*

This article implicates matters of public concern because it discusses the appropriation of public funds for a public sporting event that was designed to boost the tourism economy of this Territory.

*14. October 24, 2003 article titled "No TV contract yet, but ESPN will still visit St. Thomas boxing site"*

This article implicates matters of public concern for the same reasons as articles twelve and thirteen, discussed above.

*15. October 29, 2003 editorial titled "Volunteerism is nice, but . . ."*

This editorial implicates matters of public concern for the same reasons as articles twelve through fourteen, discussed above.

*16. November 1, 2003 article titled "No ESPN contract yet for V.I. boxing card"*

This article implicates matters of public concern for the same reasons as articles twelve through fifteen, discussed above.

*17. November 5, 2003 article titled "ESPN commits to televising V.I.'s 'Rumble in Paradise' "*

This article implicates matters of public concern for the same reasons as articles twelve through sixteen, discussed above.

*18. November 27, 2003 article titled "Sugar Ray Leonard to promote V.I. boxing match for ESPN2's 'Friday night at the Fights,' planners say"*

This article implicates matters of public concern for the same reasons as articles twelve through seventeen, discussed above.

*19. December 11, 2003 editorial titled "Boxing and tourism, a TKO; maybe 'Spongebob' can help"*

This editorial implicates matters of public concern for the same reasons as articles twelve through eighteen, discussed above.

*20. March 1, 2004 editorial titled "GERS as political fodder"*

This editorial implicates matters of public concern because it discusses the position of a Virgin Islands senator during an election year. Specifically, the editorial observes that, in 2004, the senator is attempting to enforce a "policy that has been on the books since 2000."[73] The policy referred to is a policy under which the Government Employee Retirement System ("GERS") would pay four percent interest on the money participants withdraw from the system when they leave government employment before retirement. The editorial opines that this particular policy "is not what people should be concerned about" because "even by the most conservative estimates, the GERS is underfunded by $1 billion dollars." The editorial claims that "Senators do not have the financial wisdom to properly manage [GERS], and most are motivated only by political advancement." The article also opines that the senator's position might "hurt[ ] the pensions of thousands of current and future V.I. government employees."

This editorial expresses an opinion on a candidate's position during a period of time when that candidate is up for re-election, and debate on

---

[73] Editorial *GERS as political fodder*, THE VIRGIN ISLANDS DAILY NEWS, March 1, 2004.

public issues must remain "uninhibited, robust, and wide-open."[74] The editorial's position concerning the involvement of Virgin Islands senators with GERS invites discussion about that topic, a matter of public concern due to the fact that residents of this Territory will rely on GERS as they plan for retirement.

### 21. April 6, 2004 editorial titled "Registering V.I. automobiles"

The opening sentences of this editorial encapsulate why this editorial implicates matters of public concern: "Say 'Motor Vehicles Department,' or 'Inspection Lane' to any Virgin Islands motorist and you won't have to wait long to see him wince. Is there anyone who owns or drives a motor vehicle in the territory and hasn't had an unpleasant experience with this bureaucratic jungle?"[75]

The editorial observes that, "with an election seven months away," a Virgin Islands senator is proposing to create a separate governmental agency to manage the Bureau of Motor Vehicles.[76] The editorial's author criticizes this plan as "an election year strategy to curry favor with voters and offer hope of creating jobs in a new governent bureaucracy."[77] The editorial's author also claims that "we are wary of any proposal [from that senator] to create a new government agency" for two reasons: "As chairman of the Senate Finance Committee [the senator] has been unable to pass a territorial budget for fiscal year 2004," and because the senator allegedly has "problems in managing his personal finances and the governmment's."[78]

As with the preceding editorial concerning GERS, this editorial implicates matters of public concern because it expresses an opinion on a senator's position during a period of time when that senator is up for re-election. Also like the GERS editorial, the statements made in this editorial invite discussion concerning a senator's proposals for the Government of the Virgin Islands and that senator's qualifications for making such proposals.

---

[74] *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20, 110 S. Ct. 2695, 111 L. Ed. 2d 1 (1990) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964)) (internal quotation marks omitted).

[75] Editorial, *Registering V.I. automobiles*, THE VIRGIN ISLANDS DAILY NEWS, April 6, 2004.

[76] *Id.*

[77] *Id.*

[78] *Id.*

*22. August 22, 2004 editorial titled "Blind eye to cockfighting? Animal cruelty nonetheless!"*

This editorial implicates matters of public concern because it discusses a bill passed by the Legislature of the Virgin Islands that affects the penalties for those found guilty of animal cruelty or animal neglect. The author of the editorial criticizes the bill because it excludes cockfighting from its definition of animal cruelty. The author alleges that "money is spent illegally gambling on cockfights in the Virgin Islands," and that "law enforcement officials have documented a strong connection between cockfighting and the distribution of illegal drugs."[79] As with the GERS and the V.I. Automobiles editorials discussed above, this editorial represents an opinion on the issues it addresses, and thus invites discussion about the propriety of such a bill and the exclusion of cockfighting therefrom.

*iii. Plaintiffs have not produced clear and convincing evidence from which a reasonable jury could conclude that any of the allegedly-defamatory statements made by Daily News that implicate matters of public concern were made with actual malice.*

 "In the context of the underlying defamation action brought by a public official regarding a matter of public concern, the question becomes 'whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not.' "[80] "The question [of] whether the evidence in the record . . . is sufficient to support a finding of actual malice is a question of law."[81] "At the trial phase . . . 'where the *New York Times*' clear and convincing evidence requirement applies, the trial judge's inquiry as to whether a genuine issue of material fact exists will be whether the evidence presented is such that a jury applying that

---

[79] Editorial, *Blind eye to cockfighting? Animal cruelty nonetheless!*, THE VIRGIN ISLANDS DAILY NEWS, Aug. 22, 2004.

[80] *Joseph v. Daily News Publishing Co., Inc.*, 57 V.I. 566, 584 (V.I. 2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255-56, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).

[81] *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 17, 110 S. Ct. 2695, 111 L. Ed. 2d 1 (1990) (quoting *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 685, 109 S. Ct. 2678, 105 L. Ed. 2d 562 (1989)) (internal quotations omitted).

evidentiary standard could reasonably find for either the plaintiff or the defendant.' "[82]

▇▇▇ As a public figure suing for defamation over articles and editorials that implicate matters of public concern, the First Amendment requires that Senator Donastorg substantiate his claims with clear and convincing evidence that Daily News published each of the articles and editorials in question with actual malice. Plaintiffs have not provided a statement-by-statement analysis of why they believe that Daily News' allegedly-defamatory statements were made with actual malice. Instead, Plaintiffs chose to discuss the articles and editorials by theme.[83] Since actual malice must be present for every alleged defamation in an action brought by a public official concerning matters of public concern,[84] the Court must examine each article individually to determine whether a reasonable jury could find, based upon clear and convincing evidence, that Daily News published each piece with actual malice. No reasonable jury could reach such a conclusion with regard to any of the twenty-one articles and editorials discussed below.

### 1. March 21, 1997 article titled "Senator: no conflict of interest with firm selling to hospital"

Nowhere in Plaintiffs' Opposition or Plaintiffs' Amended Response to Defendants' Statement of Facts do Plaintiffs address this article.[85] Thus, Plaintiffs have not presented clear and convincing evidence that Daily News either knew that the contents of this editorial were false, or that Daily News entertained serious doubts as to the truth or falsity of this

---

[82] *Joseph*, 51 V.I. at 584 (quoting *Anderson*, 477 U.S. at 255-56).

[83] *See* Pls.' Resp. to Defs.' Mot. for Summ. J. and Br. in Supp. 41-50 (grouping the allegedly-defamatory publications into eight separate categories for purposes of Plaintiffs' analysis); Pls.' Am. Resp. to Defs.' Stmt. of Facts 19-46 (same).

[84] *See Milkovich*, 497 U.S. at 14 (citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964)) (observing that a public official cannot recover damages for a defamatory falsehood "unless he proves that *the statement* was made with actual malice") (emphasis supplied). To bold to the contrary would permit the imposition of liability for defamation of a public official for an article that was not, itself, published with actual malice. Such a result would contradict the requirements set forth by *New York Times* and its progeny.

[85] *See* Pls.' Resp. to Defs.' Mot. for Summ. J. and Br. in Supp. 41-42 (containing no discussion of the March 21, 1997 article); Pls.' Am. Resp. to Defs.' Stmt. of Facts 19-28 (same).

editorial. Due to this absence of evidence, no reasonable jury could conclude that this article was published with actual malice.

### 2. May 29, 1998 editorial titled "The public's right to know"

Plaintiffs' Opposition quotes the portion of this editorial in which the author claims that "Donastorg is an example of one of the most anti-business legislators in recent memory."[86] To support the proposition that this article is actionable, Plaintiffs cite to "[t]he articles discussed in RSOF ¶4.B.2 . . . ."[87] Aside from the blanket citation to "RSOF ¶4.B.2," Plaintiffs' Opposition provides no factual support for the claim that any portion of the May 29, 1998 editorial was published with actual malice.

Plaintiffs' Amended Response to Defendants' Statement of Facts proffers four pieces of evidence to establish that the May 29, 1998 editorial was published with actual malice. First, Plaintiffs claim that the "portion of the [editorial] that purports to state facts about Donastorg is false and was intended to paint Senator Donastorg in a false, bad light."[88] Plaintiffs support this contention with citations to Senator Donastorg's deposition testimony.

Second, Plaintiffs claim that an editor of the paper resigned due to the publication of the editorial because, in her opinion, the editorial "destroyed the last shred of credibility that may have remained . . . ."[89] Plaintiffs support this contention with citations to the deposition testimony of Jason Robbins, an employee of Daily News who has held various editorial positions therewith over the course of his career.

Third, Plaintiffs claim that Prosser broke his promise that he "was not going to interfere with the news operations" of Daily News by appointing Ed Crouch to the editorial board, and that Ed Crouch "immediately replaced [an editorial piece] with one critical of Senator Donastorg . . . ."[90] Plaintiffs cite to the deposition testimony of Ariel Melchior Jr. to support this fact. Plaintiffs claim that "a reasonable jury could conclude there was bad motive and a subjective intent to defame"

---

[86] Editorial, *The public's right to know*, THE VIRGIN ISLANDS DAILY NEWS, May 29, 1998.

[87] Pls.' Resp. to Defs.' Mot. for Summ. J. and Br. in Supp. 41. The acronym RSOF refers to Plaintiffs' Amended Response to Defendants' Statement of Undisputed Material Facts.

[88] Pls.' Am. Resp. to Defs.' Stmt. of Facts 62-63.

[89] *Id.* at 63.

[90] *Id.*

when "editors and reporters are quitting over the unfair contents of articles due to their unfair and conflicted nature."[91]

Fourth, Plaintiffs claim that the Daily News' editorial board included people that were employed by ICC. Plaintiffs support this fact with a citation to Robbins' deposition transcript. Plaintiffs further claim that "Robbins admitted that The Daily News . . . described Senator Donastorg as a 'Rogue Senator . . . ,' " and as "one of the most 'anti-business legislators in recent memory' " despite the fact that Robbins "could not articulate any factual support" for making such assertions.[92] These alleged facts are also supported by citations to Robbins' deposition transcript.

The evidence proffered by Plaintiffs does not constitute clear and convincing evidence that Daily News published this editorial with actual malice. First, Senator Donastorg's belief that the published material was false does not constitute evidence that Daily News knew it was publishing false information at the time this editorial was published. Similarly, the fact that employees of Daily News resigned does not constitute evidence that Daily News knew it was publishing false information about Senator Donastorg. Although the employees may have disagreed with the content of certain pieces, Plaintiffs have introduced no evidence where a former employee of Daily News testified that Daily News deliberately chose to publish false information about Senator Donastorg in this editorial. Third, the fact that a member of Daily News' editorial board elected to publish an editorial piece that was critical of Senator Donastorg does not constitute evidence that Daily News knew it was publishing false information about Senator Donastorg or that Daily News entertained serious doubts about the truth or falsity of the editorial's content but nonetheless published the editorial.

▆▆ Finally, the statements from Robbins' deposition — the description of Senator Donastorg as a "rogue senator" and the characterization that Senator Donastorg was "an example of one of the most anti-business legislators in recent memory" do not constitute clear and convincing evidence of actual malice because they are statements of opinion. "[A] statement on matters of public concern must be provable as

---

[91] Id.

[92] Id. at 64.

false before there can be liability under state defamation law, at least in situations, like the present, where a media defendant is involved."[93] The question of whether one is a rogue senator or whether a senator is one of the most anti-business legislators in recent memory are statements that are not provably false. The classification of 'rogue' invites multiple interpretations: one person's rogue may be another person's hero.[94] The allegation that Senator Donastorg 'represents one of the most anti-business legislators in recent memory' is not provably false because 'recent memory' is an ambiguous frame of reference, as is the classification 'anti-business.' As statements that are not provably false, the phrases relied upon by Plaintiffs do not constitute evidence that the May 28, 1998 editorial was published with actual malice.

Having reviewed the evidence offered by Plaintiffs that relates specifically to the May 28, 1998 editorial, no reasonable jury could conclude that Daily News knew that this editorial contained false statements when it published the editorial, or that Daily News entertained serious doubts as to the truth or falsity of this editorial's contents. Consequently, no reasonable jury could conclude that this editorial was published with actual malice.

### 3. July 15, 1998 article titled "Vitelco disputes PSC study"

This article is not addressed in Plaintiffs' Opposition, nor is it addressed in paragraph 4.B.2. of Plaintiffs' Amended Response to Defendants' Statement of Facts. The article is mentioned once in Paragraph thirty-six of Plaintiffs' Amended Response to Defendants' Statement of Facts, but only to explain that the June 9, 2000 article titled "ICC, Donastorg square off over Vitelco tax breaks" must be viewed in conjunction with several other articles in order for the "gist of the defamation" to be understood.[95] Plaintiffs have introduced no evidence that Daily News knew that the contents of this article were false, or that

---

[93] *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19-20, 110 S. Ct. 2695, 111 L. Ed. 2d 1 (1990).

[94] The parties' filings illustrate the ambiguity of the phrase: Plaintiffs argue that the word carries the negative connotation of belonging to a rogues' gallery, while Daily News points to former Vice-Presidential hopeful Sarah Palin's book *Going Rogue* as an example of how the word 'rogue' can be used to cast someone in a positive light. The legend of Robin Hood also comes to mind as an example where the designation of 'rogue' carries both positive and negative connotations.

[95] Pls.' Am. Resp. to Defs.' Stmt. of Facts 73.

Daily News entertained serious doubts about the article's truth or falsity. Consequently, Plaintiffs have introduced no evidence from which a reasonable jury could conclude that Daily News published tills article with actual malice.

### 4. June 9, 2000 article titled "ICC, Donastorg square off over Vitelco tax breaks"

In their Opposition, Plaintiffs argue that "[t]he articles" discussed in paragraph 4.B.2. of Plaintiffs' Amended Response to Defendants' Statement of Facts — a set of articles of which this article is a member — "falsely painted Senator Donastorg as an 'anti-business' senator who was out to destroy ICC, VITELCO, and the economy of the Virgin Islands."[96] Without identifying this article specifically, Plaintiffs argue that "the defamatory 'sting' of the false facts arose from the false facts; the false facts were about Senator Donastorg; the Daily News knew the facts were false when it published them; and The Daily News was motivated to publish the false facts to protect its parent and sister companies, ICC and Vitelco, and knew that the sting of the piece was defamatory."[97]

Plaintiffs clarify why they believe this article is actionable in their Amended Response to Defendants' Statement of Facts. They argue that "the gist of the defamation" of this article can only be understood if this article is read in conjunction with five other articles: (1) the May 29, 1998 editorial titled "The public's right to know;" (2) the July 15, 1998 article titled "Vitelco disputes PSC study," (3) the August 17, 2000 article titled "Donastorg demands data on Vitelco's IDC compliance;" (4) the September 8, 2000 article titled "Donastorg asks court to make Vitelco open employee records;" and (5) the November 1, 2000 article titled "Donastorg, IDC director wrangle over accusations of abuses." Plaintiffs claim that, when read together, these articles portray Senator Donastorg as "a rogue, anti-business Senator who has a regular practice of making false and unsupported accusations against companies to harm the Virgin Islands for the sole purpose of furthering his political career" and portray "ICC and VITELCO as the victim of Senator Donastorg's unfair, unsupported, and

---

[96] Pls.' Resp. to Defs.' Mot. for Summ. J. and Br. in Supp. 41.
[97] *Id.*

anti-business attacks . . . ."[98] Even if the Court accepts the proposition that, when read together, these articles paint an unflattering picture of Senator Donastorg, Plaintiffs are still obligated to provide evidence that Daily News published the June 9, 2000 article with actual malice. As discussed in section one above, the classifications 'rogue', and 'anti-business' are not provably false, and therefore cannot support a claim for defamation.

In their Amended Response to Defendants' Statement of Facts, Plaintiffs examine the November 1, 2000 article titled "Donastorg, IDC director wrangle over accusations of abuses."[99] Plaintiffs quote portions of the November 1, 2000 article,[100] which states that "Donastorg failed to produce any documentation to back up his accusations and . . . he would not return calls to his office requesting further comment and information."[101] Plaintiffs contrast this language to language in the June 9, 2000 article,[102] which states that "Donastorg's office on Thursday provided The Daily News with a copy of the Vitelco employee list, which his spokesman said was the list Donastorg was operating from."[103] Plaintiffs contend that, by admitting that it received documents from Senator Donastorg's office in the June 9, 2000 article, Daily News lied when it said in the November I, 2000 article that Senator Donastorg failed to produce any documentation to back up his accusations. Plaintiffs would have this Court conclude that this discrepancy indicates that Daily News knowingly made a false statement of fact, and thus acted with actual malice.

Yet Plaintiffs have mischaracterized the June 9, 2000 and November 1, 2000 articles because the articles refer to two separate requests for information. The November 1, 2000 article's comment that "Donastorg failed to produce any documentation to back up his accusations" refers to a request that Senator Donastorg substantiate his allegation that IDC

---

[98] Pls.' Am. Resp. to Defs.' Stmt. of Facts 73.

[99] *Id.* at 76.

[100] *Id.* at 79.

[101] Susanna Henighan, *Donastorg, IDC director wrangle over accusations of abuses*, THE VIRGIN ISLANDS DAILY NEWS, Nov. 1, 2000, at page 5.

[102] Pls.' Am. Resp. to Defs. Stmt. of Material Facts, at 76.

[103] Perry Brothers, *ICC, Donastorg square off over Vitelco tax breaks*, THE VIRGIN ISLANDS DAILY NEWS, June 9, 2000.

Director Frandelle Gerard used her position as director of the IDC to solicit donations for a foundation that she chairs. By contrast, the June 9, 2000 article refers to a document upon which Senator Donastorg relied to support his claims that VITELCO's payroll included people working for other ICC subsidiaries. Because the articles were referring to two different requests, they do not contradict each other,[104] and consequently, do not constitute evidence that Daily News published the June 9, 2000 article with actual malice.

Reviewing the remainder of the articles that Plaintiffs claim are interrelated, the Court finds no factual inconsistencies that would suggest that Daily News had preexisting knowledge of certain facts, but chose to print contradictory facts in the June 9, 2000 article. Plaintiffs have proffered no additional evidence that Daily News knew that the June 9, 2000 article was false or that Daily News entertained serious doubts as to the truth of that article. Consequently, no reasonable jury could conclude that the June 9, 2000 article was published with actual malice.

### 5. August 17, 2000 article titled "Sen. Donastorg demands data on Vitelco's JDC compliance"

Like the July 15, 1998 article titled "Vitelco disputes PSC study" discussed under section three above, this article is not addressed in Plaintiffs' Opposition, nor is it addressed in paragraph 4.B.2. of Plaintiffs' Amended Response to Defendants' Statement of Facts. The article is mentioned once in paragraph thirty-six of Plaintiffs' Amended Response to Defendants' Statement of Facts, but only to explain that the June 9, 2000 article titled "ICC, Donastorg square off over Vitelco tax breaks" must be viewed in conjunction with several other articles in order for the "gist of the defamation" to be understood.[105] Plaintiffs have introduced no evidence that Daily News knew that the contents of this article were false, or that Daily News entertained serious doubts about the article's truth or falsity. Consequently, no reasonable jury could conclude that this article was published with actual malice.

---

[104] The distinction between these requests is further supported by the deposition testimony on page 116 of Davis' deposition transcript and on page 64 of Robbins' deposition transcript, both of which were cited on page 76 of Plaintiffs' Amended Response to Defendants Statement of Facts.

[105] Pls.' Am. Resp. to Defs.' Stmt. of Facts 73.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

*6. September 8, 2000 article titled "Donastorg asks court to make Vitelco open employee records"*

Like the July 15, 1998 article titled "Vitelco disputes PSC study" discussed under section three above and the August 17, 2000 article titled "Donastorg demands data on Vitelco's IDC compliance" discussed under section five above, this article is not addressed in Plaintiffs' Opposition, nor is it addressed in paragraph 4.B.2. of Plaintiffs' Amended Response to Defendants' Statement of Facts. The article is mentioned once in paragraph thirty-six of Plaintiffs' Amended Response to Defendants' Statement of Facts, but only to explain that the June 9, 2000 article titled "ICC, Donastorg square off over Vitelco tax breaks" must be viewed in conjunction with several other articles in order for the "gist of the defamation" to be understood.[106] Plaintiffs have introduced no evidence that Daily News knew that this article's contents were false, or that Daily News entertained serious doubts about the article's truth or falsity. Consequently, no reasonable jury could conclude that this article was published with actual malice.

*7. November 1, 2000 article titled "Donastorg, IDC director wrangle over accusations of abuses"*

This article discusses Senator Donastorg's allegation that IDC Director Frandelle Gerard used her position as director of the IDC to solicit donations for a foundation that she chairs.[107] According to the article, this allegation was made in a letter written by Senator Donastorg to then-Governor Charles W. Turnbull on October 24, 2000.[108] In their Opposition, Plaintiffs state that Daily News "makes the false claim that Donastorg: (1) made false, unsupported allegations against the IDC Director; (2) was asked for but refused to produce documents by The Daily News; and that (3) he was called, but 'refused' to respond to accusations that be had made false and unsupported claims and personal attacks" against the director.[109] Plaintiffs argue that the evidence cited in

---

[106] *Id.*

[107] Susanna Henighan, *Donastorg, IDC director wrangle over accusations of abuses*, THE VIRGIN ISLANDS DAILY NEWS, Nov. 1, 2000, at page 5. .

[108] *Id.*

[109] Pls.' Resp. to Defs. Mot. for Summ. J. and Br. in Supp. 41.

241

paragraph 4.B.2. of Plaintiffs' Amended Response to Defendants' Statement of Facts establishes that Daily News knew that these three statements were false when this article was published.

As discussed under section four above — concerning the June 9, 2000 article titled "ICC, Donastorg square off over Vitelco tax breaks" — Plaintiffs claim that the contents of the June 9, 2000 article contradict this article's statement that Senator Donastorg failed to produce documents to back up his accusations.[110] But as explained above, the request for documents referenced in this article is not the same request for documents discussed in the June 9, 2000 article. Consequently, statements made in the June 9, 2000 article do not constitute evidence that Daily News knowingly published a false statement in the November 1, 2000 article when it stated that "Donastorg failed to produce any documents to back up his accusations" that the IDC director abused her position.

Plaintiffs cite to the deposition testimony of Senator Donastorg to support the proposition that "[i]t was an absolutely false statement that Senator Donastorg did not have documents to back up his allegations."[111] But the in pages cited by Plaintiffs, Senator Donastorg does not identify any documents to back up his accusation that the IDC director abused her position, or testify that he produced those documents to Daily News before this article ran. Consequently, this citation to Senator Donastorg's deposition testimony does not constitute evidence that Daily News knowingly published a false statement in the November 1, 2000 article.

The Court is also not persuaded by Plaintiffs' arguments pertaining to the statement that "Donastorg . . . would not return calls to his office requesting further comment and information." Plaintiffs argue that the author of the article "made no effort to reach Senator Donastorg's office during business hours before the story ran," but instead "left a voice message at 8:00 p.m. — substantially after hours."[112] Plaintiffs also state that Senator Donastorg "requested a clarification of [the representation that he would not return calls or requests for more information] within 72 hours but one never came."[113] Citing to pages 161-68 of Robbins'

---

[110] Pls.' Am. Resp. to Defs.' Stmt. of Facts 23.

[111] *Id.* at 76.

[112] *Id.* at 79.

[113] *Id.*

242

deposition transcript, Plaintiffs claim that "Robbins admitted that the 'chronology' indicated that the paper was working on the story for three days and had been working with the people accused of wrongdoing to get their side of the story for three days before it ran and that Donastorg's office could have been contacted earlier, during regular business hours . . . ."[114] Finally, citing pages 77-112 and 116-19 of Davis' deposition transcript, Plaintiffs claim that "Davis was questioned at length in her deposition . . . why the article was presented in such a slanted way and she was evasive, defensive, and adequately couldn't explain the basis for any of The Daily News' factual misrepresentations."[115] From these citations, Plaintiff would have the Court conclude that the November 1, 2000 article was published with actual malice.

But Plaintiffs' arguments concerning Senator Donastorg's responsiveness to requests for information are as unpersuasive as Plaintiffs' attempt at demonstrating knowledge of falsity with reference to the June 9, 2000 article. First, neither the timing of Daily News' phone call to Senator Donastorg's office nor Senator Donastorg's request that Daily News print a clarification establishes that Senator Donastorg responded to Daily News before the this article was published. Second, Plaintiffs mischaracterize Robbins' deposition testimony. Although Plaintiffs claim that "Robbins admitted that . . . Donastorg's office could have been contacted earlier," Robbins testified to the opposite. Specifically, Robbins testified that Daily News' staff

> did not have their questions ready for Senator Donastorg until the 31st [of October — the day before the article ran], and that they immediately began trying to contact him as soon as they were prepared to properly interview him and to request information about this matter.[116]

Consequently. Plaintiffs' citation to Robbins' deposition transcript does not establish that Daily News knowingly published false information, or entertained serious doubts about the truth of the statements it published.

---

[114] *Id.* at 79-80.

[115] *Id.* at 80.

[116] Pls.' Resp. to Defs.' Mot. for Summ. J. and Br. in Supp. App. Vol. II, Robbins Dep. Tr. 163.

The portions of Davis' deposition testimony cited by Plaintiffs are similarly unsupportive of Plaintiffs' position. Although Plaintiffs' attorney reviewed the November 1, 2000 article with Davis in the cited pages, Davis never testified that Donastorg responded to Daily News' phone calls or provided documents to Daily News before this article was printed. Thus, Davis testimony does not support the conclusion that Daily News knowingly published a false statement by stating that Donastorg did not respond to Daily News' requests for information.

When viewed together, the evidence provided by Plaintiffs does not establish that Daily News knowingly published false statements of fact in the November 1, 2000 article, or that Daily News entertained doubts as to the truth or falsity of the November 1, 2000 article. Plaintiffs have not introduced any information that Senator Donastorg produced documents or responded to Daily News' phone calls, or produced evidence that such material was received by Daily News before it published this article. Accordingly, no reasonable jury could conclude that this article was published with actual malice.

### 8. June 12, 2001 article titled "Legislation reduction on agenda for Rules Committee"

The article begins by observing that "Sen. Adlah Donastorg Jr.'s bill would cut the Senate's membership" and "appropriate $9,975,000 to the Legislature for Fiscal Year 2002, a 25-percent cut from its current $14.4 million appropriation."[117] The article continues by stating that, "[i]ronically, Donastorg voted no on his own bill, while three senators who oppose the bill . . . voted to send it on to the Rules Committee. Donastorg wanted to send his bill directly to the full Senate for a vote when it meets in session on June 25."

Plaintiffs contend that the reference to how Senator Donastorg voted shows that Senator Donastorg is "incompetent or dishonest because he sponsored a bill and then voted against it."[118] Although Daily News later determined that the article was not accurate when it was published due to reliance on sources the Daily News believed to be true when it published

[117] Hal Hatfield, *Legislation reduction on agenda for Rules Committee*, THE VIRGIN ISLANDS DAILY NEWS, June 12, 2001, at page 11.

[118] Pls.' Resp. to Defs.' Mot. for Summ. J. and Br. in Supp. 42.

the article,[119] Daily News argues that "the article can fairly be read as indicating that Senator Donastorg voted against sending the bill to the Rules Committee in order to avoid legislative red tape, thereby forcing an early vote on the measure by the entire Senate."[120]

Plaintiffs would have this Court conclude that Daily News knew this article was defamatory when it was published, and that Daily News intended to publish that defamatory meaning. As evidence, Plaintiffs observe that the story did not attribute a source to its factual representations,[121] that Daily News did not contact Donastorg to verify the accuracy of the article,[122] that the article's author did not reveal his source to Senator Donastorg,[123] and "the hatred Prosser, ICC and The Daily News had for Donastorg."[124]

 However, a reporter's failure to verify facts does not rise to the level of actual malice required by the First Amendment,[125] and "even an extreme departure from professional standards, without more, will not support a finding of actual malice."[126] And since any personal feelings that Prosser, ICC, or Daily News may have harbored with regard to Senator Donastorg have no bearing on whether this article was published with actual malice, Plaintiffs have not provided clear and convincing evidence that Daily News knowingly published a false statement of fact in the June 12, 2001 article, or that Daily News entertained serious doubts about the truth or falsity of that article. Consequently, no reasonable jury could conclude that this article was published with actual malice.

### 9. June 14, 2001 article titled "Setting the record straight"

This article consists entirely of two factual representations, which read as follows:

> Sen. Adlah Donastorg Jr. did not vote against the bill to reduce the

---

[119] Defs.' Mot. for Summ. J. 34.

[120] *Id.* at 33.

[121] Pls.' Am. Resp. to Defs.' Stmt. of Facts 28.

[122] *Id.* at 28-29.

[123] *Id.* at 29.

[124] *Id.*

[125] *McDowell v. Paiewonsky*, 769 F.2d 942, 951 (3d Cir. 1985).

[126] *Tucker v. Fischbein*, 237 F.3d 275, 286 (3d Cir. 2001) (citing *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 665, 109 S. Ct. 2678, 105 L. Ed. 2d 562 (1989)).

size of the Senate from 15 to nine members when it was approved by the Committee on Government Operations, Planning, and Environmental Protection last week. An article Tuesday on Page 11 of The Daily News about the vote was based on information provided by committee staff.

Citing to Senator Donastorg's deposition testimony, Plaintiffs argue that this piece was published with actual malice because the article "was placed so inconspicuously when the false article was prominent and caused [Senator Donastorg] such bad publicity."[127] Senator Donastorg's testimony concerning the placement of this article does not establish that Daily News knew either knew this article was false or entertained serious doubts about its truth. In fact, the parties do not dispute that the first sentence in the article is true: Senator Donastorg did not, in fact, vote against his own bill to reduce the size of the legislature. Senator Donastorg's testimony concerning the placement of this article does not establish that Daily News knew that the contents of this article were false when the article was published, or that Daily News entertained serious doubts about the truth of this article. Consequently, no reasonable jury could conclude that this article was published with actual malice.

*10. February 7, 2002 editorial titled "Insolvent V.I. Senators"*

This editorial is not mentioned in Plaintiffs' Opposition, but is cited as an example of Daily News' allegedly-defamatory conduct in Plaintiffs' Amended Response to Defendants' Statement of Facts.[128] Yet, this article is only mentioned in a subheading for a section titled "Actionable Conduct and Publications,"[129] and Plaintiffs do not attempt to explain why they have categorized this editorial as defamatory or attempt to provide evidence that Daily News published this editorial with knowledge of its falsity or with reckless disregard thereto. Consequently. no reasonable jury could conclude that Daily News published this editorial with actual malice.

---

[127] Pls.' Am. Resp. to Defs.' Stmt. of Facts 29 (citing Donastorg Dep. Tr. 220).
[128] *Id.* at 30-31.
[129] *Id.* at 15.

## 11. April 25, 2003 article titled "Big money title fight rings up big gamble on marketing in the V.I."

This article is the first of eight allegedly-defamatory publications relating to efforts to bring a heavyweight boxing championship fight to St. Thomas. In their Opposition, Plaintiffs claim that these publications first foreshadow that the fight will be a failure entirely of Senator Donastorg's making, but later attribute none of the event's success to Senator Donastorg.[130] Plaintiffs cite generally to paragraph 4.B.6. of their Amended Response to Defendants' Statement of Facts and the evidence referenced therein to substantiate these claims.

This particular article claims that "[t]he Virgin Islands is poised to take a jab at the big money world of professional boxing, and local lawmakers are banking on a knockout show that will bring visitors and high profile exposure to the territory. But like everything with a potential for major payouts, bringing a fight to St. Thomas will have a considerable initial cost."[131] In the article, Senator Donastorg is identified as being "instrumental in working . . . to bring the fight [to St. Thomas]," but the article also reports that "[m]any issues remain to be settled" before the fight can occur.[132] In their Amended Response to Defendants' Statement of Facts, Plaintiffs contend that this series of articles was "designed to: (1) set Donastorg up as the fall guy for the $300,000 if the event failed; (2) exclude him from positive coverage for the event if and when it succeeded; and (3) slam him as being solely responsible for the $300,000 earmark regardless of whether it succeeded."[133]

Although Plaintiffs discuss other articles concerning the boxing match, Plaintiffs do not identify a single statement in this article that they claim was published with actual malice. Because Plaintiffs have not endeavored to explain how this article was published by Daily News with knowledge of its falsity or with reckless disregard thereto, no reasonable jury could conclude that this article was published with actual malice.

---

[130] *See* Pls.' Resp. to Defs.' Mot. for Summ. J. and Br. in Supp. 45-47 (constructing Plaintiffs' theory).

[131] Sean McCoy, *Big money title fight rings up big gamble on marketing in the V.I.*, THE VIRGIN ISLANDS DAILY NEWS, Apr. 25, 2006.

[132] *Id.*

[133] Pls.' Am. Resp. to Defs.' Stmt. of Facts 38.

*12. May 30, 2013 article titled "V.I.-backed boxing event called off, future uncertain"*

Citing to the deposition transcript of Tim McDonald at pages 82 and 111-13, Plaintiffs claim that this article was originally written in a way that "did not have anything to do with Senator Donastorg or the $300,000 appropriation."[134] Plaintiffs claim that "Davis changed the lead in the story about the boxing match and left McDonald's byline on it," and that "Davis inserted a paragraph that emphasized that Donastorg was the senator who 'pushed' for a $300,000 appropriations bill."[135] According to Plaintiffs, McDonald testified that "Davis completely changed the content of the first two paragraphs by adding two new paragraphs."[136] Plaintiffs further allege that "Davis changed other parts of the story:" she allegedly "inserted Senator Donastorg into the story when 'it was [McDonald's] belief that he had nothing to do with the story;' "[137] and that she "changed the story to falsely claim that, 'Donastorg did not return Daily News telephone calls requesting comments about the status of the bout,' because McDonald — the supposed author of the story — never contacted Senator Donastorg and didn't turn in a story with his name in it."[138] Based on these changes, "McDonald testified the new article was offensive and disparaging to Senator Donastorg because it clams he 'pushed' for a $300,000 appropriation for an event that the story claimed 'will not happen as scheduled.' "[139] Plaintiffs claim that the use of the verb 'pushed' "target[s] Senator Donastorg as the only proponent of the boxing match and solely responsible for the $300,000."[140]

Plaintiffs further claim that "[t]he statement that there was 'no TV coverage scheduled despite promises when Donastorg got V.I. to appropriate $300,000' is blatantly misleading because while there was no contract in place, they were simply negotiating over the terms of the

---

[134] *Id.*

[135] *Id.*

[136] *Id.* at 38-39 (citing Pls.' Resp. to Defs.' Mot. for Summ. J. and Br. in Supp. App. Vol. IV, McDonald Dep. Tr. 82).

[137] *Id.* at 39 (citing McDonald Dep. Tr. 86).

[138] *Id.* (citing McDonald Dep. Tr. 114).

[139] *Id.* (citing McDonald Dep. Tr. 118-19).

[140] *Id.* at 91 (citing Pls.' Resp. to Defs.' Mot. for Summ. J. and Br. in Supp. App. Vol. III, Donastorg Dep. Tr. 269).

contract; the fact of TV coverage was not in doubt."[141] Plaintiffs also claim that this article quotes the fight's promoter as saying "its [sic] all up in the air right now," but state that Daily News misquoted the promoter.[142] As authority for that proposition, Plaintiffs cite to page 376 of Senator Donastorg's deposition transcript.[143]

Plaintiffs' arguments do not constitute clear and convincing evidence that Daily News published this article with actual malice. The facts that Davis changed the story's lead and that she inserted a paragraph identifying Senator Donastorg as a proponent of the $300,000 expenditure, alone, do not constitute evidence that Davis made those additions knowing they were false, or while entertaining serious doubts as to their truth or falsity. And while McDonald claimed that Senator Donastorg had nothing to do with the article, Davis may have disagreed; McDonald's opinion on the draft of the article he wrote is not dispositive as to Daily News' frame of mind when it published the article. McDonald's testimony that he never contacted Senator Donastorg does not establish that the sentence alleging that "Donastorg did not return Daily News telephone calls to his office requesting comment about the status of the boxing bent" is false. The fact that McDonald never called Senator Donastorg does not establish that no other member of the Daily News contacted him. Finally, the Daily News' use of the verb "pushed" does not indicate that the Daily News knowingly published a false statement because Senator Donastorg himself testified that he was "the primary sponsor" of the legislation to appropriate money for the boxing match.[144]

Nor is there anything misleading about the portion of the article that reads "No TV coverage scheduled despite promise when Donastorg got V.I. to appropriate $300,000."[145] The article states that "Showtime officials said on Thursday that they will not televise the fight and had no plans to do so," but also explains that the fight's promoter "is talking with several cable networks [including] HBO, ESPN, and a pay-per-view

---

[141] *Id.* at 40 (citing Donastorg Dep. Tr. 265-70).

[142] *Id.* at 41.

[143] *Id.*

[144] Donastorg Dep. Tr. 269: 13-15.

[145] Tim McDonald, *V.I.-backed boxing event called off, future uncertain*, THE VIRGIN IS-LANDS DAILY NEWS, May 30, 2003, at page 3.

station."[146] The Plaintiffs' own argument explains why the article's language cannot be defamatory: Plaintiffs concede that, "while there was no contract in place, they were simply negotiating over the terms of the contract."[147] Consequently, the statement that "No TV coverage [was] scheduled" was factually accurate at the time this article ran, and thus cannot support a finding of actual malice.

Nor have the Plaintiffs persuaded the Court that Daily News knowingly published false information when in quoted the fight's promoter as saying "[i]t's all up in the air right now." The only evidence Plaintiffs provide in support of their position is a citation to a single page of Senator Donastorg's deposition transcript, in which he was asked: "Have you ever had a conversation with Mr. McPherson about whether or not he actually made that statement?"[148] Senator Donastorg responded:

> Yes. In fact, Mr. McPherson was really irate about it and decided to call Mr. Tim McDonald. And what he related to me or conveyed to me after this article is that Tim McDonald told him that the article may have miss — well, mischaracterized his position but — or his statements, and that it was not really him, that it's just that the paper despises Donastorg.[149]

Yet Senator Donastorg did not testify that the language of the quote itself had been altered. And testimony about what the fight's promoter told Tim McDonald does not establish that the fight's promoter did not say "it's all up in the air right now." Since Plaintiffs have not cited to any additional evidence to support their contention that the promoter was misquoted, Plaintiffs have not demonstrated that this language was published with knowledge of its falsity, or with reckless disregard thereto.

When Plaintiffs' arguments and evidence are viewed in the aggregate, no reasonable jury could conclude that Daily News published this article with actual malice.

---

[146] *Id.*

[147] Pls.' Am. Resp. to Defs.' Stmt. of Facts 40.

[148] Donastorg Dep. Tr. 376:9-11.

[149] *Id.* at 376:12-19.

*13. September 27, 2003 article titled "Sugar Ray Leonard to promote V.I. Boxing match for ESPN2's 'Friday night at the Fights' "*

Plaintiffs have not alleged that any specific portion of this article is defamatory. Instead, Plaintiffs compare this article to several other articles to demonstrate that, "when The Daily News ran positive stories about the Boxing Match, Senator Donastorg's name wasn't included."[150] Since Plaintiffs have not presented any evidence that any portion of this article was published with knowledge of its falsity or with reckless disregard thereto, no reasonable jury could conclude that this article was published with actual malice.

*14. October 24, 2003 article titled "No TV contract yet, but ESPN will still visit St. Thomas boxing site"*

Plaintiffs claim that this article "focuses on the uncertainty of the [boxing] event and the fact that Senator Donastorg 'sponsored the amendment' for the appropriation."[151] Plaintiffs invite the Court to contrast this article with an article published by Daily News on November 7, 2003, which is allegedly "a positive article about Sugar Ray Leonard coming to promote the fight" in which Senator Donastorg's name is not mentioned. Plaintiffs claim that this is evidence that, "when The Daily News ran positive stories about the Boxing Match, Senator Donastorg's name wasn't included."[152]

The fact that Senator Donastorg may not have been mentioned in the November 7, 2003 article does not establish that anything written in the October 24, 2003 article was false or that Daily News was aware of that falsity when it published the article. Plaintiffs claim that this article is one of a series of "false news reports that the event was doomed,"[153] but have pointed to no language in this article that they claim to be published with knowledge of falsity or reckless disregard thereto.

Plaintiffs have also made a claim that may relate to this article. Without identifying the article to which they are referring, Plaintiffs claim that "The Daily News . . . falsely reported that there was no ESPN contract in

---

[150] Pls.' Am. Resp. to Defs.' Stmt. of Facts 41.

[151] *Id.*

[152] *Id.*

[153] *Id.* at 42.

251

place and that there would not be a championship fight . . . ."[154] Plaintiffs cite to excerpts from Senator Donastorg's deposition transcript, and to an affidavit of the fight's promoter, Sterling McPherson to support this statement, which, despite being listed in the appendix to Plaintiffs' Opposition, was not attached as an exhibit to Plaintiffs' Opposition. Assuming that this claim refers to the October 24, 2003 article, Senator Donastorg's testimony does not establish that Daily News published the October 24, 2003 article with actual malice. Unlike Plaintiffs' assertion, the headline of this article states that there is "no TV contract yet, but ESPN will visit St. Thomas" to inspect a proposed venue. Nothing in Senator Donastorg's deposition testimony indicates that a television contract had been finalized as of October 24, 2003, or that ESPN did not plan on visiting St. Thomas. Even if Plaintiffs' claim pertained to this article, Plaintiffs have not produced clear and convincing evidence that Daily News knew that the article's tagline was false, but published it anyway.

Plaintiffs have not produced clear and convincing evidence that Daily News published this article knowing that the article was false, or with reckless disregard as to whether it was false. Consequently, no reasonable jury could find that Daily News published this article with actual malice.

### 15. October 29, 2003 editorial titled "Volunteerism is nice, but . . ."

This editorial pertains to an initiative undertaken by the Virgin Islands Police Department to solicit volunteers "to help in jobs ranging from mechanics to keep police cars running to clerical help in the office."[155] The author invites the reader to "look at the Police Department's volunteer initiative from the taxpayers['] viewpoint" because "[t]his is a territory of 108,000 people that cannot provide some of the most basic services for its residents."[156] It criticizes the Legislature for spending tax dollars on music festivals, "a boxing match that may or may not persuade tourists to visit the islands," and luxury vehicles.[157] The author opines

---

[154] *Id.* at 93.

[155] Editorial, *Volunteerism is nice, but . . .*, THE VIRGIN ISLANDS DAILY NEWS, Oct. 29, 2003.

[156] *Id.*

[157] *Id.*

that "taxpayers will be delighted to consider volunteering" when "the Legislature and other agencies get serious about spending tax money."[158]

Although identified as a defamatory publication in Plaintiffs' Amended Response to Defendants' Statement of Facts,[159] Plaintiffs have not identified a statement in this editorial that they allege to be false. Consequently, no reasonable jury could find, by clear and convincing evidence, that Daily News published this editorial with actual malice.

### 16. November 1, 2003 article titled "No ESPN contract yet for V.I. boxing card"

As with the October 24, 2003 article titled "No contract yet, but ESPN will visit St. Thomas boxing site," Plaintiffs invite the Court to contrast this article with an article published by Daily News on November 7, 2003, which is allegedly "a positive article about Sugar Ray Leonard coming to promote the fight" in which Senator Donastorg's name is not mentioned. Plaintiffs claim that this is evidence that, "when The Daily News ran positive stories about the Boxing Match, Senator Donastorg's name wasn't included."[160] Also like the October 24, 2003 article, Plaintiffs' claim that "The Daily News . . . falsely reported that there was no ESPN contract in place and that there would not be a championship fight"[161] might apply to this article.

The fact that Senator Donastorg may not have been mentioned in the November 7, 2003 article does not establish that anything written in the November 1, 2003 article was false. Plaintiffs claim that this article is another in a series of "false news reports that the event was doomed,"[162] but have pointed to no language in this article that they claim to be published with knowledge of falsity or with reckless disregard thereto. To the extent that Plaintiffs' claim that "[t]he Daily News . . . falsely reported that there was no ESPN contract in place and that there would not be a championship fight" was made in reference to this article and not the October 24, 2003 article, Plaintiffs have not provided clear and

---

[158] *Id.*

[159] Pls.' Am. Resp. to Defs.' Stmt. of Facts 6.

[160] *Id.* at 41.

[161] *Id.* at 93.

[162] *Id.* at 42.

convincing evidence that the statement was made with knowledge of its falsity, or with reckless disregard for the truth. Consequently, no reasonable jury could find that this article was published with actual malice.

### 17. November 5, 2003 article titled "ESPN commits to televising V.I.'s 'Rumble in Paradise' "

Although identified as a defamatory publication in Plaintiffs' Amended Response to Defendants' Statement of Facts,[163] Plaintiffs have not presented evidence that this editorial was published with actual malice. Senator Donastorg is mentioned three times in this article, but Plaintiffs have not provided evidence to demonstrate that any of those references was inaccurate. On page 90 of their Amended Response to Defendants' Statement of Facts, Plaintiffs dispute "that the 'professional boxing match' was 'underwritten by an appropriation of $300,000 from the Tourism Revolving Fund.' " Language in this article states that Senator Donastorg "sponsored legislation to appropriate $300,000 from the Tourism Revolving Fund to bring the fight to the territory." However, the language in Plaintiffs' Amended Response to Defendants' Statement of Facts is not a response to the text of this article, but rather represents Plaintiffs' position on one of the facts that Daily News claims is undisputed. Further, Senator Donastorg testified that he was the primary sponsor of the legislation to appropriate the $300,000 for the fight.[164] Plaintiffs have not provided clear and convincing evidence that Daily News published this article knowing that its contents were false, or with a reckless disregard to whether this article's contents were false. Consequently, no reasonable jury could find that this article was published with actual malice.

### 18. December 11, 2003 editorial titled "Boxing and tourism, a TKO: maybe 'Spongebob' can help"

Published after the boxing match mentioned in the preceding articles and editorials, the author of this editorial cautions readers not to be "surprised if the true ratings for last Friday night's boxing match,

---

[163] *Id.* at 6.

[164] Pls.' Resp. to Defs.' Mot. for Summ. J. and Br. in Supp. App. Vol. III, Donastorg Dep. Tr. 269:13-15.

'Rumble in Paradise' fall far, far short of the 'estimated 85 million viewers.' "[165] The author objects "to squandering $300,000 of V.I. taxpayers' money on the event under the guise of promoting tourism" when the author claims that the event "was, in reality, an ego trip for a couple of senators — at taxpayers' expense."[166] The author also states that the statistic that an estimated 85 million people would view the fight is a "false, or wildly inflated statistic[ ] to validate the wasteful spending of $300,000 . . . ."[167]

Plaintiffs claim that this editorial is "another nasty article about the match and Senator Donastorg" that "contained false, defamatory statements about Senator Donastorg, including that Senator Donastorg had taken money from the tourism fund solely for an 'ego trip;' that Senator Donastorg had intentionally used false or inflated statistics to validate the $300,000 appropriation; and that the $300,000 appropriation was wasteful."[168] In support of these allegations, Plaintiffs cite to pages 136-37 of Davis' deposition transcript and pages 202-03 of Robbins' deposition transcript for the proposition that "[n]either Robbins nor Davis had any facts" to support the assertions made in this editorial.

Even if true, the fact that Robbins and Davis had no facts to support the assertions made in this editorial does not constitute clear and convincing evidence that Daily News published this editorial with actual malice. In the pages of Davis' deposition transcript cited by Plaintiffs, Davis testified that "[t]his is an editorial; it appeared on the Opinion page. I don't know who wrote the editorial; I don't know what was in the mind of the editorial writer or what the editorial writer relied upon to produce the editorial."[169] Davis also testified that she was not "going to agree to anything out of an editorial,"[170] and that the editorial "was not a news story, so I cannot comment on it."[171] In the pages of Robbins' deposition

---

[165] Editorial, *Boxing and tourism, a TKO; maybe 'Spongebob' can help*, THE VIRGIN ISLANDS DAILY NEWS, Dec. 11, 2003.

[166] *Id.*

[167] *Id.*

[168] Pls.' Am. Resp. to Defs.' Stmt. of Facts 42.

[169] Pls.' Resp. to Defs.' Mot. for Summ. J. and Br. in Supp. App. Vol. II, Davis Dep. Tr. 136:11-15.

[170] *Id.* at 136:19-20.

[171] *Id.* at 136:24-25.

transcript cited by Plaintiffs, Robbins testified that the editorial "is a statement of opinion presented as an opinion in an article labeled 'Editorial.' It was produced and published by ICC, as a corporate function, outside the scope of responsibilities of myself or anyone else at the Daily News. I have no further information about it."[172]

 One might argue that the publication of an editorial without knowing the factual basis for the opinions contained therein constitutes a reckless disregard for the truth or the falsity of the matters contained in the article. However, "[r]ecklessness is shown by demonstrating that 'the defendant in fact entertained serious doubts as to the truth of the statement or that the defendant had a subject awareness of probable falsity.' "[173] The deposition testimony cited by Plaintiffs only establishes that neither Robbins nor Davis knew the factual basis for the statements made in this editorial. Their testimony does not establish that Daily News entertained serious doubts about the representations made in this editorial, or that it was subjectively aware that the statements in the editorial were probably false.

Nor would such a conclusion be warranted based upon the contents of this editorial. The author of the editorial discloses the factual basis for the editorial's content by referencing viewership statistics from different sources.[174] Furthermore, statements that the $300,000 appropriation was "wasteful" and "an ego trip for a couple of senators" are not provably false, and statements on matters of public concern published by a media defendant that are not provably false are not actionable under state defamation law.[175]

Consequently, Plaintiffs have not presented clear and convincing evidence that Daily News knew that the content of this editorial was false when it was published, or that Daily News entertained serious doubts as

---

[172] Pls.' Resp. to Defs.' Mot. for Summ. J. and Br. in Supp. App. Vol. I, Robbins Dep. Tr. 202: 18-23.

[173] *Kendall v. Daily News Publishing Co.*, 716 F.3d 82, 89 (3d Cir. 2013) (quoting *Schiavone Construction Co. v. Time, Inc.*, 847 F.2d 1069, 1089 (3d Cir. 1988)).

[174] *See* Editorial, *Boxing and tourism, a TKO; maybe 'Spongebob' can help*, THE VIRGIN ISLANDS DAILY NEWS, Dec. 11, 2003 (citing to statistics from the Associated Press and Nielsen Media Research to present viewership statistics for NFL championships and the top ten network television sporting events during a week's time).

[175] *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19, 110 S. Ct. 2695, 111 L. Ed. 2d 1 (1990).

to the truth or falsity of this editorial. Accordingly, no reasonable jury could conclude that this editorial was published with actual malice.

### 19. March 1, 2004 editorial titled "GERS as political fodder"

This editorial expresses an opinion on Senator Donastorg's attempt "to get the GERS to pay 4 percent interest on the money participants withdraw from the system when they leave government employment before retirement."[176] Plaintiffs argue that Daily News "accused Senator Donastorg of using [GERS] to advance his re-election efforts, 'even if it hurts the pensions of thousands of current and future V.I. Government employees.' "[177] Plaintiffs also state that this editorial "falsely reported that Senator Donastorg had 'no support from anyone else in the legislature' and was guilty of 'pre-election politicking.' "[178] Plaintiffs then claim that "[t]he Daily News falsely reported that GERS was under an imminent threat of collapse and implied that Senator Donastorg was responsible for an imminent collapse that in fact never happened."[179] Next, Plaintiffs claim that the editorial "makes a number of false factual assertions that GERS was 'underfunded by $1 billion' and about the way interest calculated [sic] in an effort to put Senator Donastorg in a false, bad light."[180] Finally, Plaintiffs claim that the editorial attributed a quote to the Senator that he did not make.[181] With one exception, the only evidence proffered by Plaintiffs is Senator Donastorg's deposition testimony.

Senator Donastorg's testimony does not establish that Daily News acted with actual malice when it published this editorial. Plaintiffs' claim that the editorial "falsely reported that Senator Donastorg had 'no support from anyone else in the legislature' and was guilty of 'pre-election politicking' " is supported by a citation to testimony concerning an article published on May 29, 1998.[182] The testimony cited by Plaintiffs has

---

[176] Editorial, *GERS as political fodder*, THE VIRGIN ISLANDS DAILY NEWS, Mar. 1, 2004.

[177] Pls.' Am. Resp. to Defs.' Stmt. of Facts 41-42 (internal citations omitted).

[178] *Id.* at 43.

[179] *Id.*

[180] *Id.* at 44.

[181] *Id.*

[182] Pls.' Resp. to Defs.' Mot. for Summ. J. and Br. in Supp. App. Vol. III, Donastorg Dep. Tr. 308-13.

nothing to do with this editorial.[183] Other portions of Senator Donastorg's testimony cited by Plaintiffs relate to this editorial, but only constitute evidence that Senator Donastorg held the belief that the representations made in this editorial were false. Senator Donastorg's opinions do not constitute evidence that Daily News knew that the content of this editorial were false, or that Daily News published this editorial despite entertaining serious concerns about the truth or falsity of the editorial.

The only evidence provided by Plaintiffs outside of Senator Donastorg's testimony comes from the deposition transcripts of Robbins and Davis. Plaintiffs claim that "[n]either Robbins nor Davis could articulate facts that supported the language of the editorial."[184] As discussed above, the fact that neither Davis nor Robbins were aware of the factual bases relied upon by the editorial's author does not constitute evidence that Daily News published this editorial with actual malice because their testimony does not establish Daily News entertained serious doubts about the representations made in this editorial, or that it was subjectively aware that the statements in the editorial were probably false.

 The Supreme Court of the United States instructs that statements implicating matters of public concern published by a media defendant are only actionable if they are provably false.[185] Plaintiffs have provided this Court with no evidence to determine, as the editorial claims, that someone is engaged in 'pre-election politicking,' that conservative estimates concerning the undervaluation of GERS are inaccurate, that Virgin Islands Senators do not have the financial wisdom to properly manage GERS, or that a senator is advancing his reelection efforts even doing so hurts thousands of current and future V.I. government employees.[186] Consequently, the deposition testimony cited to by Plaintiffs does not

---

[183] Plaintiffs also cite to testimony concerning the May 28, 1998 article to support the proposition that "[t]he article misquotes Senator Donastorg in a defamatory way, who never indicated that unless the agency must 'do it my way or I'll get rid of you.' and in fact, this was never one of his 'hallmarks;' " and the proposition that "Senator Donastorg is, himself, a businessman, and he's never been 'anti-business' and he didn't take any actions designed to 'cripple' the Virgin Islands economy." Since these propositions refer to statements that are not a part of the GERS editorial, they are irrelevant to a determination of whether the GERS editorial was published with actual malice.

[184] Pls.' Resp. to Defs.' Stmt. of Facts 43.

[185] *Milkovich v. Loran Journal Co.*, 497 U.S. 1, 19, 110 S. Ct. 2695, 111 L. Ed. 2d 1 (1990).

[186] Editorial, *GERS as political fodder*, THE VIRGIN ISLANDS DAILY NEWS, March 1, 2004.

constitute clear and convincing evidence that Daily News published this editorial knowing that it was false or with reckless disregard for its truth or falsity. No reasonable jury could conclude that this editorial was published with actual malice.

### 20. April 6, 2004 editorial titled "Registering V.I. automobiles"

In Plaintiffs' Opposition, Plaintiffs state that this editorial "falsely claimed Senator Donastorg had 'problems managing his personal finances' . . . and that Senator Donastorg had been 'unable to pass a territorial budget for fiscal year 2004' . . . ."[187] Plaintiffs allege that "Robbins admitted that Senator Donastorg is the senator referenced in the piece and the primary target of the article's attacks and he did not have any factual basis for the accusation that Senator Donastorg has 'problems managing he [sic] personal finances' or that he was responsible for failing to pass the territorial budget."[188] Plaintiffs would have the Court conclude that the statements concerning Senator Donastorg's personal finances and alleged failure to pass a territorial budget are "objectively and provably false facts" that were published "with reckless disregard for the truth and with intent to defame" Senator Donastorg "as a result of actual malice."[189]

Plaintiffs cite to pages 183-85 of Robbins' deposition transcript to support the proposition that "Robbins admitted that Senator Donastorg is the Senator referenced in Exhibit 85 and the primary target of the article's attacks . . . [and that Robbins] could not articulate any factual basis for the accusation that Senator Donastorg has 'problems managing he [sic] personal finances or that he was responsible for failing to pass the territorial budget."[190] Plaintiff's also cite to pages 124-26 of Davis' deposition transcript to support the proposition that "Davis admitted she had no facts to support these assertions."[191]

---

[187] Pls.' Resp. to Defs.' Mot. for Summ. J. and Br. in Supp. 48-49 (quoting Editorial, *Registering V.I. automobiles*, THE VIRGIN ISLANDS DAILY NEWS, Apr. 6, 2004).

[188] *Id.* at 49.

[189] *Id.*

[190] Pls.' Am. Resp. to Defs.' Stmt. of Facts 44 (citing Pls.' Resp. to Defs.' Mot. for Summ. J. and Br. in Supp. App. Vol. I, Robbins Dep. Tr. 183-85).

[191] *Id.* (citing Pls.' Resp. to Defs.' Mot. for Summ. J. and Br. in Supp. App. Vol. II, Davis Dep. Tr. 124-26).

Both Robbins and Davis testified that the content of this editorial was the opinion of the editorial board,[192] and Robbins and Davis each testified that they were not aware of the facts upon which the editorial board relied on forming its opinions. As discussed above, "[r]ecklessness is shown by demonstrating that 'the defendant in fact entertained serious doubts as to the truth of the statement or that the defendant had a subject awareness of probable falsity.' "[193] The deposition testimony cited by Plaintiffs only establishes that neither Robbins nor Davis knew the factual basis for the statements made in this editorial. Their testimony does not establish that Daily News entertained serious doubts about the representations made in this editorial, or that it was subjectively aware that the statements in the editorial were probably false.

Plaintiffs also cite to pages 203-04 of Robbins' deposition transcript to support the proposition that "Robbins . . . admitted that The Daily News knew the foreclosure action was dismissed in April 2002 . . . so the 2002 dismissed foreclosure actions [sic] provides no support for the false fact that Senator Donastorg had problems managing his personal finances." Yet Plaintiffs mischaracterize Robbins' testimony. After being shown "Plaintiffs' Exhibit 172,"[194] Robbins testified that he was "not aware that The Daily News ever became aware of this filing until the proceedings in this case . . . ."[195] Thus, contrary Plaintiffs' assertion, the testimony reflected in pages 203-04 of Robbins' deposition transcript does not establish that Daily News knew that the foreclosure action was dismissed in April 2002. This citation to Robbins' deposition testimony does not constitute evidence that Daily News entertained serious doubts as to the truth or falsity of this editorial's content.

Finally, Plaintiffs cite to page 51 of Davis' deposition transcript to support the proposition that "Davis admitted that The Daily News knew the action had been dismissed over two years prior to the 2004 article." Beginning on page 50, Davis testified that Daily News ran a story on the

---

[192] Robbins Dep. Tr. at 185; Davis Dep. Tr. at 126.

[193] *Kendall v. Daily News Publishing Co.*, 716 F.3d 82, 89 (3d Cir. 2013) (quoting *Schiavone Construction Co. v. Time, Inc.*, 847 F.2d 1069, 1089 (3d Cir. 1988)).

[194] "Plaintiffs Exhibit 172" is a document that purports to memorialize the dismissal of a foreclosure action that was filed against Senator Donastorg in 2002. Robbins Dep. Tr. at 203.

[195] *Id.* at 204.

foreclosure case as soon as it was filed.[196] On the page cited by Plaintiffs, Davis testified that "the reporter asked Senator Donastorg about [the foreclosure action] several times, and said, 'Let me know how this ends.' And Donastorg said, 'I will.' And then he did not. And eventually the filing from the court showed up — or the filing in court."[197] However, nowhere on the page cited by Plaintiffs does Davis testify that the foreclosure action was dismissed in 2002. Thus, Plaintiffs have provided no basis upon which the Court can conclude that Davis had a subjective basis to believe that this editorial 's representation concerning Senator Donastorg's finances was probably false.

The evidence cited by Plaintiffs does not constitute clear and convincing evidence that Daily News knew that this editorial was false, or that Daily News entertained serious doubts as to the truth or falsity of the editorial. Consequently, no reasonable jury could conclude that this editorial was published with actual malice.

### 21. August 22, 2004 editorial titled "Blind eye to cockfighting? Animal cruelty nonetheless!"

Plaintiffs argue that "the gist of this piece is that Senator Donastorg sponsored a bill that 'specifically excludes cockfighting' from the definition of animal cruelty and falsely implies that he was in favor of or promoted cockfighting."[198] Plaintiffs support their interpretation of the editorial by citing to Robbins' deposition testimony, in which Robbins allegedly "admitted that The Daily News has no facts ton [sic] support anything in the article." This citation appears both in Plaintiffs' Opposition[199] and in Plaintiffs' Amended Response to Defendants' Statement of Facts.[200]

Robbins did not make the admission that Plaintiffs attribute to him. As to the editorial, Robbins testified that it was

a statement of opinion. It was produced by ICC. I have no knowledge of the production of the editorial, who did it, or what the decision mak-

---

[196] Davis Dep. Tr. at 50.

[197] *Id.* at 51.

[198] Pls.' Am. Resp. to Defs.' Stmt. of Facts 45.

[199] Pls.' Resp. to Defs.' Mot. for Summ. J. and Br. in Supp. 49.

[200] Pls.' Am. Resp. to Defs.' Stmt. of Facts 70-72.

ing process was. Aside from that, it was an expression of opinion, and was on the Opinion page, separate from the operations of The Daily News and Daily News Publishing Company. It was outside the portfolio of responsibility of anyone employed by the Daily News, and I cannot comment or provide insight on anything to do with it.[201]

From Robbins' testimony — the only piece of evidence offered to support Plaintiffs' claim that this editorial was published with actual malice — a reasonable person could conclude that Daily News knew nothing about the content of the article. This does not constitute evidence that Daily News knew that the editorial was false, or that Daily News entertained doubts as to the truth of this editorial.

Further, Plaintiffs have failed to identify any false information in the editorial. Instead, by arguing that "the *gist* of the piece is that Senator Donastorg . . . was in favor of or supported cockfighting," Plaintiffs argue that this editorial has both defamatory and non-defamatory meanings. Plaintiffs are thus required to introduce clear and convincing evidence from which a reasonable jury could find not only that Daily News knew of the allegedly-defamatory message behind the editorial, but that that Daily News also intended for this editorial to convey that message. Since Plaintiffs have only introduced evidence that Robbins could not "comment or provide insight on anything to do with [the editorial]" no reasonable jury could conclude that Robbins' testimony constitutes clear and convincing evidence that this editorial was published with actual malice.

iv. *The February 6, 2002 article titled "Sen. Donastorg and wife face foreclosure on their Wintberg home" is not actionable.*

 Falsity is a prerequisite for maintaining a defamation claim. Even if one publishes a statement that harms the reputation of another, that person or entity cannot be liable for defamation if the statement is true.[202] Although "[t]he truth or falsity of a statement is generally a question of

---

[201] Pls.' Resp. to Defs.' Mot. for Summ. J. and Br. in Supp. App. Vol. I, Robbins Dep. Tr. 190-91.

[202] RESTATEMENT (SECOND) OF TORTS § 581A. *See also Joseph v. Daily News Publishing Co., Inc.*, 57 V.I. 566, 585-86 n.10 (V.I. 2012) (acknowledging, after applying the three non-dispositive *Banks* factors, that the Supreme Court of the Virgin Islands would continue to follow the principles of defamation law set forth in the Restatement (Second) of Torts).

fact for the jury,"[203] the parties here have agreed that there is no genuine dispute of material fact concerning the content of the article. Plaintiffs have admitted that this article "noted the filing of a Complaint in federal court for debt and foreclosure of mortgage on property owned by Senator and Mrs. Donastorg, a Complaint which demanded judgment for the outstanding amount of the mortgage, plus accrued and outstanding interest."[204] Plaintiffs have also admitted that this article "quoted accurately from Paragraph 7 of the Complaint, which declared a default of the Donastorg's Mortgage,"[205] and that Senator Donastorg was contacted for a comment and replied "that 'it's being taken care of; the bank dropped the ball, I don't understand why it's a major issue.' "[206] Based on these admissions, no reasonable jury could conclude that the content of the February 6, 2002 article is actionable.

Plaintiffs make several claims as to why this article is actionable. First, they argue that "Daily News claimed that Senator Donastorg was going to be 'finding himself looking for a new place to live.' "[207] This is an inaccurate characterization of the article, which opens with the following sentence: "A St. Thomas senator may find himself looking for a new place to live if he cannot pay off the mortgage on his Wintberg home."[208] The sentence is true when read as a whole: mortgage lenders may elect to foreclose on borrowers that do not pay their mortgage.

Plaintiffs also assert that this article is actionable because "Daily News falsely reported or implied that Senator Donastorg could not pay off his mortgage or meet his monthly obligations," that "Daily News selectively ignored a foreclosure action brought against Jeffrey Prosser's friend,"[209] that Daily News never wrote a follow up story about the foreclosure action being dismissed,[210] and that "Davis could not adequately explain

---

[203] *Joseph*, 57 V.I. at 586.

[204] Pls.' Am. Resp. to Defs.' Stmt. of Facts 88.

[205] *Id.*

[206] *Id.* at 88-89.

[207] *Id.* at 30 (quoting Billy Shields, *Sen. Donastorg and wife face foreclosure on their Wintberg home*, THE VIRGIN ISLANDS DAILY NEWS, Feb. 8, 2002).

[208] Billy Shields, *Sen. Donastorg and wife face foreclosure on their Wintberg home*, THE VIRGIN ISLANDS DAILY NEWS, Feb. 8, 2002.

[209] Pls.' Am. Resp. to Defs.' Stmt. of Facts 30.

[210] *Id.* at 30-31.

why an unverified, unsupported to reclosure action against the Senator was even newsworthy."[211]

Plaintiffs' arguments are unavailing. Plaintiffs have not introduced evidence from which a reasonable jury could conclude that Daily News was aware that this article carried both defamatory and nondefamatory meanings, and intended to publish the defamatory meaning. Plaintiffs' statement that "Davis could not adequately explain why . . . [the] foreclosure action against the Senator was even newsworthy" is premised on pages 54 and 55 of Davis' deposition transcript. In those pages, the following exchange takes place:

> Q: So can you tell me again why this unsubstantiated dispute over a bank payment is newsworthy, but the fact that your parent company was trying to dig up dirt on the senator wasn't?
>
> Mr. Rames: Object to form.
>
> A: You're making a lot of presumptions there. I don't know anything about the parent company digging up dirt on Senator Donastorg. At the time of the investigation you seem to be talking about, the parent company of The Daily News was the Gannett Corporation, and as far as I know, they did not dig up dirt on Senator Donastorg.[212]

This testimony has no bearing on Daily News' state of mind when it published the February 6, 2002 article. Similarly, the questions of whether Daily News chose to publish a story concerning a foreclosure filed against Prosser's friend or whether Daily News chose to write a follow-up story about the dismissal of the foreclosure action filed against Senator Donastorg have no bearing on Daily News' state of mind when it published the February 6, 2002 article.

The arguments raised by Plaintiffs are irrelevant in light of the fact that they have not disputed that the factual content of the February 6, 2002 article is true. Consequently, no reasonable jury could determine that the February 6, 2002 article pertaining to the foreclosure lawsuit filed against Senator Donastorg constitutes actionable defamation.

---

[211] *Id.* at 30 (citing Pls.' Resp. to Defs.' Mot. for Summ. J. and Br. in Supp. App. Vol. II, Davis Dep. Tr. 54-55).

[212] Davis Dep. Tr. 54-55.

### c. Redfield is entitled to summary judgment in his favor on Senator Donastorg's defamation claim.

 Plaintiffs' defamation claim against Redfield is premised on seven statements made by Redfield that were either broadcast on a local radio show, published in an ICC press release, published in *The Virgin Islands Daily News*, or published in the *St. Croix Avis*.[213] As discussed above, Senator Donastorg is a public figure for purposes of this Court's defamation analysis. All of the allegedly-defamatory statements made by Redfield implicate matters of public concern, but Plaintiffs have not introduced clear and convincing evidence from which a reasonable jury could conclude that any of Redfield's statements were made with actual malice. Consequently, no reasonable jury could find for Plaintiffs on Senator Donastorg's defamation claim against Redfield.

#### i. All of the allegedly-defamatory statements made by Redfield implicate matters of public concern.

 The question of whether speech addresses a matter of public concern "must be determined by [the expression's] content, form, and context . . . as revealed by the whole record."[214]

#### 1. March 1, 2002 ICC Press Release

This press release implicates matters of public concern because it references a lawsuit that a Virgin Islands senator intended to file against a local utility. The press release also implicates matters of public concern because it contains an opinion about the First Amendment implications of filing lawsuits against newspapers. The boundaries of the First Amendment and lawsuits against local utilities are both matters of public concern.

#### 2. May 11, 2002 article titled "Outright lies"

This article implicates matters of public concern because it discusses a public utility's position on a deal with the Government of the Virgin

---

[213] *See* Pls.' Am. Resp. to Defs.' Stmt. of Facts 31-36 (identifying the factual support underlying Plaintiffs' defamation claim against Redfield).

[214] *Dun & Bradstreet v. Greenmoss Builders*, 472 U.S. 749, 761-62, 105 S. Ct. 2939, 86 L. Ed. 2d 593 (1985) (quoting *Connick v. Myers*, 461 U.S. 138, 147-48, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983)) (internal quotations omitted). *Accord Snyder v. Phelps*, 562 U.S. 443, 453, 131 S. Ct. 1207, 179 L. Ed. 2d 172 (2011) (quoting *Dun & Bradstreet*, 472 U.S. at 761).

Islands, under which the utility would add a surcharge to customers' bills. The article also explains that a Virgin Islands senator is attempting to audit the utility due to questions over whether a surcharge imposed by the utility was given to the government or kept by the utility. The article quotes the senator as saying that "[t]here is evidence that the VI government and the taxpayers have been defrauded," and by doing so, captures the essence of why this article implicates matters of public concern.

### 3. August 1, 2002 article titled "Innovative official fires back at Donastorg"

This article chronicles the response of a public utility to a lawsuit filed against it by a Virgin Islands senator. Given that a spokesperson for the utility claimed that the lawsuit "clearly borders on abuse of legislative power," the article invites discussion concerning the relationship between the Government of the Virgin Islands and its utilities, and thus implicates matters of public concern.

### 4. Comments made by Redfield on a local radio show on October 2, 2002

Plaintiffs have provided a transcript that memorializes comments made by Redfield on a local radio show. These comments implicate matters of public concern because the conversation between the host and Redfield addresses the purpose of a private investigation conducted about a Virgin Islands senator, portions of which had just been released by that senator to the media. At one point in the discussion, the host asks Redfield about the balance between protecting corporate interests and respecting the privacy of public officials. Not only is the use of corporate power to investigate public officials a matter of public concern, a private investigation into a senator's life becomes a matter of public concern when that senator voluntarily discloses portions of the investigation to the media.

### 5. October 2, 2002 article titled "Looking for dirt"

This article implicates matters of public concern because it discusses the ongoing efforts of a Virgin Islands senator to audit a public utility. The article also discusses the utility's response to the senator's efforts, which response included a private investigation of the senator. As with the

266

previous articles, this article invites debate about the relationship between the Government of the Virgin Islands and its utilities, and about the boundaries between corporate power and the private Lives of public officials.

### 6. Oct. 3, 2002 article titled "Senator strikes back"

This article implicates matters of public concern for the same reasons as the articles identified in sections one through three, and five, above.

### 7. October 5, 2002 article titled "Lawsuits fly back-and-forth in controversy over investigation of senator"

This article implicates matters of public concern because it explains how a Virgin Islands senator responded to a private investigation, portions of which were disclosed by that senator to members of the media. The article mentions that Redfield explained that the private investigation of the senator was commissioned "to determine whether there was truth to allegations that [the senator] was attacking ICC in exchange for favors from one of ICC's competitors."[215] The article also explains that revelations concerning the existence of the private investigation prompted the public official to add both Redfield and VITELCO as defendants to a lawsuit that the public official had brought against Daily News.

> ii. *Plaintiffs have not introduced clear and convincing evidence from which a reasonable jury could conclude that any of the allegedly-defamatory statements made by Redfield were made with actual malice.*

### I. March 1, 2002 ICC Press Release

This document purports to be a press release issued by ICC on or about March 1, 2002. The document comments on "a copy of a complaint that Senator Donastorg allegedly intends to file . . . ." The document does not indicate who authored it.

---

[215] Matt Monhoe, *Lawsuits fly back-and-forth in controversy over investigation of senator*, THE VIRGIN ISLANDS DAILY NEWS, Oct. 5, 2002, at page 3.

The document claims that Redfield, "on behalf of ICC" stated the following:

> Is this for real? The suit is almost humorous except for the fact that it attempts to put a gag on the most fundamental rights set forth in the First Amendment to the Constitution which guarantees freedom of press and freedom of speech, as the suit requests the Territorial Court to enjoin the Daily News from writing further stories about Senator Donastorg.
>
> ***
>
> We suspect that all other news media in the Virgin Islands, print or electronic, finds this assault on the press to be offensive, particularly when filed by an elected leader who is duly sworn to uphold the Constitution of the United States. The allegations in the complaint are not only denied, but I am sure that these allegations will not hinder the Daily News from reporting about Senator Donastorg or any other public official as it sees fit. Indeed, it is the people's right to know the facts. For example, it is true that a bank is foreclosing on Senator Donastorg and the suit is still pending. As long as politicians don't pay their bills, while the rest of us do, newspapers will report it.

Plaintiffs' Opposition does not mention this press release at all. Plaintiffs' Amended Response to Defendants' Statement of Facts refers to this press release as an example of the "defamatory and false-light articles" introduced through the deposition of Marty Schladen.[216] It also references the press release in response to Daily News' admission that it published an article about the foreclosure action pending against Senator Donastorg.[217] Yet nowhere in Plaintiffs' Opposition or Amended Response to Defendants' Statement of Facts do Plaintiffs introduce evidence that Redfield made the statements attributed to him in this press release knowing that they were false or while entertaining serious doubts as to their truth or falsity. Consequently no reasonable jury could find that the statements attributed to Redfield in this press release were published with actual malice.

---

[216] Pls.' Am. Resp. to Defs.' Stmt. of Facts 3.
[217] *Id.* at 88.

## 2. May 11, 2002 article titled "Outright lies"

The article attributes several quotations to Redfield. Plaintiffs' Opposition cites generally to their Amended Response to Defendants' Statement of Facts to support their allegations that the statements made by Redfield in this article are defamatory.[218] This article is cited once in Plaintiffs' Amended Response to Defendants' Statement of Facts in support of the proposition that "[i]n several press releases or quotes Redfield made to the *St. Croix Avis*, Redfield made the unsupported accusation that Senator Donastorg was telling, 'outright lies' and that ICC was an innocent victim in the attacks over surcharge issues."[219] Plaintiffs cite to Redfield's deposition testimony at pages 177-85 and at pages 224-30 in support of this proposition. The remaining discussion contained in Plaintiffs' Opposition and Amended Response to Defendant's Statement of Facts pertains to the allegedly-defamatory statements made by Redfield on a local radio show, discussed under section four, below.

The pages of Redfield's deposition transcript cited by Plaintiffs do not establish that Redfield's comments in this article were the product of actual malice. The article quotes a letter from Redfield to the Governor of the Virgin Islands in which Redfield stated that ICC "has been subject to attacks, misrepresentations, and outright lies regarding the role we play . . . ."[220] During his deposition, Redfield was asked: "Well, who were you accusing of having lied about the collection of this surcharge, sir?"[221] Redfield responded that he "was talking figuratively,"[222] but when asked again "Who were you referring to, sir?"[223] Redfield replied "Mr. Donastorg, I guess."[224] Redfield then explained that his statement was premised on his belief that ICC was in compliance with the legislation concerning the surcharge based on statements made to

---

[218] Pls.' Resp. to Defs.' Mot. for Summ. J. and Br. in Supp. 44-45.

[219] Pls.' Am. Resp. to Defs.' Stmt. of Facts 31.

[220] Matt Collingsworth, '*Outright Lies*', ST. CROIX AVIS, May 11, 2002, at page 1.

[221] Pls.' Resp. to Defs.' Mot. for Summ. J. and Br. in Supp. App. Vol. II, Redfield Dep. Tr. at 180: 10-11.

[222] *Id.* at 180:14.

[223] *Id.* at 180:16.

[224] *Id.* at 180:18.

Redfield by other employees of ICC.[225] The later pages of Redfield's deposition transcript cited to by Plaintiffs memorialize a portion of the questioning directed at Redfield concerning three articles, none of them being the May 11, 2002 article at issue.[226] From this testimony, no reasonable jury could conclude that Redfield knew he was making false statements concerning Senator Donastorg's criticisms of ICC's collection of the surcharge, or that Redfield entertained doubts about the truth or falsity of same.

The article later claims that Redfield stated that "ICC can make better use of its time and money than being embroiled in this mean-spirited issue."[227] Although a plain reading of this article demonstrates that the term "mean-spirited" was being used as an adjective to describe the implication that ICC was mishandling surcharges, Redfield testified that the adjective "mean-spirited" referred to "the inferences made regarding [the surcharge issue] . . . by Senator Donastorg."[228] However, Redfield again explained that his use of the adjective "mean-spirited" was due to his belief — based on information he had received — that ICC was in compliance with the laws surrounding the surcharge.[229]

When further questioned as to "what other fact [Redfield relied upon] to substantiate that the motive of Senator Donastorg was not because he was truly concerned about this issue, but because he was simply being meanspirited [sic],"[230] Redfield replied that, in addition to the information provided by ICC personnel, Redfield also relied upon "the actions of the Public Service Commission" and "the IG's report," neither of which "referred to [ICC] trying to keep money and use it for our own purposes."[231] This evidence further suggests that Redfield's statements in the May 11, 2002 article titled "Outright Lies" were not made with knowledge of their falsity, or with reckless disregard of same. To the

---

[225] *Id.* at 180:20-23.

[226] *See id.* at 222-30 (containing Plaintiffs' examination of Redfield concerning an October 2, 2002 article titled "Looking for dirt," an October 4, 2002 article titled "The plot thickens," and an October 5, 2002 article titled "Donastorg-ICC fight unleashes flurry of lawsuits").

[227] Matt Collingsworth, *'Outright Lies'*, St. CROIX AVIS, May 11, 2002, at page 2.

[228] Redfield Dep. Tr. 182:3-183:5.

[229] *Id.* at 183:6-16.

[230] *Id.* at 184:21-24.

[231] *Id.* at 185:11-15.

contrary, the only evidence proffered by Plaintiffs in support of their argument that Redfield's statements in this article were made with actual malice illustrates that Redfield's statements were made based upon information he received from ICC and from other reports, and thus, were made by Redfield with the subjective belief that they were true.

It must also be observed that an accusation that someone is 'mean-spirited' is a statement that is not provably false. Since "a statement on matters of public concern must be provable as false before there can be liability under state defamation law,"[232] Redfield's use of the term 'mean-spirited' cannot support Senator Donastorg's claim for defamation.

When viewed in total, the facts offered by Plaintiffs do not constitute clear and convincing evidence that the statements attributed to Redfield in this article were made with either knowledge of their falsity, or a reckless disregard for same. Accordingly, no reasonable jury could conclude that the statements at issue in this article were made with actual malice.

### 3. August 1, 2002 article titled "Innovative official fires back at Donastorg"

In the article, Redfield is quoted as saying that the lawsuit filed by Senator Donastorg was "mean-spirited and illogical."[233] As with the preceding article, this article is cited once in Plaintiffs' Amended Response to Defendants' Statement of Facts in support of the proposition that, "[i]n several press releases or quotes Redfield made to the *St. Croix Avis*, Redfield made the unsupported accusation that Senator Donastorg was telling, 'outright lies' and that ICC was an innocent victim in the attacks over surcharge issues."[234] Aside from the citation to pages 177-85 and pages 224-30 of Redfield's deposition transcript discussed above, Plaintiffs provide no additional support to substantiate their claim that this article was published with actual malice. For the same reasons discussed in the preceding section, no reasonable jury could conclude that the statements attributed to Redfield in this article were published with actual malice.

---

[232] *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19-20, 110 S. Ct. 2695, 111 L. Ed. 2d 1 (1990).

[233] Valarie Lovett, *Innovative official fires back at Donastorg*, ST. CROIX AVIS, Aug. 1, 2002, at page 1.

[234] Pls.' Am. Resp. to Defs.' Stmt. of Facts 31.

271

### 4. *Comments made by Redfield on a local radio show on October 2, 2002*

After Senator Donastorg disclosed portions of the Sheraw Investigation to the *St. Croix Avis*, the investigation of Senator Donastorg was discussed on a local radio show. Redfield called into that radio show and discussed ICC's position on the investigation of Senator Donastorg. Plaintiffs allege that the comments made by Redfield during his call-in constitute defamation of Senator Donastorg. In paragraph 4.B.5. of Plaintiffs' Amended Response to Defendants' Statement of Facts, Plaintiffs identify several statements made during the course of Redfield's call that Plaintiffs claim are contradicted by Redfield's deposition testimony. Although the phrase "actual malice" appears nowhere in paragraph 4.B.5. the Court finds that the juxtaposition of the statements made by Redfield on air with the statements made by Redfield in his deposition represent Plaintiffs' attempt to prove that Redfield's on-air statements were made with actual malice.

First, citing to pages 196-97 of Redfield's deposition transcript, Plaintiffs state that "Redfield told [the show's host] the investigation occurred in 1998 and that 'the victim in this situation is not Senator Donastorg, its [sic] ICC,' because Senator Donastorg for years has made slanderous statements against Prosser and was also 'questioning and attacking.' "[235] Plaintiffs then claim that "Redfield, in his deposition, could not actually testify to any 'slanderous statements' Senator Donastorg had made against Prosser."[236] However, when asked to identify the slanderous statement to which he was referring, Redfield testified at his deposition as follows: "I have heard then, but I can't recall them. It has to do with, again, some of these issues like over earning and keeping the money and, you know, we're talking about the one dollar was the one that really —."[237] Redfield was then interrupted by Plaintiffs' attorney, who asked: "Well, how does that have anything to do with slandering Mr. Prosser personally?"[238] Redfield responded that "it was referring to the fact that he would allow something like that to go on in

---

[235] *Id.*

[236] *Id.* at 31-32.

[237] Pls.' Resp. to Defs.' Mot. for Summ. J. and Br. in Supp. App. Vol. II, Redfield Dep. Tr. 197:3-6.

[238] *Id.* at 197:7-8.

his company."[239] Plaintiffs' attorney then asked Redfield: "Well, we now know he would, don't we?"[240] And Redfield replied over objection: "I didn't at the time."[241] This exchange between Redfield and Plaintiffs' attorney illustrates that Redfield believed the statements he was making on air were true at the time he made them. Since this citation is the only evidence offered by Plaintiffs to prove that Redfield's on-air comments referring to Donastorg's 'slanderous statements' were made with actual malice, Plaintiffs have not produced clear and convincing evidence that Redfield either knew his statements were false, or entertained serious doubts as to their truth or falsity. To the contrary, the pages of Redfield's deposition transcript cited by Plaintiffs indicate that Redfield honestly believed that what he said on air was true.

Second, citing to pages 200-01 of Redfield's deposition transcript, Plaintiffs state that "Redfield falsely claimed that the investigation related to an 'alleged event that took place, back in — in that time period where it was alleged that [Senator Donastorg] had flown on an AT&T aircraft down to a jazz festival.' "[242] Plaintiffs then argue that "Redfield admits he didn't have any information that Senator Donastorg flew on an AT&T jet to a jazz festival, but he nevertheless stated, 'This is what instituted the investigation.' "[243] Redfield was asked specifically: "What information did you have that this flight, supposed flight to St. Lucia, was in 1998?"[244] He responded: "I didn't have any. The only information I knew was what was represented to me with reference to the motives."[245] This testimony again demonstrates that Redfield's on-air comments were based on information that was represented to him, thus suggesting that Redfield honestly believed what be was saying when he was describing the purpose of the Sheraw Investigation on air. Because these citations are the only evidence offered by Plaintiffs in support of their claim that this statement was made with actual malice, Plaintiffs have not produced clear and convincing evidence from which a reasonable jury could conclude

---

[239] Id. at 197:9-10.

[240] Id. at 197:11.

[241] Id. at 197:14.

[242] Pls.' Am. Resp. to Defs.' Stmt. of Facts 32 (citing Redfield Dep. Tr. 200).

[243] Id. (citing Redfield Dep. Tr. 200-01).

[244] Redfield Dep. Tr. 200:12-13.

[245] Id. at 200:14-16.

that Redfield either knew his statement was false, or entertained serious doubts as to its truth or falsity. Again, the pages of Redfield's deposition transcript cited by Plaintiffs indicate otherwise.

Third, citing to pages 204-05 of Redfield's deposition transcript, Plaintiffs state that "Redfield also falsely claimed that the investigation was justified because Senator Donastorg was 'extremely close' to 'this Georgetown group that was evaluating the company, but he admitted in his deposition that the events he was describing on the radio occurred after the report was completed."[246] Redfield did state that Senator Donastorg's accusations concerning ICC's overearning and alleged ties to the Georgetown Group were events that happened after 1998,[247] but Redfield continued by testifying that "the only motive that [he] was given was the issue of the airplane flight."[248] This testimony indicates that Redfield's statements were based off of conversations that he had with other people concerning the investigation of Senator Donastorg, and that Redfield believed that the statements he was making were true at the time that he made him. Consequently, no reasonable jury could conclude that the testimony cited by Plaintiffs constitutes clear and convincing evidence that Redfield either knew that his statements were false, or that Redfield entertained serious doubts as to the truth or falsity of his statements.

Fourth, citing to pages 206-07, 210, and 211-12 of Redfield's deposition transcript, Plaintiffs claim that "Redfield stated that, '[t]he report was done to basically find out whether there was some relationship that was developing between our competitors and [Senator Donastorg], to the detriment of the company.' "[249] Plaintiffs also claim that "Redfield represented that there was 'absolutely nothing' to any of Senator Donastorg's allegations, and that Senator Donastorg just wanted to 'destroy the livelihoods of over four hundred and some employees, and put in jeopardy a utility [ICC] in the Virgin Islands.' "[250] Plaintiffs then

---

[246] Pls.' Am. Resp. to Defs.' Stmt. of Facts 32 (citing Redfield Dep. Tr. 204-05).

[247] Redfield Dep. Tr. 205:1-7.

[248] *Id.* 205:19-20.

[249] *Id.* (citing Redfield Dep. Tr. 206-07).

[250] *Id.* at 32-33 (quoting Redfield Dep. Tr. 210).

274

claim that "Redfield could not articulate a factual basis to make this representation in his deposition . . . ."[251]

In the cited pages of Redfield's deposition transcript, Redfield testifies that he "did not have any specifics that [he] could refer to," but he qualified that statement by explaining that he "can't recall them . . . [t]his was a long time ago." Redfield also testified, both on the cited pages and the pages surrounding them, that he was relying on "information that was made available to [him] by the telephone company with reference to the determination that was made by the Public Service Commission"[252] and that he "didn't understand [Senator Donastorg's] motivations [for accusing ICC and VITELCO] when these things were proven not to be true."[253] Again, this testimony indicates that Redfield's on-air statements were the product of information that he had received prior to appearing on the radio show and of the beliefs he held at the time that the statements were made.

Plaintiffs' assertion that Redfield stated "that Senator Donastorg just wanted to destroy the livelihoods of over four hundred and some employees and put in jeopardy a utility [ICC] in the Virgin Islands" mischaracterizes Redfield's on-air statement. The statement pertaining to the "livelihoods of over 400 and some off employees" was phrased as a rhetorical question by Redfield as a means of explaining that he did not understand why Senator Donastorg leveled accusations against ICC. The relevant portion of the transcript from Redfield's on-air statement reads as follows: "Why would somebody want to destroy the livelihoods of over 400 and some off employees and put in jeopardy a utility in the Virgin Islands claiming it's either over earning, stealing money from the public or whatever?"[254] Following this statement, Redfield claimed that ICC has been "proven absolutely innocent" with regard to allegations that it was pocketing the surcharges it had imposed on its customers. Consequently, no reasonable jury could conclude that the pages cited by Plaintiffs constitute clear and convincing evidence that Redfield made his on-air statements with knowledge of their falsity, or that Redfield entertained serious doubts as to the truth or falsity of the statements he made.

---

[251] *Id.* at 33 (quoting Redfield Dep. Tr. 211-12).

[252] Redfield Dep. Tr. 208:16-20.

[253] *Id.* at 211:4-5.

[254] Pls.' Am. Resp. to Defs.' Stmt. of Facts App. Vol. VII, Ex. 16, page 5.

Fifth, citing to pages 213-14 of Redfield's deposition testimony, Plaintiffs claim that "Redfield represented on the radio that Senator Donastorg was leveling charges either to benefit ICC competitors or because he was simply mean-spirited."[255] In the following sentence, Plaintiffs state that "Redfield admitted he had no facts that Senator Donastorg was in bed with ICC's competitors."[256] Yet in the pages of Redfield's deposition testimony cited by Plaintiffs, Redfield testified that "[t]he only motive [he knew of] for the investigation was the issue of the possibility that [Senator Donastorg] flew on an airplane from AT&T."[257] Yet again, the pages cited by Plaintiff constitute evidence that Redfield's statements were premised on what he had been told by others at ICC. Consequently, no reasonable jury could conclude that the cited pages constitute clear and convincing evidence that Redfield made his on-air statements with knowledge of their falsity, or that Redfield entertained serious doubts as to the truth or falsity of the statements he made.

Sixth, citing to pages 215-19 of Redfield's deposition testimony, Plaintiffs claim that "Redfield said on the radio that, Senator Donastorg was a 'mean-spirited individual who was trying to destroy a company,' to 'seek votes or to gain sympathy from the public,' but admitted he didn't have any facts to support this statement either."[258] As discussed in the preceding paragraphs, Redfield testified in these pages that his on-air statements were premised on information that he received from ICC and VITELCO.

Seventh, citing to pages 119-26 of Redfield's deposition testimony, Plaintiffs claim that "Redfield falsely told the public that the purpose of the investigation was to look for an AT&T connection with Senator Donastorg and that it was 'professionally done'; but in his deposition Redfield claimed that he didn't actually know why they conducted the investigation or who even conducted it."[259] However, Redfield testified that he assumed that the report was done by a professional.[260] This assumption indicates that Redfield honestly believed that the report was

---

[255] Id.

[256] Id.

[257] Redfield Dep. Tr. 214:12-14.

[258] Pls.' Am. Resp. to Defs.' Stml. of Facts 33 (quoting Redfield Dep. Tr. 215-19).

[259] Id. (quoting Redfield Dep. Tr. 119-26).

[260] Redfield Dep. Tr. 122:24-25.

done by a professional, and that Redfield did not entertain serious doubts as to whether or not the report was done by a professional.

Plaintiffs also claim that "Redfield . . . admitted no facts were disclosed to him that revealed any connection between Senator Donastorg and AT&T,"[261] that "Redfield finally admitted he did nothing to verify any connection between Senator Donastorg and AT&T or the plane trip and he was not aware of any facts to support the allegation,"[262] and that "Redfield admitted that he went on the air with the allegation without a 'shred of evidence' to support that statement."[263] But, as explained in the preceding paragraphs, Plaintiffs' characterization of Redfield's testimony is contradicted by Redfield's actual testimony. A showing of actual malice requires that Plaintiffs produce clear and convincing evidence that Redfield either knew his on-air statements were false when he made them, or that Redfield entertained serious doubts as to the truth or falsity of those statements. Redfield's deposition testimony only constitutes evidence that Redfield's statements were based upon information he had received through his employer and on opinions that Redfield held as a result of previous audits of ICC and VITELCO. Consequently, no reasonable jury could conclude that Redfield's on-air statements were made with actual malice.

### 5. October 2, 2002 article titled "Looking for dirt" [264]

According to this article, Redfield characterized Senator Donastorg's "repeated public attacks on ICC" as "slanderous, unfounded, relentless and mean spirited."[265] Like the articles discussed in sections two and three above, Plaintiffs only cite to pages 177-85 and pages 224-30 of Redfield's deposition transcript as evidence that the statements attributed to Redfield in this article were made with actual malice. Unlike the articles examined in sections two and three above, this article is mentioned in the cited pages of Redfield's deposition transcript. Specifically, Redfield was asked to identify the "ongoing attacks and

---

[261] Pls.' Am. Resp. to Defs.' Stmt. of Facts 34.

[262] Id.

[263] Id. (quoting Redfield Dep. Tr. 143-44).

[264] The copy of this article provided to the Court is difficult to read. Page one is illegible, and only portions of page two can be read.

[265] Valarie Lovett, Looking for dirt, ST. CROIX AVIS, Oct. 2, 2002, at page 2.

slanderous statements and unfounded, relentless, meanspirited [sic] behavior by Senator Donastorg that indicated he was seeking to curry favor from a competitor."[266] Redfield testified in response that he could not recall, but "there were constant discussions with him on the floor of the Senate and this and that regarding the company."[267] Earlier in his deposition, as discussed under section two above, Redfield explained that his characterizations of Senator Donastorg's attempts to investigate ICC were the result of assurances Redfield had received that ICC was in compliance with any applicable laws and regulations pertaining to the surcharge. Redfield's justification for his opinions on Senator Donastorg's motives does not establish that Redfield's characterization of Senator Donastorg's investigation of ICC was made with knowledge of its falsity, or with reckless disregard for same. Consequently, no reasonable jury could find that the statements attributed to Redfield in this article were made with actual malice.

### 6. Oct. 3, 2002 titled "Senator Strikes Back"

Similar to the article discussed in section five above, this article quotes Redfield as saying that Senator Donastorg's "repeated public attacks . . . toward ICC . . . [are] slanderous, unfounded, relentless and mean-spirited."[268] And as with the statements discussed in sections one through three, and five, above, the only evidence cited by Plaintiffs to demonstrate Redfield's statements were made with actual malice are pages 177-85 and 224-30 of Redfield's deposition transcript. For the reasons set forth in those sections, Plaintiffs have not demonstrated with clear and convincing evidence that the statements attributed to Redfield in this article were made with actual malice.

### 7. October 5, 2002 article titled "Donastorg-ICC fight unleashes flurry of lawsuits"

This article is not specifically cited in either Plaintiffs' Opposition or Plaintiffs' Amended Response to Defendants' Statement of Facts. The article quotes statements made by Redfield on a local radio show — the

---

[266] Pls.' Resp. to Defs.' Mot. for Summ. J. and Br. in Supp. App. Vol. 11, Redfield Dep. Tr. 225:2-5.

[267] *Id.* at 225:11-14.

[268] Valarie Lovett, *Senator strikes back*, ST. CROIX AVIS, Oct. 3, 2002, at page 2.

same statements discussed under section four, above. Since Plaintiffs have not provided clear and convincing evidence that Redfield made his on-air statements with actual malice, Daily News' republication of those same statements does not expose Redfield to additional liability.

## II. INTERFERENCE WITH BUSINESS RELATIONSHIPS

In paragraph 28 of their Complaint, Plaintiffs allege that "[t]he [Defendants'] actions constitute a concerted effort to harass and discredit Plaintiffs and to interfere with their business relationships."[269] The Court has identified several cases in the Territory where the tort of interference with "business relationships" has been alleged,[270] but none of those cases define the elements of that cause of action in detail. Plaintiffs' Opposition does not assist the Court in determining exactly what claim Plaintiffs are attempting to allege, as Plaintiffs' Opposition claims that "courts interpreting Virgin Islands law have consistently relied on RESTATEMENT [(SECOND) OF TORTS] § 766 *et seq.* to supply the rule of decision in the past in tortious interferences cases."[271] Yet "§ 766 *et seq.*" sets forth several theories of liability.[272] Regardless of the theory applied, Plaintiffs have not demonstrated genuine issues of material fact to justify submitting their second cause of action to a jury.

### a. Applicable law

It is helpful to adopt consistent terminology at the outset of this analysis. A cause of action that protects business relationships or contracts that are reasonably certain to occur, but that may not have been reduced to writing, enjoys no less than twenty-four similar, yet distinct titles

---

[269] Fourth Am. Compl. ¶ 28.

[270] *Pemberton Sales & Service, Inc. v. Banco Popular de Puerto Rico*, 877 F. Supp. 961 (D.V.I. 1994); *Fountain Valley Corp. v. Wells*, 98 F.R.D. 679, 19 V.I. 607 (D.V.I. 1983); *Wells v. Rockefeller*, 97 F.R.D. 42, 19 V.I. 481 (D.V.I. 1983); *Storage on Site, LLC v. Slodden*, 57 V.I. 94 (V.I. Super. Ct. 2012).

[271] Pls.' Resp. to Defs'. Mot. for Summ. J. and Br. in Supp. 60.

[272] *See, e.g.*, RESTATEMENT (SECOND) OF TORTS § 766A (describing the principles for a cause of action based on the intentional interference with existing contractual relations); *id.* § 766B (describing same for a cause of action based on the intentional interference with prospective business relations).

across fifty-four jurisdictions.[273] The most common title given to such a tort is "intentional interference with prospective business relations," which is the term that the Court will adopt for the purpose of its analysis.

It is also necessary to detail the interrelationship between three closely-related, but distinct theories of liability. While the law of contracts prescribes the rights, obligations, and remedies for parties to a contract, a cause of action that protects parties to an existing contract from interference by a third party is generally referred to as a claim for intentional interference with existing contractual relations. Since parties to a contract expect to derive some benefit from their contract, courts generally consider a claim for intentional interference with existing contractual relations to be an example of a broader cause of action for intentional interference with prospective business relations.[274] This second cause of action protects an anticipated economic advantage in one's business dealings from the interference of others. However, both of these torts are examples of an even broader cause of action for intentional interference with prospective economic advantage.[275] This third cause of action protects economic expectations that arise outside the scope of business — one's ability to receive an inheritance, for example.[276]

---

[273] *See, e.g., Dube v. Likens*, 216 Ariz. 406, 167 P.3d 93, 98 (2007) (identifying such a tort as a claim for "tortious interference"); *Soderlund Bros, Inc. v. Carrier Corp.*, 278 Ill. App. 3d 606, 663 N.E.2d 1, 7-8, 215 Ill. Dec. 251 (1995) (titling the tort "interference with prospective business advantage"); *Gieseke ex rel. Diversified Water Diversion, Inc. v. IDCA, Inc.*, 844 N.W.2d 210, 215 (Minn. 2015) (acknowledging the tort as "interference with a prospective economic advantage"); *M & M Rental Tools, Inc. v. Milchem, Inc.*, 1980-NMCA-072, ¶ 20, 94 N.M. 449, 453, 612 P.2d 241, 245 (acknowledging the tort as "prospective contract interference").

[274] *E.g., Oaksmith v. Brusich*, 774 P.2d 191, 198 (Alaska 1989); *Gifford v. Sun Data, Inc.*, 165 Vt. 611, 686 A.2d 472, 474 (1996).

[275] *Oaksmith*, 774 P.2d at 198. *See also Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 131 Cal. Rptr. 2d 29, 63 P.3d 937, 953 (2003) (observing that the tort of interference with a prospective economic advantage is "considerably more inclusive" than actions in contract or interference with contract).

[276] *See, e.g., Allen v. Hall*, 328 Ore. 276, 974 P.2d 199, 202-03 (1999) (en banc) (concluding that inheritance is an interest that "fits by logical extension within the concept underlying the tort of intentional interference with prospective economic advantage," despite the fact that such a tort has generally been used to protect commercial interests).

Because Plaintiffs' Complaint alleges an interference with "business relationships,"[277] this Court need not consider the broadest of the three torts discussed in the preceding paragraph. But while some jurisdictions distinguish between a cause of action for intentional interference with existing contractual relations and a cause of action for intentional interference with prospective business relations, other jurisdictions treat them as the same cause of action.[278] Before the Court can define the parameters of the tort at issue, the Court must first determine how it will treat causes of action that protect the expectancies of one's business dealings.

*i. This jurisdiction recognizes a distinction between claims for intentional interference with existing contractual relations and intentional interference with prospective business relations.*

■ Although similar, each cause of action shelters a different legally-protected interest and is justified by a different policy. Causes of action for intentional interference with existing contractual relations protect the right of contracting parties to receive the benefit of their bargain without improper interference from a third party,[279] and support the policy that parties should be encouraged to contract freely without fear of improper interference from third parties.[280] In contrast, a cause of action for intentional interference with prospective business relations protects an individual's right to develop networks and relationships and generally conduct business without fear that their efforts will be

---

[277] Fourth Am. Compl. ¶ 28.

[278] *See, e.g., Dube*, 167 P.3d at 98 (explaining that a plaintiff who wishes to assert a claim for tortious interference must allege the existence of a valid contractual or business relationship); *Calbom v. Knudtzon*, 65 Wn.2d 157, 162-63, 396 P.2d 148 (1964) (clarifying that "[t]he basic elements going into a prima facie establishment of the tort are (1) the existence of a valid contractual relationship or business expectancy . . .").

[279] *See generally* RESTATEMENT (SECOND) OF TORTS § 766 cmt. c (summarizing the historical development of the tort of intentional interference with contractual relations, and observing that the tort is "but one instance . . . of protection against improper interference in business relations"). Some courts have characterized interference with an existing contractual relationship as an interference with property rights. *E.g., Lien v. Northwestern Engineering Co.*, 73 S.D. 84, 39 N.W.2d 483, 486 (1949).

[280] *See Watson's Carpet and Floor Coverings, Inc. v. McCormick*, 247 S.W.3d 169, 174 (Tenn. Ct. App. 2007) (explaining that an action for interference with existing contractual relations "is based on society's need for stability in contractual relations").

unlawfully undermined by competitors.[281] The latter tort promotes the policy that, while competition should be open and robust, some activities cross the line that divides lawful competition from unlawful activity. The law should incentivize the former, and penalize the latter.

 One might argue that the distinction between these two theories is unnecessary because all circumstances under which a plaintiff could state a cause of action for intentional interference with existing contractual relations could also justify a claim for intentional interference with prospective business relations. Some courts recognize this overlap. However, this criticism ignores the fact that each tort protects a unique interest. Consequently, this Court recognizes two separate torts: the tort of intentional interference with existing contractual relations, and the tort of intentional interference with prospective business relations.

### ii. *This jurisdiction recognizes a cause of action for intentional interference with existing contractual relations.*

Since at least 1621, courts have recognized that certain forms of interference with another's business constitute tortious conduct,[282] and courts in every jurisdiction in the United States recognize that certain interference with the contractual relations of others constitutes actionable conduct. Because the Supreme Court of the Virgin Islands has not yet defined this cause of action, this Court must determine the soundest rule of law for the Virgin Islands.[283]

---

[281] *See, e.g., Hawaii Medical Association v. Hawaii Medical Service Association, Inc.*, 113 Haw. 77, 148 P.3d 1179, 1217 (2006) (explaining that the purpose of this tort *"is the protection of legitimate and identifiable business expectancies"* by "[w]eighing against social and individual interests in protection of business expectancies and efforts to acquire property . . . the interests in legitimate business competition") (emphasis in original).

[282] *See generally Tortious Interference with Conduct of a Business*, 56 YALE L.J. 885, 885 (1947) (citing *Garret v. Taylor*, Cro. Jack 567, 79 Eng. Rep. 485 (K.B. 1621); *Gregory v. Duke of Brunswick*, 6 Man. & G. 205, 134 Eng. Rep. 866 (C.P. 1843); *Tarleton v. McGawley*, Peake N.P. 270, 170 Eng. Rep. 153 (K.B. 1793); and *Keeble v. Hickeringill*, 11 Mod. 130, 88 Eng. Rep. 945 (K.B. 1707)) (discussing the origins of tortious interference claims).

[283] *See Malloy v. Reyes*, 61 V.I. 163, 176 (V.I. 2014) (observing that, "when the Superior Court confronts an issue of common law that this Court has yet to address . . . it must conduct a three-factor Banks analysis"); *Government of the Virgin Islands v. Connor*, 60 V.I. 597, 600 (V.I. 2014) (holding that, pursuant to *Banks v. International Rental and Leasing Corp.*, 55 V.I. 967 (V.I. 2011), the Superior Court must consider the approaches taken by other courts in the Virgin Islands, the approaches taken by a majority of other jurisdictions — along with any

### 1. Approaches taken by other courts in this jurisdiction

Courts in the Virgin Islands have acknowledged two situations where a cause of action will lie for intentional interference with existing contractual relations. For claims that a defendant caused a third party to breach an existing contractual relation with the plaintiff, both the Superior Court of the Virgin Islands and the District Court of the Virgin Islands have relied on the principles of law summarized in the RESTATEMENT (SECOND) OF TORTS, Section 766 to determine when the interfering party may be held liable.[284] Courts in the Virgin Islands have not developed any competing approaches to Section 766's standard, under which a plaintiff must prove that: "[1] there was an existing contract, [2] that the alleged tortfeasor knew of the existing contract, [3] that the alleged tortfeasor's actions were the proximate cause of the third person's failure to perform, and [4] that the tortfeasor's actions were intentional, improper, and caused damages."[285] To determine if the alleged interference was improper under this standard, courts have considered the factors listed in the RESTATEMENT (SECOND) OF TORTS SECTION 767.[286]

When a defendant has allegedly interfered with the plaintiff's performance of the plaintiff's contractual obligations to a third party, the United States Court of Appeals for the Third Circuit has opined that the principles of law summarized in Section 766A represent the law of Virgin Islands.[287] Under this standard, a plaintiff must prove that there was an existing contract, that the alleged tortfeasor knew of that contract, that the defendant's actions proximately caused the plaintiff to either breach the contract or perform the contract under substantially more expensive or

---

competing approaches — and most importantly, the soundest rule for the Virgin Islands, when the Superior Court considers a question of common law not foreclosed by binding authority).

[284] *E.g.*, *Board of Directors of Sapphire Bay Condominiums West v. Simpson*, Civil No. 04-62, 2014 U.S. Dist. LEXIS 112570, *37 (D.V.I. Aug. 13, 2014); *Sorber v. Glacial Energy VI, LLC*, ST-2010-CV-588, 2013 V.I. LEXIS 69, *14 (V.I. Super. Ct. Nov. 22, 2013).

[285] *Government Guarantee Fund of Republic of Finland v. Hyatt Corp.*, 955 F. Supp. 441, 452, 35 V.I. 356 (D.V.I. 1997) (citing RESTATEMENT (SECOND) OF TORTS § 766).

[286] *See id.* (listing factors such as "the nature of the actor's conduct . . . the actor's motive . . . the interests of the other with which the actor's conduct interferes . . . the interests sought to be advanced by the actor . . . the societal interests in protecting the freedom of action of the actor . . . the contractual interests of the other, and . . . the relations between the parties").

[287] *Barefoot Architect, Inc. v. Bunge*, 632 F.3d 822, 833-34, 54 V.I. 948 (3rd Cir. 2011).

burdensome conditions than the plaintiff had originally bargained for, and that the plaintiff suffered damages as a result.[288]

## 2. Approaches taken by other jurisdictions

Every jurisdiction in the United States recognizes a cause of action for intentional interference with existing contractual relations. To prevail on such a claim, thirty-four jurisdictions explicitly require that a plaintiff prove the existence of a contract.[289] The remaining jurisdictions either imply that a plaintiff must prove the existence of a contract,[290] or, similar to courts in Nebraska, require that a plaintiff prove "the existence of a valid business relationship or expectancy" — a requirement that encapsulates an existing contractual agreement.[291] At least thirty-one jurisdictions require the plaintiff prove that the defendant had know ledge of the contract at issue.[292] Jurisdictions that do not explicitly state that the defendant's knowledge of the contract is an element of the plaintiff's case require the plaintiff to prove that the defendant's conduct was

---

[288] *See id.* (explaining that action rendering a third-party's performance more burdensome, expensive, or impossible is not actionable, but that action rendering a plaintiff's performance more burdensome, expensive, or impossible is actionable pursuant to Section 766A).

[289] *E.g., Paul v. Howard University*, 754 A.2d 297, 308-09 (D.C. 2009); *Levee v. Beeching*, 729 N.E.2d 215, 222 (Ind. Ct. App. 2000); *Brass Metal Products, Inc. v. E-J Enterprises, Inc.*, 189 Md. App. 310, 984 A.2d 361, 383 (2009); *Community Title Co. v. Roosevelt Federal Savings and Loan Association*, 796 S.W.2d 369, 372 (Mo. 1990) (en banc); *Snyder v. Sony Music Entertainment, Inc.*, 252 A.D.2d 294, 684 N.Y.S.2d 235, 238 (1999); *Hill v. Heritage Resources, Inc.*, 964 S.W.2d 89, 123 (Tex. Ct. App. 1997).

[290] *See, e.g., Nesler v. Fisher & Co.*, 452 N.W.2d 191, 194 (Iowa 1990) (requiring a plaintiff to plead that the defendant had improperly interfered with the performance of a contract); *Bolz v. Myers*, 200 Mont. 286, 651 P.2d 606, 611 (1982) (citing *Bermil Corp. v. Sawyer*, 353 So. 2d 579, 585 (Fla. Dist. Ct. App. 1977)) (stating that, "[i]n order to establish a prima facie case of interference with contractual or business relations, it must be shown that the acts were intentional and willful, (2) were calculated to cause damage to the plaintiff in his or her business, (3) were done with the unlawful purpose of causing damage or loss, without any right or justifiable cause on the part of the actor, and (4) that actual damages and loss resulted").

[291] *See Midwest, Inc. v. Lund Co.*, 284 Neb. 777, 826 N.W.2d 225, 229 (2012) (analyzing an alleged inducement to breach an existing lease agreement as a claim for "interference with a business relationship").

[292] *E.g., White Sands Group, L.L.C. v. PRS II, LLC*, 32 So. 3d 5, 14 (Ala. 2009); *Beard Research, Inc. v. Kates*, 8 A.3d 573, 605 (Del. Ch. 2010); *Cohen v. Battaglia*, 296 Kan. 542, 293 P.3d 752, 755 (2013); *Royal Realty Co. v. Levin*, 244 Minn. 288, 69 N.W.2d 667, 671 (1955); *Sunridge Builders, Inc. v. Olde Blue, LLC*, Nos. 56338, 57316, 2013 WL485831, at *1 (Nev. Feb. 6, 2013); *Belliveau Building Corp. v. O'Coin*, 763 A.2d 622, 627 (R.I. 2000).

intentional.[293] Twenty-nine jurisdictions explicitly require a plaintiff to plead that the contract at issue was breached or tenninated,[294] while other jurisdictions only require a showing that the defendant interfered with the contract.[295] Across all jurisdictions, a plaintiff must prove that the defendant's interference damaged the plaintiff.

In order to be actionable, over forty jurisdictions require that a defendant's interference be something more than intentional. In defining the behavior that constitutes actionable inference, jurisdictions have variously required that interference be "improper,"[296] "unprivileged"[297] or "unjustified."[298] There is no clear majority position as to how improper, unprivileged, or unjustified interference is defined. Some jurisdictions look to the factors listed in Section 767 of the Restatement (Second) of Torts,[299] while others evaluate the facts of each case.[300] Although only arising in the context of a claim for intentional interference

---

[293] *See, e.g., Allen v. Hall*, 328 Ore. 276, 974 P.2d 199, 202 (1999) (en banc) (requiring a plaintiff to plead both the existence of a professional or business relationship, "which could include . . . a contract," and an "intentional interference with that relationship").

[294] *E.g., Stewart Title Guarantee Co. v. American Abstract & Title Co.*, 363 Ark. 530, 215 S.W.3d 596, 601 (2005); *Smith v. Ocean State Bank*, 335 So.2d 641, 643 (Fla. Dist. Ct. App. 1976); *Galinski v. Kessler*, 134 Ill. App. 3d 602, 480 N.E.2d 1176, 1182, 89 Ill. Dec. 433 (1985); *Duggin v. Adams*, 234 Va. 221, 360 S.E.2d 832, 835, 4 Va. Law Rep. 820 (1987).

[295] *E.g., Downes-Patterson Corp. v. First National Supermarkets, Inc.*, 64 Conn. App. 417, 780 A.2d 967, 976 (2001); *Shaw v. Southern Aroostook Community School District*, 683 A.2d 502, 503 (Me. 1996) (citing *Barnes v. Zappia*, 658 A.2d 1086, 1090 (Me. 1995)); *Bolz v. Myers*, 200 Mont. 286, 651 P.2d 606, 611 (1982) (citing *Bermil Corp. v. Sawyer*, 353 So. 2d 579, 585 (Fla. Dist. Ct. App. 1977)).

[296] *E.g., ASC Construction Equipment, USA, Inc. v. City Commercial Real Estate, Inc.*, 303 Ga. App. 309, 693 S.E.2d 559, 563 (2010) (requiring the plaintiff to show that the defendant "acted improperly" in a claim for "tortious interference with contracts and business relationships"); *Nesler v. Fisher & Co.*, 452 N.W.2d 191, 194 (Iowa 1990) (requiring interference to be intentional and improper); *Allen*, 974 P.2d at 202 (requiring that the defendant interfere by improper means or for an improper purpose).

[297] *E.g., Cohen*, 293 P.3d at 755; *Snyder v. Sony Music Entertainment, Inc.*, 252 A.D.2d 294, 684 N.Y.S.2d 235, 238 (1999); *Thompson Coal Co. v. Pike Coal Co.*, 488 Pa. 198, 412 A.2d 466, 471 (1979).

[298] *E.g., Galinski*, 480 N.E.2d at 1182; *Recio v. Evers*, 278 Neb. 405, 771 N.W.2d 121, 131 (2009).

[299] *E.g., Amoco Oil v. Ervin*, 908 P.2d 493, 500 (Colo. 1995) (en banc); *Calbom v. Knudtzon*, 65 Wn.2d 157, 396 P.2d 148, 151-52 (1964) (en banc).

[300] *E.g., Top Service Body Shop, Inc. v. Allstate Insurance Co.*, 283 Ore. 201, 582 P.2d 1365, 1371 (1978) (en banc).

with prospective business relations, a minority of courts have observed that the touchstone of impropriety is that the defendant acted with either an improper motive, or interfered using improper means — means which, by themselves, would be actionable.[301]

Finally, a small minority of jurisdictions only require that a plaintiff prove that a defendant's intentional interference with the contractual relation of another was the proximate cause of harm to the plaintiff.[302] In these jurisdictions, interference alone is wrongful, regardless of the method of, or justification for the interference.

### 3. The soundest rule of law for the Virgin Islands

In determining the soundest rule to apply, the weight of authority supports the conclusion that a plaintiff must demonstrate the existence of a specific contract, that the defendant knew of that contract, and that the defendant intentionally interfered with that contract. The Supreme Court of New Mexico provides the clearest justification for the knowledge requirement: "[o]ne cannot be held liable . . . unless he has knowledge of the contract; without such knowledge, the requisite intention is absent."[303] Additionally, requiring a plaintiff to plead both the existence of a contract and the defendant's knowledge of that contract comports with past approaches utilized by courts in the Virgin Islands.

The weight of authority also supports the conclusion that a plaintiff must prove that the defendant's conduct damaged the plaintiff. Every jurisdiction requires a plaintiff to plead causation and damages, including the Virgin Islands. There is no compelling reason to abandon these requirements here.

A plaintiff in the Virgin Islands must also demonstrate that the defendant's interference was improper. The Supreme Court of Connecticut has explained that "not every act that disturbs a contract . . .

---

[301] *E.g., id.* at 1371; *Crandall Corp. v. Navistar International Transportation Corp.*, 302 S.C. 265, 266, 395 S.E.2d 179 (1990); *Leigh Furniture & Carpet Co. v. Isom*, 657 P.2d 293, 300 (Utah 1982); *Duggin v. Adams*, 234 Va. 221, 360 S.E.2d 832, 836, 4 Va. Law Rep. 820 (1987).

[302] *E.g., Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 131 Cal. Rptr. 2d 29, 63 P.3d 937, 953 (2003); *Hill v. Heritage Resources, Inc.*, 964 S.W.2d 89, 123 (Tex. Ct. App. 1997).

[303] *Wolf v. Perry*, 1959-NMSC-044, 65 N.M. 457, 339 P.2d 679, 682 (1959).

is actionable,"[304] and as discussed above, a clear majority of jurisdictions require that a defendant's interference be more than intentional before it will be actionable. This shifting attitude can also be seen in the change in language from the Restatement (First) of Torts, which required only that interference be purposeful, to the language in the Restatement (Second) of Torts, which now states that interference must be both intentional and improper.[305] Again, such a requirement is consistent with previous opinions. from courts in the Virgin Islands.

Requiring a plaintiff to prove impropriety also serves the important objective of distinguishing legitimate competition from unlawful activity. Although this concern bears more weight in the context of an alleged interference with prospective business relations, an example illustrates how the same concerns apply where parties have reduced their agreements to a contract. A defendant, aware of an existing contract between the plaintiff and a third party, could intentionally adjust its prices to create a situation where it would be economically efficient for the third party to breach its contract with the plaintiff and contract with the defendant instead. In this situation, the principles of contracts law entitle the plaintiff to be made whole by the third party, and the defendant and the third party benefit by way of their newly-formed relationship. Liability in tort should not attach to economic activity that leave all parties involved in no worse a position than where they began.

 It is axiomatic the law should not incentivize unlawful behavior. When a defendant interferes with an existing contract using means that are proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard,[306] however, a cause of action for intentional interference with existing contractual relations exists.

---

[304] *Larsen Chelsey Realty Co. v. Larsen*, 232 Conn. 480, 656 A.2d 1009, 1022 n.24 (1995). *Accord Dolton v. Capitol Federal Savings and Loan Association*, 642 P.2d 21, 22-23 (Colo. Ct. App. 1981) (explaining that, while interference with voidable contracts is actionable, interference with contracts that are void as a matter of law is not actionable).

[305] RESTATEMENT (SECOND) OF TORTS § 766, reporters note.

[306] *Accord Korean Supply Co.*, 63 P.3d at 954 (discussing impropriety in the context of claims for intentional interference with prospective business relations, and concluding that an improper act is one that is "proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard"); *Gieseke ex rel. Diversified Water Diversion, Inc. v. IDCA, Inc.*, 844 N.W.2d 210, 219 (Minn. 2014) (requiring interference to be independently tortious or in violation of a state or federal statute or regulation).

Similarly, when a defendant is not motivated by a genuine business purpose, but rather interferes with a plaintiff's contract solely for the purpose of injuring the plaintiff, a cause of action for intentional interference also exists.[307] Thus, in order to prevail on a claim for intentional interference with existing contractual relations, a plaintiff must prove that the defendant's interference was the product of either an improper means or an improper motive. This approach to impropriety comports with a growing minority of jurisdictions,[308] and strikes the appropriate balance between promoting competition and disincentivizing illegal behavior.

█ This Court rejects the approach of jurisdictions where plaintiffs are required to establish impropriety with reference to Section 767 of the Restatement (Second) of Torts. Section 767's approach effectively requires a plaintiff to disprove any legitimate reason that a defendant might have for its actions. This greatly increases a plaintiff's burden of persuasion, and the fact-intensive nature of such an inquiry almost guarantees that such a claim cannot be resolved on the pleadings alone. Thus, a disgruntled plaintiff could use a lawsuit to force a competitor into discovery. At best, the suit would disrupt operations and cash flow. At worst, it could compromise trade secrets or other proprietary information, and may even culminate in the termination of a business.

█ To prevail on a claim for intentional interference with existing contractual relations, a plaintiff in this jurisdiction must prove: (1) the existence of a contract between the plaintiff and a third party; (2) that the defendant knew of that contract (3) that the defendant interfered with the contract using improper means or with an improper motive; and (4) that the plaintiff was damaged as a result.

---

[307] *Accord Top Service Body Shop, Inc. v. Allstate Insurance Co.*, 283 Ore. 201, 582 P.2d 1365, 1368 (1978) (en banc) (permitting a cause of action for intentional interference with prospective business relationships where a defendant's motive is to harm the plaintiff).

[308] *See, e.g., Trade 'N Post, L.L.C. v. World Duty Free Americas, Inc.*, 2001 ND 116, ¶ 36, 628 N.W.2d 707, 717 (requiring "an independently tortious or unlawful act of interference"); *Top Service Body Shop, Inc.*, 582 P.2d at 1371 (requiring interference to be "unlawful by some measure beyond the fact of the interference itself," as derived, for example, from "a statute or other regulation, or a recognized rule of common law, or perhaps an established standard of a trade profession"); *Trau-Med of America. Inc. v. Allstate Insurance Co.*, 71 S.W.3d 691, 701 (Tenn. 2002) (citing *Top Service Body Shop, Inc.*, 582 P.2d at 1371) (requiring "improper motive or improper means"); *Leigh Furniture and Carpet Co. v. Isom*, 657 P.2d 293, 304 (Utah 1982) (citing *Top Service Body Shop, Inc.*, 582 P.2d at 1371) (same).

### iii. *This jurisdiction recognizes a cause of action for intentional interference with prospective business relations.*

Like the tort of intentional interference with existing contractual relations, a cause of action for the intentional interference with prospective business relations is widely recognized across the United States. Because no binding authority directs this Court on the nature of a claim for intentional interference with prospective business relations, this Court is again obligated to determine the soundest rule of law for the Virgin Islands.[309]

### I. Approaches taken by other courts in this jurisdiction

In the Virgin Islands, courts have looked to the principles summarized in the RESTATEMENT (SECOND) OF TORTS, Section 766B, to determine when a plaintiff may prevail on a claim for interference with prospective business relations.[310] In doing so, Virgin islands courts have drawn no distinction between claims titled "tortious interference," "tortious interference with prospective advantage;" "tortious interference with prospective economic advantage," "interference with prospective contractual relations," or "intentional interference with prospective contractual relations."[311] Courts here have stated that the expected benefit must be "sufficiently concrete" before a cause of action will lie.[312] Courts in the Virgin Islands have not utilized other standards to analyze claims of

---

[309] *Government of the Virgin Islands v. Connor*, 60 V.I. 597, 600 (V.I. 2014).

[310] *Board of Directors of Sapphire Bay Condominiums West v. Simpson*, Civ. No. 04-62, 2014 U.S. Dist. LEXIS 112570, *37 (D.V.I. Aug. 13, 2014); *First American Development Group/Carib, LLC v. WestLB AG*, 55 V.I. 316, 333-34 (V.I. Super. Ct. 2011).

[311] *Compare Simpson*, 2014 U.S. Dist. LEXIS 112570, at *37 (analyzing a claim for " intentional interference" under the standard set forth in Section 766B), *with Pourzal v. Marriot International, Inc.*, 305 F. Supp. 2d 544, 45 V.I. 488, 491-92 (D.V.I. 2004) (analyzing a claim for "tortious interference with prospective advantage" under the same standard), *Government Guarantee Fund of the Republic of Finland v. Hyatt Corp.*, 955 F. Supp. 441, 35 V.I. 356, 375-76 (D.V.I. 1997) (analyzing a claim for "tortious interference with prospective economic advantage" under the same standard), *and First American Development Group/Carib, LLC*, 55 V.I. 316 at 333-34 (analyzing a claim for "interference with prospective contractual relations" under the same standard).

[312] *See, e.g., Government Guarantee Fund of the Republic of Finland*, 35 V.I. at 376-77 (determining that a plaintiff, a contractor, did not state a claim for intentional inference with prospective economic advantages because he did not demonstrate that he had any concrete plans for future contracting work).

this nature. In determining whether a defendant's conduct is improper, some courts in the Virgin Islands have looked to the factors listed in the RESTATEMENT (SECOND) OF TORTS SECTION 767.[313] Others have rendered their opinion after considering the facts of each case.[314] No court in the Virgin Islands has addressed the question of whether a defendant's conduct must be independently actionable.

## 2. Approaches taken by other jurisdictions

In every jurisdiction, the existence of a prospective business relation is a prerequisite for prevailing on this cause of action. The interest has been variously described as "a valid contractual relationship or business expectancy,"[315] a "prospective contract,"[316] a "business relationship[] not formally reduced to contract,"[317] a "reasonable probability that a contractual relationship would have been entered,"[318] "a prospective relationship with an identifiable class of third persons,"[319] and a "reasonable expectation of an economic advantage,"[320] among other descriptions. However termed, the interest must be "something more than a mere hope or the innate optimism of the salesman,"[321] and must be "sufficiently definite, specific, and capable of acceptance in the sense that there is a reasonable probability of it maturing into a future economic benefit to the plaintiff."[322]

---

[313] E.g., Pourzal, 45 V.I. at 492; Government Guarantee Fund of Republic of Finland, 35 V.I. at 369-70.

[314] E.g., Board of Directors of Sapphire Bay Condominiums West, 2014 U.S. Dist. LEXIS 112570, at *37; First American Development Group/Carib, LLC, 55 V.I. at 333-34.

[315] Calbom v. Knudtzon, 65 Wn.2d 157, 162, 396 P.2d 148 (1964).

[316] Allen Realty Corp. v. Holbert, 227 Va. 441, 318 S.E.2d 592, 597 (1984).

[317] Gifford v. Sun Data, 165 Vt. 611, 686 A.2d 472, 474 (1996).

[318] Hill v. Heritage Resources, Inc., 964 S.W.2d 89, 124 (Tex. Ct. App. 1997).

[319] Trau-Med of America, Inc. v. Allstate Insurance Co., 71 S.W.3d 691, 701 (Tenn. 2002).

[320] Printing Mart-Morristown v. Sharp Electronics Corp., 116 N.J. 739, 563 A.2d 31, 37 (1989).

[321] Thompson Coal Co. v. Pike Coal Co., 488 Pa. 198, 412 A.2d 466, 471 (1979).

[322] Hawaii Medical Association v. Hawaii Medical Service Association, Inc., 113 Haw. 77, 148 P.3d 1179, 1218 (2006).

At least twenty-five jurisdictions explicitly require a plaintiff to prove that the defendant knew of the relation.[323] All remaining jurisdictions imply that such knowledge is a prerequisite to maintaining a cause of action for intentional interference with prospective business relations by requiring the plaintiff to prove that the defendant acted intentionally. One cannot intentionally interfere with a relationship about which one knows nothing.

At least forty-three jurisdictions requite that a defendant's interference be wrongful by some measure beyond the interference itself.[324] Some of these jurisdictions require the plaintiff to establish that interference was improper with reference to the factors listed in Section 767 of the Restatement (Second) of Torts.[325] Other jurisdictions require the plaintiff to prove that the defendant acted without justification or without privilege.[326] A minority of jurisdictions require a plaintiff to prove that the defendant's interference was the product of either improper motive or improper means.[327] Remaining jurisdictions only require that the defendant's intentional interference with the relation caused the plaintiff to suffer damages.[328]

As with the previous tort of intentional interference with existing contractual relations, all jurisdictions require a plaintiff must prove

---

[323] *E.g., White Sands Group, L.L.C. v. PRS II, LLC*, 32 So. 3d 5, 14 (Ala. 2009); *Dube v. Likens*, 216 Ariz. 406, 167 P.3d 93, 98 (2007); *Hi-Ho Tower, Inc. v. Com-Tronics, Inc.*, 255 Conn. 20, 761 A.2d 1268, 1273 (2000); *Cedroni Associates, Inc. v. Tomblinson, Harburn Associates, Architects & Planners, Inc.*, 492 Mich. 40, 821 N.W.2d 1, 4 (2012); *Gieseke ex rel. Diversified Water Diversion, Inc. v. IDCA, Inc.*, 844 N.W.2d 210, 219 (Minn. 2014); *Calbom v. Knudtzon*, 65 Wn.2d 157, 162, 396 P.2d 148 (1964); *Gore v. Sherard*, 2002 WY 114, 50 P.3d 705, 710 (2002).

[324] *E.g., Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 814 (Fla. 1994) (requiring interference to be "intentional and unjustified"); *United Truck Leasing Corp. v. Geltman*, 406 Mass. 811, 551 N.E.2d 20, 23 (1990) (requiring proof of "malicious" conduct); *Nichols v. Tri-State Brick and Tile Co., Inc.*, 608 So. 2d 324, 328 (Miss. 1992) (requiring proof that interference was "done with the unlawful purpose of causing damage and loss, without right or justifiable cause on the part of the defendant"); *Allen Realty Corp. v. Holbert*, 227 Va. 441, 318 S.E.2d 592, 597 (1984) (requiring both intentional and improper interference).

[325] *E.g., Crandall Corp. v. Navistar International Transportation Corp.*, 302 S.C. 265, 266, 395 S.E.2d 179 (1990).

[326] *E.g., Leavitt v. Leisure Sports Incorporation*, 103 Nev. 81, 734 P.2d 1221, 1225 (1987).

[327] *E.g., Leigh Furniture and Carpet Co. v. Isom*, 657 P.2d 293, 304 (Utah 1982).

[328] *E.g., Soderlund Bros., Inc. v. Carrier Corp.*, 278 Ill. App. 3d 606, 663 N.E.2d 1, 7, 215 Ill. Dec. 251 (1995).

damages in order to prevail on a claim for intentional interference with prospective business relations.

### 3. The soundest rule of law for the Virgin Islands

■ In order to prevail on a claim for intentional interference with prospective business relations, a plaintiff in the Virgin Islands must prove the existence of a business relation that was reasonably certain to produce an economic benefit for the plaintiff. A plaintiff must also prove that the defendant knew of that relationship. Adopting these requirements harmonizes Virgin Islands law with the majority of other jurisdictions and conforms to the decisions of prior Virgin Islands courts. For these reasons, a plaintiff must also prove damages as a result of the defendant's interference.

■ A plaintiff must also demonstrate that the defendant's conduct was wrongful for reasons beyond the interference itself. A plaintiff must satisfy this requirement by proving that the defendant's interference was the result of either improper means or an improper motive. Improper means include acts that would be independently actionable, in violation of existing laws, statues, or regulations.[329] Improper means may also include an extreme departure from an established industry standard.[330] An improper motive exists when the defendant acts with no legitimate business objective, but instead acts only to harm the plaintiff.

A brief discussion of the evolution of this particular tort illustrates the propriety of such an approach. Early formulations of this tort allowed a plaintiff to prevail over a defendant by proving that the defendant

---

[329] *See, e.g., Gieseke ex rel. Diversified Water Diversion, Inc. v. IDCA, Inc.,* 844 N.W.2d 210, 219 (Minn. 2014) (citing *Hayes v. N. Hills General Hospital,* 1999 SD 28, 590 N.W.2d 243, 248 (1999)) (requiring that interference be "independently tortious or in violation of a state or federal statute or regulation"); *Top Service Body Shop, Inc. v. Allstate Insurance Co.,* 283 Ore. 201, 582 P.2d 1365, 1371 (1978) (en banc) (explaining that means may be improper "by reason of statute or other regulation, or a recognized rule of common law, or perhaps an established standard of a trade or profession") *Watson's Carpet & Floor Coverings, Inc. v. McCormick,* 247 S.W.3d 169, 176 (Tenn. Ct. App. 2007) (providing examples of improper conduct, such as "means that are illegal, independently tortious, or that violate an established standard of a trade or profession" and "violations of statutes, rules, or recognized common law rules, violence, threats, bribery, unfounded litigation, fraud, misrepresentation, defamation, duress, undue influence, misuse of confidential information, or breach of a fiduciary duty").

[330] *Top Service Body Shop, Inc.,* 582 P.2d at 1371.

intentionally interfered with a prospective business relation, thereby damaging the plaintiff.[331] Courts have criticized this approach for requiring too little of a plaintiff and for exposing a wide range of otherwise-legal conduct to liability.[332] In response, courts began placing the burden on the plaintiff to demonstrate that the defendant acted without privilege or justification.[333] Again, this shift can be seen when one reviews the change in language from the Restatement (First) which required only that interference be purposeful, to the language in the Restatement (Second) which now states that interference must be both intentional and improper.[334] But if the early approaches to this tort required too little of the plaintiff, the revised approached requires too much because it required a plaintiff to effectively disprove that a defendant's conduct was lawful.

Acknowledging these two extremes, a few courts utilize the approach adopted above. By requiring a plaintiff to establish that a defendant's interference resulted from either improper means or an improper motive, these courts implicitly determined that liability should only flow when the defendant has committed an independently-wrongful act. Since a cause of action for intentional interference with prospective business should not impinge upon lawful competition, it makes sense to identify actionable conduct based on the illegality of that conduct.

 Thus, to prevail on a claim for interference with prospective business relations, a plaintiff in this jurisdiction must demonstrate: (1) the existence of a professional or business relation that is reasonably certain to produce an economic benefit for the plaintiff; (2) intentional interference with that relationship by the defendant; (3) that was accomplished through improper means or for an improper purpose; and (4) that the defendant's interference damaged the plaintiff.

---

[331] *See Leigh Furniture and Carpet Co.*, 657 P.2d at 302 (discussing early formulations of the tort).

[332] *E.g.*, *id.* at 303.

[333] *See generally* RESTATEMENT (SECOND) OF TORTS § 766 cmt. a (tracing the evolution of interference torts from the 1600s to present).

[334] *See id.* reporters note (observing the change in language).

**b. To the extent that Plaintiffs have stated a claim for intentional interference with existing contractual relations against Daily News and Redfield on behalf of any of the Plaintiffs, Daily News and Redfield are entitled to summary judgment IN their favor on those portions of Plaintiffs' Complaint.**

 In order to prevail on a claim for intentional interference with existing contractual relations, Plaintiffs must identify a specific contract about which Daily News or Redfield knew, and with which Daily News or Redfield intentionally interfered. Despite having provided hundreds of pages of evidence to support their Opposition, Defendants have failed to identify such a contract. Consequently, no reasonable jury could find Daily News or Redfield liable for intentionally interfering with a contract to which any of the Plaintiffs were a party.

**c. To the extent that Plaintiffs have stated a claim for intentional interference with prospective business relations against Daily News and Redfield on behalf of any of the Plaintiffs, Daily News and Redfield are entitled to summary judgment in their favor on those portions of Plaintiffs' Complaint.**

 Although Plaintiffs allege that the allegedly-defamatory material published by Daily News and Redfield discouraged companies from doing business with Senator Donastorg, Plaintiffs do not identify a single business relationship between any of the Plaintiffs and a third party about which Daily News or Redfield knew and with which Daily News or Redfield improperly interfered. Consequently, no reasonable jury could find Daily News and Redfield liable to any of the Plaintiffs for intentionally interfering with a prospective business relationship.

## III. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### a. Applicable law

 There is no binding authority that compels this Court to adopt a specific formulation of the tort of intentional infliction of emotional distress. However, in the case of *Joseph v. Sugar Bay Club & Resort*

294

*Corp.*,[335] the Superior Court of the Virgin Islands, Francois, J., conducted a *Banks* analysis and concluded that the principles of law summarized in Section 46 of the Restatement (Second) of Torts represented the soundest rule of law for the Virgin Islands. Having reviewed the reasoning set forth in *Joseph*, there is no need to revisit this Court's conclusion, and *Joseph*'s reasoning is incorporated by reference in this Memorandum Opinion.

In order for a plaintiff's intentional infliction of emotional distress claim to survive a motion for summary judgment, a plaintiff must demonstrate genuine issues of material fact concerning whether a defendant: (1) intentionally or recklessly; (2) engaged in extreme and outrageous conduct that exceeds all possible bounds of decency such that it is regarded as atrocious and utterly intolerable in a civilized society; (3) that caused the plaintiff to suffer severe emotional distress.[336]

For a public official, the burden is higher. According to the Supreme Court of the United States, when a claim for intentional infliction of emotional distress is brought by a public official and the official alleges that the actionable conduct constitutes defamation:

> public figures and public officials may not recover for the tort of intentional infliction of emotional distress . . . without showing . . . that the [allegedly-defamatory] publication contains a false statement of fact which was made with "actual malice," *i.e.*, with knowledge that the statement was false or with reckless disregard as to whether or not it was true.[337]

**b. To the extent that Plaintiffs have stated a claim for intentional infliction of emotional distress on behalf of Senator Donastorg against Daily News, Daily News is entitled to summary judgment in its favor on those portions of Plaintiffs' Complaint.**

As evidence of genuine disputes of material fact, Plaintiffs offer all citations contained in paragraph 4 of Plaintiffs' Amended Response to

---

[335] Case No. ST-2013-CV-491, 2014 V.I. LEXIS 14 (V.I. Super. Ct. Mar. 17, 2014), *rev'd on other grounds*, S. Ct. Civ. No. 2014-0048, 2015 V.I. Supreme LEXIS 4 (V.I. Feb. 10, 2015).
[336] *See* RESTATEMENT (SECOND) OF TORTS § 46 (outlining the tort of intentional infliction of emotional distress).
[337] *Hustler Magazine v. Falwell*, 485 U.S. 46, 56, 108 S. Ct. 876, 99 L. Ed. 2d 41 (1988).

Defendants' Statement of Facts.[338] Paragraph 4 of Plaintiffs' Amended Response to Defendants' Statement of Facts contains two categories of facts. First, paragraph 4.B.1. discusses the Sheraw Investigation and the alleged relationship of all Defendants thereto. Second, paragraphs 4.B.2-9. discuss a series of allegedly-defamatory statements, some made by Daily News, others made by Redfield. As discussed under the section pertaining to Senator Donastorg's defamation claim, Plaintiffs have not adduced clear and convincing evidence from which a reasonable jury could conclude that the allegedly-defamatory statements implicating matters of public concern made by Daily News were made with actual malice.[339] Consequently, no reasonable jury could conclude that the allegedly-defamatory statements referenced in paragraphs 4.B.2-9. constitute the extreme and outrageous conduct necessary to support Senator Donastorg's intentional infliction of emotional distress claim against Daily News.

The only remaining evidence that could support Senator Donastorg's claim must be found in paragraph 4.B.1. In paragraph 4.B.1., Plaintiffs identify the actions that allegedly constitute an invasion of Senator Donastorg's privacy, and Daily News is only mentioned once in that paragraph. Citing to the affidavit of Attorney Dean Barnes, Plaintiffs claim that "[a] The [sic] Daily News reporter . . . also improperly tried to get confidential information from a government agency about alleged claims that Donastorg was not paying child support which was just false."[340] Although Attorney Barnes states in his affidavit that a reporter from the Daily News visited the Division of Paternity and Child Support because the reporter "had received a tip that a senator was not paying his child support,"[341] nowhere in his affidavit does Attorney Barnes state that

---

[338] Pls.' Resp. to Defs.' Mot. for Summ. J. and Br. in Supp. 59.

[339] Although the February 6, 2002 article titled "Sen. Donastorg and wife face foreclosure on their Wintberg home" was not analyzed to determine whether it was published with actual malice, the article cannot form the basis for Senator Donastorg's defamation claim because the parties agree that the contents of the article were factually accurate. Since the truth of this article precludes it from supporting a defamation action, this article cannot constitute one of the allegedly-defamatory statements upon which Senator Donastorg's intentional infliction of emotional distress claim could be founded.

[340] Pls.' Am. Resp. to Defs.' Stml. of Facts 18-19.

[341] Pls.' Resp. to Defs.' Mot. for Summ. J. and Br. in Supp. App. Vol. V, Aff. of Atty. Dean L. Barnes ¶ 4.

the reporter inquired specifically about Senator Donastorg. To the contrary, Attorney Barnes stated that the reporter "did not mention . . . the name of any specific senator."[342] Consequently, Attorney Barnes' affidavit does not constitute evidence from which a reasonable jury could conclude that Daily News engaged in "extreme and outrageous conduct that exceeds all possible bounds of decency such that it is regarded as atrocious and utterly intolerable in a civilized society" with respect to Senator Donastorg.

The evidence discussed in the preceding two paragraphs is the only evidence offered by Plaintiffs to substantiate the existence of genuine disputes of material fact on Senator Donastorg's intentional infliction of emotional distress claim against Daily News. Since no reasonable jury could find for Senator Donastorg on this evidence, Daily News is entitled to summary judgment on Senator Donastorg's intentional infliction of emotional distress claim.

### c. To the extent that Plaintiffs have stated a claim for intentional infliction of emotional distress on behalf of Senator Donastorg against Redfield, Redfield is entitled to summary judgment in his favor on those portions of Plaintiffs' Complaint.

Plaintiffs allege that the same evidence supporting Senator Donastorg's intentional infliction of emotional distress claim against Daily News also supports Senator Donastorg's intentional infliction of emotional distress claim against Redfield. As with Daily News, Plaintiffs have not set forth clear and convincing evidence that any of the allegedly-defamatory publications attributed to Redfield in paragraphs 4.8.2-9. were made with actual malice. Consequently, no reasonable jury could conclude that Redfield's statements constitute the extreme and outrageous conduct necessary to support Senator Donastorg's intentional infliction of emotional distress claim against Redfield.

In paragraph 4.B.1., Plaintiffs allege that Redfield committed two specific acts that each represent evidence that Redfield intentionally inflicted emotional distress upon Senator Donastorg. First, citing to pages 16, 17, and 83 of Sheraw's deposition transcript, Plaintiffs claim that

---

[342] *Id.* ¶ 9.

"Holland Redfield [was an] ICC contact person [ ] for Sheraw or [was a] person [ ] with which Sheraw discussed the report."[343] Second, citing to pages 94 and 95 of Senator Donastorg's deposition transcript, Plaintiffs claim that "Prosser, Redfield, ICC, and the cabal had Senator Donastorg followed in 2000, 2001, and 2002."[344]

Neither of these two propositions is supported by the citations provided by Plaintiffs. First, Redfield is not mentioned anywhere in pages 16, 17, or 83 of Sheraw's deposition transcript. Consequently, these pages do not constitute evidence that Redfield engaged in the sort of conduct for which a claim for intentional infliction of emotional distress may lie. Even when read as a whole, no reasonable jury could find that Sheraw's deposition transcript constitutes evidence that Redfield engaged in extreme and outrageous conduct. Sheraw testified that he communicated once with Redfield, and that Redfield "told [Sheraw] that Donastorg had called him and told him that he had this investigative file."[345] Sheraw was later asked whether he had "ever been hired ʾby Holland Redfield to do an investigation of Donastorg or any member of his family," to which Sheraw replied: "no."[346] Based upon this evidence, the Court is not persuaded that a reasonable jury could find that Redfield engaged in extreme and outrageous conduct toward Senator Donastorg that is utterly intolerable in a civilized society.

Second, Redfield is not mentioned anywhere in pages 94 or 95 of Senator Donastorg's deposition transcript. Like the pages of Sheraw's deposition transcript cited by Plaintiffs, these pages do not constitute evidence that Redfield engaged in the sort of conduct for which a claim for intentional infliction of emotional distress exists. Page 94 of Senator Donastorg's deposition transcript memorializes Senator Donastorg's testimony that he observed "[t]wo gentlemen in a white car; just certain individuals, other individuals that I don't ever recall or could identify" that were allegedly following him.[347] Senator Donastorg's failure to

---

[343] Pls.' Am. Resp. to Defs.' Stmt. of Facts 16 (citing Pls.' Resp. to Defs.' Mot. for Summ. J. and Br. in Supp. App. Vol. IV, Sheraw Dep. Tr. 16-17, 83).
[344] *Id.* at 18 (citing Pls.' Resp. to Defs.' Mot. for Summ. J. and Br. in Supp. App. Vol. II, Donastorg Dep. Tr. 94-95).
[345] Sheraw Dep. Tr. 84:13-17.
[346] *Id.* at 99:14-16.
[347] Donastorg Dep. Tr. 94:5-7.

identify Redfield as one of the men who allegedly followed him precludes a reasonable jury from concluding that Redfield engaged in the conduct upon which a claim for intentional infliction of emotional distress can be founded.

Even when viewed in a light most favorable to Senator Donastorg, the evidence cited by Plaintiffs in paragraph 4.B.1. does not establish genuine disputes of material fact over whether Redfield's alleged malfeasance exceeds all possible bounds of decency in a civilized society. Consequently, Redfield is entitled to summary judgment in his favor on Senator Donastorg's intentional infliction of emotional distress claim.

### d. To the extent that Plaintiffs have stated a claim for intentional infliction of emotional distress on behalf of Senator Donastorg's family against Daily News and Redfield, Daily News and Redfield are entitled to summary judgment in their favor on those portions of Plaintiffs' Complaint.

 The tort of intentional infliction of emotional distress is meant to impose liability for only extreme and outrageous conduct. Other opinions from courts in this Territory demonstrate that termination of an employee does not meet this standard,[348] that the failure to warn firefighters that they are operating in a building containing asbestos does not meet this standard,[349] and a financial institution's alleged breach "of its contractual duty of confidentiality and good faith during bankruptcy proceedings and negotiations, concerning . . . [a] mortgage account" with that institution does not state a claim for intentional infliction of emotional distress.[350] When compared against such examples and in light of the evidence proffered by Plaintiffs, no reasonable jury could conclude that either Daily News or Redfield engaged in the extreme and outrageous conduct for which a claim for intentional infliction of emotional distress will lie simply because Senator Donastorg's family was mentioned in an investigative report authorized under the Virgin Islands Code.

Plaintiffs claim that Senator Donastorg's family suffered an intentional infliction of emotional distress due to the events described in paragraph

---

[348] *Hodge v. Daily News Publishing Co., Inc.*, 52 V.I. 186, 198 (V.I. Super. Ct. 2009).

[349] *Louis v. Caneel Bay, Inc.*, 50 V.I. 7, 20-21 (V.I. Super. Ct. 2008).

[350] *FirstBank of Puerto Rico v. Prosser*, Case No. SX-09-CV-520, 2015 V.I. LEXIS 72, at *3, 9-12 (V.I. Super. Ct. June 22, 2015).

4.B.1. of Plaintiffs' Amended Response to Defendants' Statement of Facts.[351] In paragraph 4.B.1., Plaintiffs only address the impact of the Sheraw Investigation on Senator Donastorg's family in broad terms by stating that:

> [w]ith respect to Senator Donastorg and all of his family members, the evidence shows that Sheraw gathered 'confidential source information' from 'law enforcement sources and campaign contributors'; gathered private bank-account information that is 'difficult to obtain and highly confidential in nature and should be handled accordingly,'; and made 'pretext calls to gain confidential information from medical providers including the St. Thomas Hospital, in an effort to find 'indiscretions'; and made pretext calls to lawyers and colleges like California State University, Fullerton.[352]

Nothing in paragraph 4.B.1. alleges that either Daily News or Redfield commissioned or facilitated the research into Senator Donastorg's family, and Plaintiffs have provided no evidence of same. Further, the Virgin Islands Code authorizes the investigation of a person with reference to "[t]he identity, habits, conduct, movement, whereabouts, affiliation, associations, transactions, reputation or character of any person, group or [sic] persons, association, organization, society, other group of persons or partnership or corporation."[353]

Additionally, the portions of the Sheraw Investigation submitted by Plaintiffs to the Court demonstrate that Senator Donastorg's family receives little exposure in the report. An April 16, 1998 report begins by indicating that several court cases involving Adlah Donastorg, Sr. had been identified.[354] The report does not discuss these cases. The report later indicates that Ella Moran, Norma Duran, and Josefina Donastorg are the directors of Senator Donastorg's corporation, "Carrier Multi-Service, Inc."[355] The report concludes that further investigation will occur

---

[351] Pls.' Resp. to Defs.' Mot. for Summ. J. and Br. in Supp. 60.

[352] Pls.' Am. Resp. to Defs.' Stmt. of Facts 14-15.

[353] 23 V.I.C. § 1301(f)(2).

[354] Pls.' Resp. to Defs.' Mot. for Summ. J. and Br. in Supp. App. Vol. VI, Ex. 3, at Bates No. D 1300.

[355] *Id.* at Bates No. D 1303-04.

pertaining to "Josephine Donastorg's experience in the business."[356] No other information about Senator Donastorg's family is contained in this report.

A May 20, 1998 report indicates that "Josephine Donastorg is the subject's mother and Benedicta Donastorg is the subject's wife."[357] The report also indicates that "Ella Moran and Norma Duran . . . are listed as Directors of Carrier Multi Service, Inc. — the corporate name of Donastorg's Company. No entries were found for Moran, however, a criminal case was found for Duran."[358] The report clarifies that "Ms. Duran was arrested on August 10, 1993 for defrauding the Department of Agriculture by falsifying her income in order to obtain low income housing[,]" but also indicates that "the case was dismissed on March 22, 1996, and the case file contained no information regarding why the case was dismissed . . . ."[359] In a section titled "Business Licensing," the report states that the business license file for Senator Donastorg's company lists Josefina Donastorg, Ella Moran, and Glenda Hamm, but not Norma Duran, as the directors.[360] The report concludes by noting that there would be further investigation "regarding the dismissal of the criminal case against Norma Duran" and "into Josephine Donastorg's qualifications and involvement in Carrier Medical Supply."[361] No further mention is made of Senator Donastorg's family in this report.

A June 24, 1998 report indicates that Duran's criminal case was likely dismissed because Duran immediately vacated the premises that she was inhabiting and paid some restitution, and because the US Attorney's Office was overworked and may have missed a filing deadline.[362] This report also indicates that Josephine Donastorg "was the Head Office Clerk in St. Thomas" for a local supermarket, that she held that position from approximately 1960 through 1980, and that she has been retired since that

---

[356] *Id.* at Bates No. D 1306.

[357] *Id.* at Bates No. D 1288.

[358] *Id.*

[359] *Id.* at Bates No. D 1289.

[360] *Id.* at Bates No. D 1290.

[361] *Id.* at Bates No. D 1294.

[362] *Id.* at Bates No. D 1295.

time.[363] The report observes that a source "had heard nothing about Josephine working for (or running) her son's company . . . ."[364] The report concludes by offering to further research "how active (if at all) Josephine Donastorg is· in the company."[365] No further mention of Senator Donastorg's family is made in this report.

 Plaintiffs have provided no other excerpts from the Sheraw Investigation that reference Senator Donastorg's family. Due to the fact that Senator Donastorg's family receives little mention in the Sheraw Investigation, coupled with the fact that Plaintiffs have not demonstrated that either Daily News or Redfield commissioned or participated in the Sheraw Investigation, no reasonable jury could find either Daily News or Redfield liable for intentional infliction of emotional distress to Senator Donastorg's family.

## IV. NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

Plaintiffs' claim for negligent infliction of emotional distress is alleged as an alternative cause of action to Plaintiffs' claim for intentional infliction of emotional distress.[366]

### a. Applicable law

Unlike the version of this tort predicated upon intent, there is no authority to inform this Court on the parameters of the tort of negligent infliction of emotional distress that comports with the framework established by *Banks v. International Rental & Leasing Corp.* Consequently, this Court must determine the soundest rule of law for the Virgin Islands.[367]

#### i. *Approaches taken by other courts in this jurisdiction*

Courts in the Virgin Islands have approached causes of action for negligent infliction of emotional distress in different ways. In the case of

---

[363] *Id.* at Bates No. D 1297.

[364] *Id.*

[365] *Id.* at Bates No. D 1299.

[366] Fourth Am. Compl. ¶ 32.

[367] *King v. Appleton*, 61 V.I. 339, 349 (V.I. 2014) (citations omitted).

*Berry v. Jacobs, IMC, LLC,*[368] the United States Court of Appeals for the Third Circuit affirmed an entry of summary judgment against an employee in a suit brought by the employee against his employer.[369] The employee premised his claim for negligent infliction of emotional distress on his employer's alleged discrimination, breaches of contract, and violations of federal laws.[370] Citing to the summary of law set forth in Section 313 of the Restatement (Second) of Torts,[371] the Third Circuit observed that the employee did not produce evidence that he suffered any sort of physical injury as a result of his employer's conduct, or evidence that it was reasonably foreseeable that his employer's conduct would result in physical injury.[372]

In the case of *Mingolla v. Minnesota Mining and Manufacturing Co.,*[373] the wife and children of a deceased patient brought a wrongful death suit on the patient's behalf for injuries arising out of the use of a surgical pin that had been implanted in the decedent. The plaintiffs in *Mingolla* alleged that they suffered emotional distress as a result of witnessing their father suffer.[374] They premised their right to recovery on

---

[368] 99 Fed. Appx. 405 (3d Cir. 2004).

[369] *Id.* at 410.

[370] *Id.* at 407.

[371] Section 313 reads:

(1) If the actor unintentionally causes emotional distress to another, he is subject to liability to the other for resulting illness or bodily harm if the actor:

(a) should have realized that his conduct involved an unreasonable risk of causing the distress, otherwise than by knowledge of the harm or peril of a third person, and

(b) from facts known to him should have realized that the distress, if it were caused, might result in illness or bodily harm.

(2) The rule stated in Subsection (1) has no application to illness or bodily harm of another which is caused by emotional distress arising solely from harm or peril to a third person, unless the negligence of the actor has otherwise created an unreasonable risk of bodily harm to the other.

[372] 99 Fed. Appx. at 410.

[373] 893 F. Supp. 499 (D.V.I. App. Div. 1995).

[374] *Id.* at 505.

Sections 402A,[375] 436,[376] and 436A[377] of the Restatement (Second) of Torts. The Appellate Division of the District Court of the Virgin Islands observed that, although the plaintiffs alleged emotional distress, the plaintiffs' complaint failed to state a claim because the plaintiffs did not allege that the emotional distress resulted in physical harm. The Appellate Division also cited Section 436A to explain that the plaintiffs could not recover for negligent infliction of emotional distress absent some showing of bodily harm.

Since *Mingolla*, the District Court for the Virgin Islands has clarified when a plaintiff who witnesses injury to a third person may recover for negligent infliction of emotional distress. In the case of *Cohler v. United States ex rel. National Park Services*,[378] the District Court drew from Sections 436(2)-(3) and 436A of the Restatement (Second) of Torts, and stated that a claim for negligent infliction of emotional distress premised on "witnessing injury to a third person" requires a plaintiff to allege: (1) that the defendant's negligence placed the plaintiff in danger for his own safety — in other words, the plaintiff was in the "zone of danger" when the accident occurred; (2) that the emotional disturbance manifested

---

[375] Section 402A concerns the right of an end user to recover in strict liability for a defective or unreasonably dangerous product. The court dismissed the plaintiffs' claim because they were not the end-users of the surgical pin that had been implanted in the decedent.

[376] Section 436 reads:

 (1) If the actor's conduct is negligent as violating a duty of care designed to protect another from a fright or other emotional disturbance which the actor should recognize as involving an unreasonable risk of bodily harm, the fact that the harm results solely through the internal operation of the fright or other emotional disturbance does not protect the actor from liability.

 (2) If the actor's conduct is negligent as creating an unreasonable risk of causing bodily harm to another otherwise than by subjecting him to fright, shock, or other similar and immediate emotional disturbance, the fact that such harm results solely from the internal operation of fright or other emotional disturbance does not protect the actor from liability.

 (3) The rule stated in Subsection (2) applies where the bodily harm to the other results from his shock or fright at harm or peril to a member of his immediate family occurring in his presence.

[377] Section 436A reads: "If the actor's conduct is negligent as creating an unreasonable risk of causing either bodily harm or emotional disturbance to another, and it results in such emotional disturbance alone, without bodily harm or other compensable damage, the actor is not liable for such emotional disturbance."

[378] 48 V.I. 575 (D.V.I. 2006).

physical symptoms; and (3) that the plaintiff is a member of the injured third party's immediate family.[379]

In the case of *Hill v. De Jongh*,[380] the Superior Court of the Virgin Islands relied on Section 313 of the Restatement (Second) of Torts when analyzing an employee's claim for negligent infliction of emotional distress. The employee based his claim on allegations that his union failed to represent him in his effort to seek back pay under the terms of a collective bargaining agreement between the union and the government.[381] The Superior Court dismissed the employee's claim for negligent infliction of emotional distress because the employee failed to allege that he suffered physical harm as a result of the defendants' conduct.[382]

Two observations can be drawn from these cases. First, a plaintiff may state a direct cause of action against a defendant for negligent infliction of emotional distress. Both the *Berry* and *Hill* cases illustrate this, and demonstrate that a plaintiff who alleges emotional distress resulting from a defendant's alleged negligence may not recover without demonstrating that the emotional distress caused physical harm. In *Berry* and *Hill*, the absence of an intrusion upon the plaintiff's physical wellbeing justified dismissing the plaintiff's claims.

The second observation to be drawn from the Virgin Islands courts' past treatment of negligent infliction of emotional distress claims is that a cause of action for negligent infliction of emotional distress may lie for those who witness injury to a third person. The plaintiffs in both *Mingolla* and *Cohler* premised their right to recovery on the suffering they witnessed others endure. The *Cohler* opinion drew a clear boundary for such claims when it stated a conjunctive, three-part test to determine which plaintiffs could recover for being a bystander to the injury of another.

### ii. *Approaches taken by other jurisdictions*

Although recognized in nearly every jurisdiction,[383] approaches to the tort of negligent infliction of emotional distress vary from jurisdiction to

---

[379] *Id.* at 578-79 (citing RESTATEMENT (SECOND) OF TORTS §§ 436(2)-(3), 436A).

[380] ST-2010-CV-585, 2012 V.I. LEXIS 11 (V.I. Super. Ct. Apr. 19, 2012).

[381] *Id.* 2012 V.I. LEXIS 11, at *2-3.

[382] *Id.* 2012 V.I. LEXIS 11, at *15.

[383] *But see, e.g., FMC Corp., Inc. v. Helton*, 360 Ark. 465, 202 S.W.3d 490, 502 (2005) (explaining that Arkansas does not recognize the tort of negligent infliction of emotional distress); *Hamilton v. Ford Motor Credit Co.*, 66 Md. App. 46, 502 A.2d 1057, 1065-66

jurisdiction. The extent to which other jurisdictions recognize the tort of negligent infliction of emotional distresses depends upon the extent to which each jurisdiction characterizes a defendant's duty toward the emotional wellbeing of others.[384] Noting that traditional negligence principles define a defendant's liability by the foreseeability of harm caused, most jurisdictions have determined that foreseeability alone is both too speculative for an award of damages and does not guarantee the veracity of a plaintiff's mental suffering.[385] Consequently, nearly every jurisdiction has determined that a defendant owes no general duty of care to refrain from negligently inflicting emotional distress on others.[386]

However, under certain circumstances, a clear majority of jurisdictions have determined that a defendant owes a duty of care toward the emotional wellbeing of others. The scope of this duty is defined by the context in which a plaintiff alleges injury: whether the plaintiff was the direct victim of the defendant's negligence, or whether the plaintiff was a bystander who witnessed the defendant's conduct injured a third party.[387]

---

(1986) (explaining that Maryland does not recognize an independent tort of negligent infliction of emotional distress, but that mental anguish may be an element of damages under other recognized theories of recovery).

[384] *See Lee v. State Farm Mutual Insurance Co.*, 272 Ga. 583, 533 S.E.2d 82, 86 (2000) (citations omitted) (explaining that rules for recovery for negligent infliction of emotional distress "run the gamut from variations of the impact approach, to analysis under a so-called 'zone of danger,' to a broader rule based on foreseeability of injury assessed by application of factors relating to proximity, direct observation, and relationship to the victim, to the most expansive view of reasonable foreseeability of injury under general tort theory").

[385] *See, e.g., Curtis v. Porter*, 2001 ME 158, ¶ 18, 784 A.2d 18, 25 (reasoning that "the determination of duty in [claims of negligent infliction of emotional distress] is not generated by traditional concepts of foreseeability"). *But see O'Donnell v. HCA Health Services of New Hampshire, Inc.*, 152 N.H. 608, 883 A.2d 319, 324 (2005) (clarifying that New Hampshire has "relied upon the traditional tort concepts of foreseeability and causation" when evaluating claims for negligent infliction of emotional distress).

[386] *See Boyles v. Kerr*, 855 S.W.2d 593, 598 n.2 (Tex. 1993) (collecting cases).

[387] *See, e.g., Burgess v. Superior Court*, 2 Cal. 4th 1064, 9 Cal. Rptr. 2d 615, 831 P.2d 1197, 1200-01 (1992) (en banc) (discussing the differences between direct victim and bystander causes of action for negligent infliction of emotional distress); *Corgan v. Muehling*, 143 Ill. 2d 296, 574 N.E.2d 602, 605, 158 Ill. Dec. 489 (1991) (same); *Clark v. Estate of Rice ex rel. Rice*, 653 N.W.2d 166, 170-71 (Iowa 2002) (same); *Jarrett v. Jones*, 258 S.W.3d 442, 446 (Mo. 2008) (en banc) (same); *Montoya v. Pearson*, 2006-NMCA-097, ¶ 19, 140 N.M. 243, 142 P.3d 11, 16 (acknowledging the distinction between direct victim and bystander claims).

In the context of direct victim cases, there is little uniformity as to how a defendant's duty is defined. Some jurisdictions state that a claim for negligent infliction of emotional distress will only lie when a defendant has breached a duty that was imposed upon him or her by the operation of law or contract.[388] In these cases, the plaintiff and defendant enjoy a special relationship, beyond the general relationship that strangers share with each other. Due to the nature of this relationship, the defendant has undertaken a duty to avoid negligently inflicting emotional distress upon the plaintiff.

Other jurisdictions have defined a defendant's duty by the zone of danger the defendant creates as the result of the defendant's negligent conduct.[389] Courts that employ this standard permit a plaintiff to recover for mental anguish when the defendant's negligent action places the plaintiff within a zone of physical danger. Some jurisdictions that rely on the zone-of-danger test require that a plaintiff's mental anguish manifest itself in the form of physical symptoms,[390] but some do not.[391] At least one jurisdiction examines whether serious emotional harm was reasonably foreseeable.[392]

In contrast to direct victim cases, jurisdictional approaches to bystander cases have been more uniform. Most jurisdictions employ some variation of the test first articulated by the Supreme Court of California in the case of *Dillon v. Legg*.[393] Under that standard, courts must determine the existence of a duty of case on a case-by-case basis by weighing three

---

[388] *E.g., Burgess*, 831 P.2d at 1201; *Spangler v. Bechtel*, 958 N.E.2d 458, 466 (Ind. 2011); *Boyles v. Kerr*, 855 S.W.2d 593, 596 (Tex. 1993).

[389] *E.g., Armstrong v. A.I. Dupont Hospital for Children*, 60 A.3d 414, 426 (Del. Super. Ct. 2012) (citations omitted); *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 798 (D.C. 2011) (citing *Washington v. John T. Rhines Co.*, 646 A.2d 345, 347-48 (D.C.1994)); *Bohdan v. Altool Manufacturing Co.*, 411 N.W.2d 902, 907 (Minn. Ct. App. 1987); *Vaillancourt v. Medical Center Hospital of Vermont, Inc.*, 139 Vt. 138, 425 A.2d 92, 95 (1980).

[390] *E.g., Bohdan*, 411 N.W.2d at 907.

[391] *AALAR, Ltd. Inc., v. Francis*, 716 So. 2d 1141, 1147 (Ala. 1998).

[392] *Johnson v. Ruark Obstetrics and Gynecology Associates, P.A.*, 327 N.C. 283, 395 S.E.2d 85, 97 (1990) (citations omitted).

[393] 68 Cal. 2d 728, 69 Cal. Rptr. 72, 441 P.2d 912 (1968) (en banc). *But see AALAR, Ltd. Inc.*, 716 So. 2d at 1147 (citing *Gideon v. Norfolk Southern Corp.*, 633 So. 2d 453, 454 (Ala. 1994)) (explaining that the Alabama Supreme Court has "refused to extend liability so far as to recognize a right of recovery in bystanders").

factors: (1) whether the plaintiff was located near the scene of the accident; (2) whether the shock to the plaintiff resulted from "the sensory and contemporaneous observation of the event;" and (3) whether the plaintiff and the victim were closely related.[394] The *Dillon* test was later refined by the same court in *Thing v. La Chusa*.[395] Thus, in California, bystander recovery is limited to circumstances where: "(1) the plaintiff is closely related to the injury victim; (2) is present at the scene of the injury-producing event at the time it occurs and is then aware that it is causing injury to the victim and, (3) as a result suffers emotional distress beyond that which would be anticipated in a disinterested witness."[396] Most notably, *Thing* clarified the quantum of psychological injury one must suffer in order to prevail in a claim for negligent infliction of emotional distress.[397]

The evolution of bystander liability in California mirrors the evolution of bystander liability around the country. Although a clear majority of jurisdictions still require that a plaintiff be closely related to the victim and that the plaintiff contemporaneously perceive the injury-causing event, other requirements have emerged. Some jurisdictions explicitly require that the victim suffer severe injury or death,[398] while other jurisdictions require the plaintiff to be within the zone of danger created by the event that injured the victim. Some jurisdictions require that the plaintiff be at the scene as the injury occurs,[399] while other jurisdictions allow a plaintiff to maintain an action if he or she arrives at the scene of the accident shortly after its occurrence.[400] Some jurisdictions require that the bystander substantiate his or her claim for mental anguish by demonstrating that the anguish manifested itself with physical

---

[394] 441 P.2d at 920.

[395] 48 Cal. 3d 644, 257 Cal. Rptr. 865, 771 P.2d 814 (1989).

[396] *Id.* at 866.

[397] *See id.* (requiring that a bystander must suffer "emotional distress beyond that which would be anticipated in a disinterested witness").

[398] *Browne v. Kommel*, No. FSTCV085006167S, 2009 Conn. Super. LEXIS 2012, *8-9 (Conn. Super. Ct. July 14, 2009) (citing *Clohessy v. Bachelor*, 237 Conn. 31, 675 A.2d 852, 865 (1996)).

[399] *E.g., Heldreth v. Marrs*, 188 W. Va. 481, 425 S.E.2d 157, 169 (1992).

[400] *E.g., Eskin v. Bartee*, 262 S.W.3d 727, 739-40 (Tenn. 2008).

symptoms,[401] while some jurisdictions do not.[402] And not all jurisdictions permit bystanders recovery.[403]

Finally, some jurisdictions reject a cause of action for negligent infliction of emotional distress entirely. Both Arkansas[404] and Maryland[405] explicitly reject the tort.

### iii. *The soundest rule of law for the Virgin Islands*

■ The soundest rule of law for the Virgin Islands is to treat a claim for negligent infliction of emotional distress similar to the manner in which this Court would treat an ordinary claim for negligence: a plaintiff must demonstrate the existence of a duty, a breach of that duty, direct and proximate causation, and damages. By recognizing a claim for negligent infliction of emotional distress, the Court recognizes that individuals have a legally protected interest in some degree of emotional tranquility. The corollary of this proposition is that individuals owe some duty of care to refrain from impinging upon that degree of emotional tranquility. However, "[c]omplete emotional tranquility is seldom attainable in this world, and some degree of transient and trivial emotional distress is part of the price of living among people."[406] The soundest rule of law for this jurisdiction must thus address two concerns: First, mindful that "emotional disturbance can be too easily feigned or imagined,"[407] the Court must define the nature of the interest protected by this tort.[408]

---

[401] *E.g.*, *Wargelin v. Sisters of Mercy Health Corp.*, 149 Mich. App. 75, 385 N.W.2d 732, 735 (1986).

[402] *E.g.*, *Burgess v. Superior Court*, 2 Cal. 4th 1064, 9 Cal. Rptr. 2d 615, 831 P.2d 1197, 1200 (1992) (en banc) (citing *Thing*, 771 P.2d at 816).

[403] *See AALAR, Ltd. Inc., v. Francis*, 716 So. 2d 1141, 1147 (Ala. 1998) (observing that the Supreme Court of Alabama "has, however, refused to extend liability so far as to recognize a right of recovery in bystanders").

[404] *FMC Corp. v. Helton*, 360 Ark. 465, 202 S.W.3d 490, 502 (2005).

[405] *Hamilton v. Ford Motor Credit Co.*, 66 Md. App. 46, 502 A.2d 1057, 1065-66 (1986).

[406] *Thing v. La Chusa*, 48 Cal. 3d 644, 257 Cal. Rptr. 865, 771 P.2d 814, 839 (1989). *Accord Osborne v. Keeney*, 399 S.W.3d 1, 17 (Ky. 2012) (explaining that "emotional tranquility is rarely attained and that some degree of emotional harm is an unfortunate reality of living in a modem society").

[407] *Chizmar v. Mackie*, 896 P.2d 196, 201 (Alaska 1995).

[408] *See Consolidated Rail Corp. v. Gottshall*, 512 U.S. 532, 545, 114 S. Ct. 2396, 129 L. Ed. 2d 427 (1994) (explaining that "[n]o jurisdiction, however, allows recovery for all emotional harms, no matter how intangible or trivial, that might be causally linked to the negligence of

Second, the law must ensure that a defendant's liability is proportional to his or her culpability.[409]

■ The first of these concerns is addressed by requiring that a plaintiff suffer serious or severe emotional distress. Although the description of compensable emotional distress within the context of a claim for negligent infliction of emotional distress varies by jurisdiction,[410] a clear majority of jurisdictions that recognize claims for negligent infliction of emotional distress explicitly require that the alleged emotional distress be serious or severe.[411] The Supreme Court of Kentucky provides a framework that requires a plaintiff's suffering to be sufficiently serious but still allows a jury to consider the facts of the case in light of their life experiences and common sense. According to the Supreme Court of Kentucky, "[a] serious or severe emotional injury occurs where a reasonable person, normally constituted, would not be expected to endure

another"). *Accord Bowen v. Lumbermens Mutual Casualty Co.*, 183 Wis. 2d 627, 517 N.W.2d 432, 443 (1994) (explaining the policy considerations underlying the tort of negligent infliction of emotional distress).

[409] *Burgess v. Superior Court*, 2 Cal. 4th 1064, 9 Cal. Rptr. 2d 615, 831 P.2d 1197, 1200 (1992) (en banc). *Accord Bowen*, 517 N.W.2d at 443-44 (explaining that courts ensure the "fairness of the financial burden placed upon a defendant" by considering, among other things, "whether allowance of recovery would place an unreasonable burden on the negligent tortfeasor," "whether allowance of recovery would be too likely to open the way to fraudulent claims," and "whether allowance of recovery would enter a field that has no sensible or just stopping point").

[410] *Compare, e.g., Carrol v. Allstate Ins. Co.*, 262 Conn. 433, 815 A.2d 119, 127 (2003) (requiring that emotional injury be "severe enough that it might result in illness or bodily harm"), *with Osborne*, 399 S.W.3d at 17 (requiring that the emotional injury be one where "a reasonable person, normally constituted, would not be expected to endure the mental stress engendered by the circumstances of the case").

[411] E.g., *Chizmar*, 896 P.2d at 201; *Burgess*, 831 P.2d at 1201; *Clohessy v. Bachelor*, 237 Conn. 31, 675 A.2d 852, 865 (1996); *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 796-97 (D.C. 2011); *Lee v. State Farm Mutual Insurance Co.*, 272 Ga. 583, 533 S.E.2d 82, 86-87 (2000); *Doe Parents No. 1 v. State Department of Education*, 100 Haw. 34, 58 P.3d 545, 581 (2002); *Clark v. Estate of Rice ex rel. Rice*, 653 N.W.2d 166, 170 (Iowa 2002); *Osborne*, 399 S.W.3d at 17; *Gammon v. Osteopathic Hospital of Maine, Inc.*, 534 A.2d 1282, 1284 (Me. 1987); *Sacco v. High Country Independent Press, Inc.*, 271 Mont. 209, 896 P.2d 411, 425 (Mont. 1995); *O'Donnell v. HCA Health Services of New Hampshire, Inc.*, 152 N.H. 608, 883 A.2d 319, 324 (N.H. 2005); *Paugh v. Hanks*, 6 Ohio St. 3d 72, 6 Ohio B. 114, 451 N.E.2d 759, 765 (1983); *Reilly v. United States*, 547 A.2d 894, 895 (R.I. 1988); *Camper v. Minor*, 915 S.W.2d 437, 446 (Tenn. 1996); *Heldreth v. Marrs*, 188 W. Va. 481, 425 S.E.2d 157, 161 (1992). The words 'severe' and 'serious function as synonyms, and although the adjective varies by jurisdiction, the principle that an emotional injury must surpass a certain threshold before the law will provide a remedy does not.

the mental stress engendered by the circumstances of the case."[412] Accordingly, in order to prove that a defendant has encroached upon the legally-protected interest for which a claim of negligent infliction of emotional distress will provide a remedy, a plaintiff in this jurisdiction must prove that he or she has suffered a serious or severe mental injury by demonstrating that a reasonable person, normally constituted, would not be expected to endure the mental stress engendered by the circumstances of the plaintiff's case.

In light of the historical approaches to this tort, further clarification on what constitutes a serious or severe emotional injury is necessary. In the past, jurisdictions had satisfied themselves that a plaintiff's alleged distress was the type of distress for which the law should provide a remedy if the plaintiff proved that his or her mental suffering was precipitated by a physical injury. However, recognizing that a near miss could be as frightening as a direct hit,[413] almost every jurisdiction has abandoned the requirement that emotional distress stem from a physical impact.[414] Now, some jurisdictions find that a plaintiff has suffered serious emotional injuries only if he or she was in the zone of danger created by the trauma-inducing event.[415] Other jurisdictions state that mental suffering is only serious when accompanied by physical symptoms.[416] However, a growing minority of jurisdictions has abandoned these legal fictions entirely.[417]

 This Court joins that growing minority. The jurisdictions that have abandoned the legal fictions surrounding the tort of negligent infliction of emotional distress reason that medicine and science have advanced to the point where the testing and diagnosis by medical professionals provide a

---

[412] *Osborne*, 399 S.W.3d at 17.

[413] *Consolidated Rail Corp.*, 512 U.S. at 547 (citations omitted).

[414] *But see Lee*, 533 S.E.2d at 86 (retaining the rule that a plaintiff must suffer physical impact before he or she can recover for negligent infliction of emotional distress).

[415] *E.g., Armstrong v. A.I. Dupont Hospital for Children*, 60 A.3d 414, 423 (Del. Super. Ct. 2012).

[416] *E.g., Payton v. Abbott Labs*, 386 Mass. 540, 437 N.E.2d 171, 181 (1982).

[417] *Osborne* 399 S.W.3d at 6. *See also id.* (explaining that "societal advancements in mental health treatment and education . . . assures [that] individuals suffering from legitimate emotional injuries will be able to seek recovery"); *Camper v. Minor*, 915 S.W.2d 437, 446 (Tenn. 1996) (concluding that "the claimed injury or impairment must be supported by expert medical or scientific proof").

more accurate method for determining whether a plaintiff has suffered severe emotional distress.[418] Although there may never be an exact method for determining whether a plaintiff has suffered the kind of mental distress for which the law should provide a remedy, there is no longer a need to define the severity of a plaintiff's emotional injury based upon arbitrary standards such as his or her presence on the 'zone of danger' or the presence of physical symptoms when medicine can provide a more individualized diagnosis.

 The Court will not rely on zone of danger test as the sole means of determining whether a plaintiff may recover for the negligent infliction of emotional distress because this fiction does not allow a plaintiff to be assessed as an individual, and individuals respond differently to the same stimulus. For example, a defendant may negligently crash his car into a diner in which two patrons are enjoying their coffee. One patron may be startled by this occurrence, but may nonetheless finish her coffee, pay her tab, exit the diner, and continue her day unfazed. The other patron may be so shaken by this occurrence that he spills his coffee, collapses into a corner, and relives the incident every evening in vivid nightmares for the following month. Under the zone of danger test, each patron's claim to mental anguish would be equally viable. However, medical diagnosis would likely confirm that the first patron suffered little mental anguish, while the second patron's suffering was severe.

 The Court also rejects the requirement that emotional distress must produce physical symptoms before the emotional injury will be considered severe. Although courts in the Virgin Islands have imposed such a requirement in the past, this requirement ignores the facts that individuals respond differently to the same event, and that some mental injuries persist despite an absence of physical symptoms. Courts from other jurisdictions have criticized such a requirement for being both over and under inclusive,[419] and medicine has advanced to the point where medical professionals can accurately determine the nature and extent of

---

[418] *See* Comment, *Negligently Inflicted Mental Distress: The Case for an Independent Tort*, 59 GEO. L.J. 1237, 1247-54 (1970) (explaining the medical aspects of mental distress). *See also Leong v. Takasaki*, 55 Haw. 398, 520 P.2d 758, 766-67 (1974) (explaining how a calculation of damages can be accomplished with reference to the medical aspects of mental distress).

[419] *Chizmar v. Mackie*, 896 P.2d 196, 202 (Alaska 1995) (citing *Molien v. Kaiser Foundation Hospitals*, 27 Cal. 3d 916, 167 Cal. Rptr. 831, 838, 616 P.2d 813 (1980) (en banc)).

an individual's mental injury. Given the advances in medicine that make such diagnoses possible, courts no longer need to impose an arbitrary bar that prohibits recovery for mental distress absent physical symptoms.

■ It should be noted that a plaintiff's presence in the zone of danger and the manifestation of physical symptoms may still constitute evidence that a plaintiff has suffered a severe or serious emotional injury. Indeed, such facts are relied upon by physicians in assessing the extent of a plaintiff's mental injury.[420] However, neither fact is a prerequisite for recover under a theory of negligent infliction of emotional distress in this jurisdiction.

By determining that a claim for negligent infliction of emotional distress only provides redress to a plaintiff that has suffered a serious or severe emotional injury, it follows that, in some instances, individuals have a duty to refrain from negligently inflicting serious or severe emotional injury upon others. Having identified the duty implicated by the tort of negligent infliction of emotional distress, the Court must next define the class of individuals to whom this duty is owed.

■ The concern that a defendant's liability must be proportionate to his or her negligence is fundamentally a question of fairness. In the context of negligence, a plaintiff's duty, and hence a plaintiff's liability, is premised on foreseeability of harm.[421] The soundest rule for the Virgin Islands will clearly define the class of people to whom the defendant owes a duty of care, thereby ensuring that any award of liability is proportionate to the defendant's misconduct.

In direct victim cases, the rule that most closely guarantees that a defendant's liability will be foreseeable, and hence proportionate to his or her negligence, is a rule that requires a showing of some preexisting duty

---

[420] Comment, *Negligently Inflicted Emotional Distress: The Case for an Independent Tort, supra* note 418, at 1248-52 (explaining that traumatic stimuli cause both primary and secondary reactions, and observing that, "[d]ue to the subjective nature of [primary reactions], precise levels of suffering and disability cannot be objectively determined, and the psychiatrist must rely on the plaintiff's testimony the context in which the trauma occurred, and on his general knowledge of the amount of pain and disability likely to result from such a trauma").

[421] *Accord Machado v. Yacht Haven U.S.V.I., LLC*, 61 V.I. 373, 386 (V.I. 2014) (quoting *Perez v. Ritz-Carlton (Virgin Islands), Inc.*, 59 V.I. 522, 533 (V.I. 2013)) (holding that "the foreseeability of harm 'is the touchstone of the existence of [a land possessor's] duty of reasonable or ordinary care' ").

between the plaintiff and the defendant, imposed either by law or contract, such that the defendant has undertaken a special relationship to ensure the emotional wellbeing of the plaintiff. Although many jurisdictions rely on the zone-of-danger concept to determine to whom a defendant owed a duty of care, the zone of danger rule is arbitrary because it is incapable of a precise definition. Effectively, the zone of danger test requires a determination that anyone within a fifteen-foot radius of a defendant's negligent act is owed a duty of care, but that anyone standing sixteen feet away has no right to recovery. Under the zone of danger rule, a potential defendant cannot foresee the extent to which his or her actions may result in liability. When compared to the zone of danger test, the requirement of a preexisting duty more accurately defines the category of people to whom a duty of care is owed; the zone-of-danger rule is inferior at protecting against fraudulent claims because it may expose the tortfeasor to greater liability than justice requires. Consequently, in the absence of a preexisting duty imposed by law or contract, a plaintiff may not recover damages for mental anguish premised solely on the negligence of the defendant.

In bystander cases, jurisdictions are nearly unanimous that a defendant's duty only extends to those who satisfy the factors first set forth by the Supreme Court of California in *Dillon v. Legg*. Thus, in a claim for negligent infliction of emotional distress premised on witnessing the injury of another, a defendant's duty of care only extends to those in a familial or a close personal relationship with the victim who were present at the scene of the injury or arrived immediately thereafter, before the scene had been altered. Case law from other jurisdictions has provided no reason to expand the scope of a defendant's duty in bystander cases, and the Court perceives no reason to do so here.

 Thus, to prevail on a claim of negligent infliction of emotional distress under a theory that the plaintiff was the direct victim of a defendant's negligent conduct, a plaintiff must prove: (1) that the defendant owed the plaintiff a duty of care to ensure the plaintiff does not suffer serious or severe emotional injury, which duty either arose by contract or was imposed as an independent legal obligation; (2) that the defendant breached its contractual or legal obligation, i.e. its duty; and (3) that, as a direct and proximate result of defendant's breach, the plaintiff suffered a serious or severe emotional injury. To prevail on a claim of negligent infliction of emotional distress under a theory that the plaintiff

witnessed the defendant cause injury to a third party, the plaintiff must prove: (1) that the plaintiff was in a familial or a close personal relationship with the victim and that the plaintiff was present at the scene of the injury or arrived immediately thereafter, before the scene had been altered; (2) that the defendant's conduct caused the victim to suffer severe injuries or death; and that (3) as a direct and proximate result of either witnessing the victim's injury or arriving at the scene of the victim's injury shortly after the injury occurred — but before the scene has been altered — the plaintiff suffered a serious or severe emotional injury.

**b. To the extent that Plaintiffs have stated a claim for negligent infliction of emotional distress against Daily News and Redfield on behalf of any Plaintiff, Daily News and Redfield are entitled to summary judgment in their favor on those portions of Plaintiffs' Complaint.**

█ In their Opposition, Plaintiffs do not address their claim for negligent infliction of emotional distress. Consequently, to the extent that they have stated a claim for such a tort, they have not demonstrated genuine issues of material fact on any of its elements.

Nor is it clear that they could, based on the standards adopted above. Plaintiffs have not introduced evidence that either Daily News or Redfield owed any of the Plaintiffs a duty of care that arose from a contract or existed due to a previously-imposed legal obligation. Nor have Plaintiffs introduced evidence that that any of the Plaintiffs were bystanders to a physical injury sustained by a family member or a close personal relation, that any of the Plaintiffs were present when that injury was sustained, and that any of the Plaintiffs believed that the injured party suffered severe injuries or death.

Due to Plaintiffs' failure to introduce evidence pertaining to any element of a claim for negligent infliction of emotional distress, no reasonable jury could find either Daily News or Redfield liable to any of the Plaintiffs for the negligent infliction of emotional distress.

## V. INVASION OF PRIVACY

Plaintiffs have alleged that Defendants' conduct constitutes an "invasion of privacy,"[422] and. cite to the evidence referenced in paragraph 4.B.1. of Plaintiffs' Amended Response to Defendants' Statement of Facts to substantiate their claim. Whether by statute or evolution of common law, all fifty states and the District of Columbia recognize that certain invasions of one's privacy are actionable in tort. The concept of a common law right to privacy was first advanced in a law review article written by Samuel Warren and Louis Brandeis in 1890,[423] but the modern understanding of an actionable invasion of privacy can be traced back to a law review article written by Professor William Prosser in 1960.[424] Based upon a review of over three hundred opinions issued since Warren and Brandeis' article, Professor Prosser concluded that the right to privacy "[i]s not one tort," but is rather "four distinct kinds of invasion of four different interests of the plaintiff, which are tied together by the common name, but otherwise have almost nothing in common . . . ."[425] Following Professor Prosser's guidance — first due to his law review article and then later due to his position as a reporter for the American Law Institute — every jurisdiction in the United States to address the issue has acknowledge Prosser's four-part distinction. Yet the extent to which each of Prosser's four torts is recognized varies by jurisdiction.

### a. Applicable law

There is no binding authority in this jurisdiction addressing the extent to which these four torts are actionable in the Virgin Islands. Plaintiffs' Opposition narrows the scope of the Court's inquiry because it only argues that Defendants are liable for the torts of intrusion upon seclusion and for publically portraying Plaintiffs in a false light. Yet the Court must still determine whether to recognize each of these causes of action, and if so, how to define them.

---

[422] Fourth Am. Compl. ¶¶ 34-36.

[423] Samuel D. Warren & Louis D. Brandeis, *The Right To Privacy*, 4 HARV. L. REV. 193 (1890).

[424] William L. Prosser, *Privacy*, 48 CALIF. L. REV. 383 (1960).

[425] *Id.* at 389.

### i. *This jurisdiction recognizes a cause of action for intrusion upon seclusion.*

 A cause of action for intrusion upon seclusion protects an individual from "intentional interference with his interest in solitude or seclusion, either as to his person or as to his private affairs or concerns, of a kind that would be highly offensive to a reasonable man."[426] It protects "the home, hospital room or other place the privacy of which is legally recognized, as well as unwarranted sensory intrusions such as eavesdropping, wiretapping, and visual or photographic spying."[427] Given that past practices by courts in the Virgin Islands mirror the approach taken by a majority of other jurisdictions, the Virgin Islands should continue to recognize a cause of action for intrusion upon seclusion.

### 1. Approaches taken by other courts in this jurisdiction

The tort of intrusion upon seclusion has been analyzed several times by courts in the Virgin Islands.[428] In each instance, the court has applied the principles of law summarized in Section 652B of the Restatement (Second) of Torts to analyze the plaintiff's claims.[429] Section 652B requires a plaintiff to prove (1) an intrusion upon the solitude, seclusion, or private affairs or concerns of another; (2) that is intentional; and (3) that would be highly offensive to a reasonable person.[430]

### 2. Approaches taken by other jurisdictions

At least forty-three jurisdictions recognize a common law cause of action for intrusion upon seclusion, and another four jurisdictions have created a statutory right to bring such a claim. Only two jurisdictions explicitly reject the cause of action.

---

[426] RESTATEMENT (SECOND) OF TORTS § 652B cmt. a.

[427] *Shulman v. Group W. Productions, Inc.*, 18 Cal. 4th 200, 74 Cal. Rptr. 2d 843, 955 P.2d 469, 489 (1998).

[428] *Anderson v. Government of the Virgin Islands*, 199 F. Supp. 2d 269 (D.V.I. 2002); *Venzen v. Abraham*, 18 V.I. 385 (D.V.I. 1981); *FirstBank Puerto Rico v. Webster*, ST-2012-CV-239, 2013 V.I. LEXIS 5 (V.I. Super. Ct. Jan. 17, 2013).

[429] *Anderson*, 199 F. Supp. at 278; *Venzen*, 18 V.I. at 388-89; *Webster*, 2013 V.I. LEXIS 5, at *9.

[430] RESTATEMENT (SECOND) OF TORTS § 652B.

There is a great deal of similarity across the jurisdictions that recognize a common law cause of action for intrusion upon seclusion, but each jurisdiction enumerates the elements of the tort with slight differences. For example, all jurisdictions recognizing a common law cause of action for intrusion upon seclusion require the alleged intrusion to be offensive to some degree. At least thirty-one jurisdictions require the intrusion to be "highly offensive to a reasonable person,"[431] while at least seven jurisdictions require the intrusion be offensive or objectionable to a reasonable person.[432] The remaining jurisdictions require that the intrusion would cause mental suffering to an ordinary person.[433] As another example, all jurisdictions require some form of intrusion into the plaintiff's solitude or seclusion, but at least two jurisdictions have held

[431] *E.g., Phillips v. Smalley Maintenance Services, Inc.*, 435 So. 2d 705, 708-09 (Ala. 1983); *Shulman v. Group W. Productions, Inc.*, 955 P.2d at 490 (citing *Miller v. National Broadcasting Co.*, 187 Cal. App. 3d 1463, 232 Cal. Rptr. 668, 678 (1986)); *Danai v. Canal Square Associates*, 862 A.2d 395, 400 (D.C. 2004); *Froelich v. Adair*, 213 Kan. 357, 516 P.2d 993, 997 (1973); *Furman v. Sheppard*, 130 Md. App. 67, 744 A.2d 583, 585 (2000); *PETA v. Bobby Berosini, Ltd.*, 111 Nev. 615, 895 P.2d 1269, 1279 (1995); *Burgess v. Busby*, 142 N.C. App. 393, 544 S.E.2d 4, 10-11 (2001); *Mauri v. Smith*, 324 Ore. 476, 929 P.2d 307, 310 (1975); *Valenzuela v. Aquino*, 853 S.W.2d 512, 513 (Tex. 1993); *Hillman v. Columbia County*, 164 Wis. 2d 376, 474 N.W.2d 913, 918-19 (1991).

[432] *E.g., Doe v. High-Tech Institute, Inc.*, 972 P.2d 1060, 1067 (Colo. Ct. App. 1998) (requiring that the intrusion be "offensive or objectionable to a reasonable person"); *Yarbray v. Southern Bell Telephone & Telecommunications Co.*, 261 Ga. 703, 409 S.E.2d 835, 837 (1991) (requiring intrusion "which would be offensive or objectionable to a reasonable person"); *Burns v. Masterbrand Cabinets, Inc.*, 369 Ill. App. 3d 1006, 874 N.E.2d 72, 77, 314 Ill. Dec. 162 (2007) (same); *Dalley v. Dykema Gossett*, 287 Mich. App. 296, 788 N.W.2d 679, 687 (2010) (requiring that the intrusion be "objectionable to a reasonable man"); *Remsburg v. Docusearch, Inc.*, 149 N.H. 148, 816 A.2d 1001, 1008 (2003) (requiring that the intrusion be "offensive to persons of ordinary sensibilities"); *Hougum v. Valley Memorial Homes*, 1998 ND 24, ¶ 14, 574 N.W.2d 812, 817 (requiring that the intrusion be "objectionable to a reasonable person"); *Roth v. Farner-Bocken Co.*, 2003 SD 80, ¶ 19, 667 N.W.2d 651, 660-61 (requiring that the intrusion be "unreasonable, unwarranted, serious, and offensive").

[433] *See Rucinsky v. Hentchel*, 266 Mont. 502, 881 P.2d 616, 618 (1994) (citing *Sistok v. Northwestern Telephone Systems, Inc.*, 189 Mont. 82, 615 P.2d 176, 182 (1980)) (requiring that the invasion be conducted "in such a manner as to outrage or cause mental suffering, shame, or humiliation to a person of ordinary sensibilities"); *Snakenberg v. Hartford Casualty Insurance Co., Inc.*, 299 S.C. 164, 383 S.E.2d 2, 6 (1989)) (citing *Meetze v. Associated Press*, 230 S.C. 330, 95 S.E.2d 606 (1956) (requiring conduct that "would cause mental injury to a person of ordinary feelings and intelligence in the same circumstances").

that the instruction must be physical,[434] while others permit a cause of action for intrusion "by use of a defendant's sense of sight or hearing, or by use of some other form of investigation or examination,"[435] and at least one has required that the defendant's actions be "intrusive into a matter that the plaintiff has a right to expect privacy."[436] However, despite these variations, there is no deviation from the general principle, first articulated by Professor Prosser, that a cause of action will lie when a defendant intentionally intrudes upon a place where the plaintiff has secluded him or herself, and the defendant's intrusion was offensive to some degree.

### 3. The soundest rule of law for the Virgin Islands

▮▮ Given the nearly uniform approach to this tort across other jurisdictions in the United States, the soundest rule for the Virgin Islands is to recognize a cause of action for intrusion upon seclusion under the same parameters as courts in the Virgin Islands have previously done. Thus, in order to prevail on a claim for intrusion upon seclusion in the Virgin Islands, a plaintiff must prove: (1) an intrusion upon the solitude, seclusion, or private affairs or concerns of another; (2) that is intentional; and (3) that would be highly offensive to a reasonable person. This approach mirrors the common law in a majority of other jurisdictions, and facilitates consistency amongst trial court opinions here in the Virgin Islands. As the common law of this Territory develops, it will fall to the courts to determine exactly where an individual enjoys the solitude or seclusion upon which a defendant may not intrude, or what conduct will be deemed highly offensive.

### ii. This jurisdiction does not recognize a cause of action for false light invasion of privacy.

There is no binding precedent in this jurisdiction that addresses a cause of action for false light invasion of privacy. Because the Supreme Court of the Virgin Islands has not yet addressed this cause of action, this Court

---

[434] *Newman v. Jewish Community Center Association of Indianapolis*, 875 N.E.2d 729, 737 (Ill. Ct. App. 2007); *Nelson v. Maine Times*, 373 A.2d 1221, 1223 (Me. 1977) (citing *Estate of Berthiaume v. Pratt, M.D.*, 365 A.2d 792, 795 (Me. 1976)).

[435] *Danai*, 862 A.2d at 400.

[436] *Koeppel v. Speirs*, 808 N.W.2d 177, 181 (Iowa 2011).

must determine the soundest rule of law for the Virgin Islands.[437] Although there is a growing trend to recognize the existence of this tort, the Virgin Islands lacks sufficient safeguards to ensure that a cause of action for false light invasion of privacy does not chill the freedoms protected by the First Amendment.

### 1. Approaches taken by other courts in this jurisdiction

No court in the Virgin Islands has addressed a cause of action for false light invasion of privacy. Although a few courts have acknowledged that false light invasion of privacy constitutes one of four torts that comprise a broader common-law right to privacy,[438] no court in this jurisdiction has set forth the elements for such a claim.

### 2. Approaches taken by other jurisdictions

A majority of jurisdictions recognize a cause of action for false light invasion of privacy. Of those jurisdictions, at least twenty eight draw their statement of the law directly from Section 652E of the Restatement (Second) of Torts.[439] At least nineteen of these jurisdictions cite to the Restatement — and often to Professor Prosser's article as well — without conducting any additional analysis of whether their jurisdiction should adopt a cause of action for false light invasion of privacy. However, a few

---

[437] *Malloy v. Reyes*, 61 V.I. 163, 176 (V.I. 2014).

[438] *See, e.g., Venzen v. Abraham*, 18 V.I. 385 (D.V.I. 1981) (discussing how the concept of a common-law right to privacy, as first articulated in 1890 and later refined by Professor Prosser in the 1960s, generally comprises four interrelated, but distinct torts).

[439] *E.g., Regions Bank v. Plott*, 897 So. 2d 239, 244 (Ala. 2004) (citing to the RESTATEMENT (SECOND) OF TORTS § 652E); *Goodrich v. Waterbury Republican-American, Inc.*, 188 Conn. 107, 448 A.2d 1317, 1330-31 (1982) (adopting the RESTATEMENT (SECOND) OF TORTS § 652E); *Chung v. McCabe Hamilton & Renny Co., Ltd.*, 109 Haw. 520, 128 P.3d 833, 847 (2006) (citing to the RESTATEMENT (SECOND) OF TORTS § 652E); *Winegard v. Larsen*, 260 N.W.2d 816, 823 (Iowa 1977) (same); *Cole v. Chandler*, 2000 ME 104, ¶ 17, 752 A.2d 1189, 1197 (same); *Meyerkord v. Zipatoni Co.*, 276 S.W.3d 319, 325 (Mo. Ct. App. 2008) (same); *Romaine v. Kallinger*, 109 N.J. 282, 537 A.2d 284, 289-90 (1988) (collecting cases from New Jersey that cite the RESTATEMENT (SECOND) OF TORTS § 652E); *Marleau v. Truck Insurance Exchange*, 333 Ore. 82, 37 P.3d 148, 153-54 (2001) (recognizing by implication a cause of action for false light invasion of privacy and citing to the RESTATEMENT (SECOND) OF TORTS § 652E); *West v. Media General Convergence, Inc.*, 53 S.W.3d 640, 648 (Tenn. 2001) (citing to the RESTATEMENT (SECOND) OF TORTS § 652E); *Crump v. Beckley Newspapers, Inc.*, 173 W. Va. 699, 320 S.E.2d 70, 85 (1983) (same); *Bolain v. Guam Publications, Inc.*, 4 N.M.I. 176, ¶¶ 19-23 (same).

jurisdictions that draw their definition of this tort directly from the Restatement have done so after analyzing whether it was appropriate to recognize such a cause of action. A few other jurisdictions recognize the tort as an evolution of their common law without reference to the Restatement.[440]

Two minority positions exist relative to this cause of action. The larger of these positions rejects the concept of false light invasion of privacy by operation of statute.[441] The smaller of these positions is held by a group of states that do not recognize the existence of this cause of action at common law.[442] The jurisdictions that do not recognize this tort reason that the tort of false light invasion of privacy is so similar to the tort of defamation that there is very little conduct that could not be properly addressed by a claim for defamation, or by other causes of action. These jurisdictions also point out that many of the protections that have evolved to prohibit the abuse of defamation lawsuits have not evolved to address the potential chilling effects that allegations of false light invasions of privacy could have. These jurisdictions have questioned whether non-defamatory speech should be actionable on any grounds at all.

### 3. The soundest rule of law for the Virgin Islands

 ██ Despite the widespread recognition of a cause of action for false light invasion of privacy, the Virgin Islands is best served by rejecting this tort at this time. The third prong of the *Banks* analysis

---

[440] *E.g., Association Services, Inc. v. Smith*, 249 Ga. App. 629, 549 S.E.2d 454, 459 (2001); *Hoskins v. Howard*, 132 Idaho 311, 971 P.2d 1135, 1140 (1998); *Stern v. Doe*, 806 So. 2d 98, 101 (La. Ct. App. 2001); *Tobin v. Michigan Civil Service Commission*, 416 Mich. 661, 331 N.W.2d 184, 189 (1982); *Lake v. Wal-Mart Stores, Inc.*, 582 N.W.2d 231, 235-36 (Minn. 1998).

[441] *See, e.g., Ayash v. Dana Farber Cancer Institute*, 443 Mass. 367, 822 N.E.2d 667, 681 n.16 (2005) (citing MASS. GEN. LAWS ch. 214 § 1B) (observing that Massachusetts has not interpreted its privacy statute to permit claims for false light invasion of privacy); *Johnson v. Staten Island Advance Newspaper, Inc.*, 13 Misc. 3d 1215(A), 824 N.Y.S.2d 755, 2004 N.Y. Misc. LEXIS 3113, *20 (N.Y. City Civ. Ct. 2004) (citing *Arrington v. New York Times Co.*, 55 N.Y.2d 433, 434 N.E.2d 1319, 1323, 449 N.Y.S.2d 941 (1982)) (explaining that New York's statutory right to privacy only applies to situations where a person's photograph is used for advertising or trade without that person's consent); *Ladd v. Uecker*, 2010 WI App. 28, ¶ 5, 323 Wis. 2d 798, 780 N.W.2d 216, 218-19 (citing WIS. STAT. § 995.50) (acknowledging that Wisconsin does not recognize false light privacy claims under its privacy statute).

[442] *E.g., Denver Publishing Co. v. Bueno*, 54 P.3d 893, 894 (Colo. 2002) (en banc); *Cain v. Hearst Corporation*, 878 S.W.2d 577, 577 (Tex. 1994).

mandates that this Court "determine the appropriate common law rule based on the unique characteristics and needs of the Virgin Islands."[443] When the criticisms of false light claims are compared to the present development of the Virgin Islands Judiciary, the desirability of rejecting this tort becomes apparent.

Critics of false light invasion of privacy point out that the tort lacks many of the procedural safeguards that protect free speech in the context of defamation claims.[444] This criticism is most easily illustrated with reference to printed media, where even the smallest factual inaccuracy could form the basis for a cause of action against the author or the publisher.[445] Proponents of the tort argue that the criteria that a false statement be highly offensive to a reasonable person guarantees that free speech will not be chilled. But the definition of "highly offensive" is also highly subjective. Consequently, journalists and publishers are left to speculate whether the subject of a story will consider their portrayal to be highly offensive. Critics of the false light tort argue that this ambiguity disincentivizes the open and robust debate encouraged by the First Amendment by encouraging journalists and newspapers to tread softly.[446] This Court agrees with the critics.

As the tort of defamation has evolved, absolute and qualified privileges have developed to ensure that defamation remained the exception to the general rule of free speech. For example, absolute privileges protect statements made during judicial proceedings, by legislators during legislative debates, and between spouses. Qualified privileges protect statements made in government reports of official proceedings, fair criticism of published media, and statements made in self-defense. Given the novelty of false light claims, it is unclear to what extent the privileges pertaining to defamation apply to claims of false light invasion of privacy.

This concern is magnified by the infancy of the common law in the Virgin Islands. Although the Supreme Court of the Virgin Islands has

---

[443] *Government of the Virgin Islands v. Connor*, 60 V.I. 597, 603 (V.I. 2014).

[444] *E.g., Lake*, 582 N.W.2d at 235-36; *Arrington*, 434 N.E.2d at 1323.

[445] *See Cain*, 878 S.W.2d at 577 (observing that "any fact in the story, no matter how seemingly innocuous, may prove to be a basis for liability").

[446] *E.g., Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1113-14 (Fla. 2003); *Lake*, 582 N.W.2d at 235-36; *Moats v. Republican Party of Nebraska*, 281 Neb. 411, 796 N.W.2d 584, 588-89 (2011).

acknowledged the existence of both absolute and qualified privileges in the context of defamation claims,[447] it has not issued an opinion establishing whether or to what extent these privileges are recognized in the Virgin Islands. Only as recently as October of 2014 has the Supreme Court issued an opinion that conclusively establishes the elements of negligence without relying on the Restatements of Law.[448] Thus, it is difficult to believe that the Supreme Court will issue an opinion that comprehensively defines the privileges that will defeat a defamation action in the near future. Given the novelty of false light claims, the likelihood of receiving such an opinion concerning the privileges that will defeat false light claims anytime soon decreases even further. Finally, the Virgin Islands Code does not codify privileges for the journalist, reporter, or publisher. Consequently, the burden falls upon the Superior Court to adjudicate, on a case-by-case basis, whether these privileges exist in the Virgin Islands. With this in mind, it is not hard to see how a well-pled complaint and the threat of voluminous discovery could be used as a weapon to pacify media here in the Territory.

It is also worth noting that the majority position concerning the recognition of this tort is somewhat misleading. Although a clear majority of jurisdictions permit a cause of action for false light invasion of privacy, at least half of those jurisdictions do not appear to have analyzed the development of their jurisdiction's common law or the unique characteristics of their jurisdiction to determine whether it would be appropriate to adopt such a cause of action.[449] Rather, these jurisdictions simply acknowledge the four-part distinction articulated in Professor Prosser's article and copy their legal standard straight from the Restatement. Thus, at least half of the jurisdictions to recognize a cause of action for false light invasion of privacy have done so in a manner that resembles the mechanistic application of the Restatement that the Supreme Court of the Virgin Islands has deemed to be unconstitutional.

Of the jurisdictions that have adopted the tort of false light invasion of privacy after analyzing the propriety of doing so, some have satisfied themselves that First Amendment guarantees will not be chilled due to the

---

[447] *See Joseph v. Daily News Publishing Co.*, 57 V.I. 566, 586 (V.I. 2012) (discussing the second element of a claim for defamation in the Virgin Islands).

[448] *Machado v. Yacht Haven U.S.V.I., LLC*, 61 V.I. 373, 380 (V.I. 2014).

[449] *E.g.*, *Cole v. Chandler*, 2000 ME 104, ¶ 17, 752 A.2d 1189, 1197.

Supreme Court of the United States' holding in the case of *Time, Inc. v. Hill*.[450] In that case, the Supreme Court held that a plaintiff alleging false light invasion of privacy pursuant to a state's privacy statute must establish 'actual malice' when that plaintiff is a public figure, like in a claim for defamation.[451] However, the requirement that a public figure establish that false light publications were either made with knowledge of their falsity or reckless disregard thereto does not address the concern that false light claims require a journalist or publisher to gamble on whether a reasonable person would find an article's content highly offensive. Although the Supreme Court of the United States has expanded First Amendment protections in the context of false light claims in one instance, members of the media in a jurisdiction lacking robust protections for journalists, reporters, and publishers — jurisdictions like the Virgin Islands — are still only safe from legal action so long as the subject of a story does not take offense to that story.

Courts have correctly pointed out that false light claims protect a different interest than defamation claims: defamation claims protect one's reputation in the community, while false light claims protect one's right to the integrity of one's image.[452] However, this Court has not discovered a single example of a case that succeeded as a claim for false light invasion of privacy, but failed as a claim for defamation.[453] Furthermore, the success of such a claim assumes that non-defamatory speech should be actionable. In the context of a claim for false light invasion of privacy, the Supreme Court of the United States has cautioned that it would "create a grave risk of serious impairment of the indispensable service of a free press in a free society if [the Court were to] saddle the press with the impossible burden of verifying to a certainty the facts associated in

---

[450] 385 U.S. 374, 87 S. Ct. 534, 17 L. Ed. 2d 456 (1967).

[451] *Id.* at 387-88.

[452] *E.g.*, *Easter Seal Society for Crippled Children & Adults, Inc. v. Playboy Enterprises, Inc.*, 530 So. 2d 643, 646 (La. Cc. App. 1988).

[453] *But see Jensen v. Sawyers*, 2005 UT 81, ¶ 57, 130 P.3d 325, 337 (observing that the Supreme Court of Utah "remain[s] sufficiently persuaded that there is certain unacceptable conduct that could be within the reach of false light invasion of privacy, but not defamation"). The *Jensen* Court vacated an award of damages on claims for defamation and false light invasion of privacy that were each premised on the same set of facts. Consequently, *Jensen* does not provide guidance as to the type of conduct that would be actionable under the theory of false light invasion of privacy but not as a claim for defamation.

news articles with a person's name, picture or portrait, particularly as related to nondefamatory matter."[454] Such a concern militates against lawsuits for nondefamatory speech.

Assuming that some forms of non-defamatory speech should be actionable, there may come a day when a claim for false light invasion of privacy is necessary to remedy a wrong that cannot be addressed by any other cause of action, and can proceed in a manner that does not chill First Amendment freedoms. But it is not this day. At present, this Court will not embrace the questionable protection afforded by false light claims where the attendant potential for their abuse is so great.

### b. To the extent that Plaintiffs have stated a claim for intrusion upon seclusion on behalf of any Plaintiff against Daily News, Daily News is entitled to summary judgment in its favor on those portions of Plaintiffs' Complaint.

Plaintiffs state that the facts supporting their intrusion upon seclusion claim against Daily News are contained in paragraph 4.B.1. of Plaintiffs' Amended Response to Defendant's Statement of Facts.[455] Daily News is only mentioned once in paragraph 4.B.1. Citing to the affidavit of Attorney Dean Barnes for support, Plaintiffs allege that "[a] The [sic] Daily News reporter . . . also improperly tried to get confidential information from a government agency about alleged claims that Donastorg was not paying child support which was just false."[456]

As the only piece of evidence offered to support Plaintiffs' intrusion upon seclusion claim against Daily News, the Barnes Affidavit does not constitute evidence of any of the three elements of the tort of intrusion upon seclusion. In his affidavit, Barnes testifies that, on or about March 7, 2006, he met with a reporter from *The Virgin Islands Daily News*.[457] Barnes testified that the reporter "said that he had received a tip that a senator was not paying the child support,"[458] but that he "did not

---

[454] *Time, Inc.*, 385 U.S. at 389.

[455] Pls.' Resp. to Defs.' Mot. for Summ. J. and Br. in Supp. 58-59.

[456] Pls.' Am. Resp. to Defs.' Stmt. of Facts 18-19.

[457] Pls.' Resp. to Defs.' Mot. for Summ. J. and Br. in Supp. App. Vol. V, Aff. of Atty. Dean L. Barnes ¶¶ 2-3.

[458] *Id.* ¶ 4.

mention . . . the name of any specific senator."[459] Barnes further testified that he did not "refer to or otherwise identify any party to a child support case."[460] Because Barnes' affidavit establishes that Senator Donastorg was never identified during Barnes' encounter with the reporter, the Barnes Affidavit does not constitute evidence that Daily News intentionally intruded upon solitude, seclusion, or private affairs or concerns of any of the Plaintiffs. Consequently, no reasonable jury could find Daily News liable for the tort of intrusion upon seclusion in favor of any of the Plaintiffs.

### c. To the extent that Plaintiffs have stated a claim for intrusion upon seclusion on behalf of any Plaintiff against Redfield, Redfield is entitled to summary judgment in his favor on those portions of Plaintiffs' Complaint.

The facts supporting Plaintiffs' intrusion upon seclusion claim against Redfield are also contained in paragraph 4.B.1. of Plaintiffs' Amended Response to Defendants' Statement of Facts. The Sheraw Investigation forms the basis of Plaintiffs' intrusion upon seclusion claim against Redfield. Citing to Pages 16, 17, and 83 of Sheraw's deposition transcript, Plaintiffs allege that Redfield was "[an] ICC contact person[ ] for Sheraw or [was a] person[ ] with which [sic] Sheraw discussed the report."[461] Plaintiffs also claim that Redfield's alleged intrusion upon Plaintiffs' seclusion extended beyond Redfield's discussion of the report with Sheraw. Citing to pages 94-95 of Senator Donastorg's deposition transcript, Plaintiffs allege that Redfield, along with Prosser, ICC, "and the cabal" all "had Senator Donastorg followed in 2000, 2001, and 2002."[462]

The evidence provided by Plaintiffs concerning Sheraw's investigation of Senator Donastorg does not show that Redfield had any role in the commission or execution of the investigation. As discussed in the section pertaining to Plaintiffs' intentional infliction of emotional distress claim, Redfield is not mentioned in the pages of the deposition transcripts cited by Plaintiffs. The surrounding pages of Sheraw's deposition transcript

---

[459] *Id.* ¶ 9.

[460] *Id.* ¶ 12.

[461] Pls.' Am. Resp. to Defs.' Stmt. of Facts 16.

[462] *Id.* at 18.

demonstrate Redfield did not hire Sheraw to conduct an investigation of Senator Donastorg or Senator Donastorg's family. Sheraw's deposition transcript reveals that Redfield spoke to Sheraw only once: after Senator Donastorg had received a copy of the Sheraw Investigation from his attorney.

Additionally, the portions of the Sheraw Investigation attached to Plaintiffs' Opposition contain no reference to Redfield. Instead, those documents indicate that Benta was Sheraw's contact person. By letter dated April 16, 1998, directed to Benta, Sheraw confirmed that he had undertaken a "background search on Adlah Donastorg" "pursuant to [Benta's] request."[463] By letter dated June 24, 1998, directed to Benta, Sheraw confirmed that his investigation of Senator Donastorg was complete.[464] Sheraw's June 24, 1998 letter to Benta identifies that Sheraw provided Benta with one additional progress report on his investigation of Senator Donastorg, which was dated May 20, 1998.[465] These documents were all addressed to "Mr. Oakland Benta, Security Director, Emerging Communications, P.O. Box 1730 St. Croix, V.I. 00821."[466] Additionally, the invoice for Sheraw's services was directed to Benta under the same title and at the same address,[467] and was paid in full by Atlantic Tele-Network Co., P.O. Box 1730, Christiansted, St. Croix, USVI 00821.[468] Redfield's name does not appear in any of these documents.

 The pages of Senator Donastorg's deposition testimony are similarly unavailing to Plaintiffs, as these pages do not demonstrate that Redfield had Senator Donastorg followed. Senator Donastorg testified that he saw "two gentlemen in a white car" that were "just certain individuals, other individuals that I don't ever recall or could identify."[469] Based upon Senator Donastorg's failure to identify Redfield as one of the

---

[463] Pls.' Resp. to Defs.' Mot. for Summ. J. and Br. in Supp. App. Vol. VI, Ex. 3, at Bates No. D 1300.

[464] Id. at Bates No. D 1295.

[465] Id. at Bates No. D 1287.

[466] See id. at Bates No. D 1300 (directing the initial report to Benta); id. at Bates No. D 1287 (directing the second progress report to Benta); id. at Bates No. D 1295 (directing the final report to Benta).

[467] Id. at App. Vol. VI, Ex. 4, at 1-2.

[468] Id. at 2.

[469] Id. at App. Vol. III, Donastorg Dep. Tr. 94:5-7.

men allegedly following him, no reasonable jury could find that Redfield intruded upon Senator Donastorg's seclusion.

From the evidence submitted by Plaintiffs, no reasonable jury could find that Redfield intruded upon the seclusion of any of the Plaintiffs, whether though his alleged involvement with the Sheraw Investigation or due to Plaintiffs' allegation that Redfield was part of an alleged cabal that had Senator Donastorg followed.

## VI. PLAINTIFFS' CONCERTED ACTION THEORIES

In addition to allegations that each Defendant has engaged in one or more of the torts described in analysis sections I through V above, Plaintiffs have also proffered multiple theories under which the conduct of one Defendant may be imputed upon another Defendant for purposes of establishing the liability of the second Defendant. Plaintiffs allege that "[t]he V.I. Supreme Court . . . expressly, and broadly, recognizes 'alter-ego,' 'joint-enterprise,' and 'concerted-action' theories as viable under the law."[470] As authority for this proposition, Plaintiffs cite to a number of cases from courts in the Third Circuit — none of which constitute binding precedent on this Court[471] — and to an opinion from the Supreme Court of the Virgin Islands concerning a conviction for the crime of aiding and abetting.[472]

The three terms used by Plaintiffs — alter-ego, joint-enterprise, and concerted-action — refer to three distinct categories of liability. Generally, alter-ego liability pertains to circumstances where a court will disregard the legal fiction that business entities and those entities' owners are separate. Joint-enterprise liability refers to circumstances where courts will disregard the legal fiction that business entities owned by a parent corporate retain a distinct existence from one another. Concerted-action is more appropriately termed civil conspiracy, and refers to situations where courts can impute the tortious conduct of one person to other members of a group.

---

[470] Pls.' Resp. to Defs.' Mot. for Summ. J. and Br. in Supp. 27-29. *See also id.* at 27 n.16 (collecting cases).

[471] *See id.* at 27 n.16 (citing opinions issued by the United States Court of Appeals for the Third Circuit that originated outside of the Virgin Islands, opinions from the District Court of the Virgin Islands, opinions from various courts in Pennsylvania; and an opinion from Texas).

[472] *Id.* at 27 (citing *Nanton v. People of the Virgin Islands*, 52 V.I. 466, 484-85 (V.I. 2009)).

### a. Applicable law

Despite Plaintiffs' assertion that the Supreme Court of the Virgin Islands "expressly[ ] and broadly" recognizes the theories of liability set forth by Plaintiffs, there is no binding authority in this jurisdiction addressing civil conspiracy, corporate veil piercing, or the joint enterprise theory of liability. Plaintiffs have also cited to case law in which federal courts have employed 'single employer' and 'joint employer' tests. Although the discussions in analysis sections I through V above explain why Daily News and Redfield are entitled to summary judgment on each claim asserted by Plaintiffs against them directly, the Court must also determine whether the plethora of joint liability theories advanced by Plaintiffs could justify holding Daily News or Redfield liable for the conduct of the remaining Defendants.

### i. *Civil conspiracy*

Amongst the theories propounded by Plaintiffs, Plaintiffs argue first that the Supreme Court of the Virgin Islands has "expressly[] and broadly"[473] recognized the principles of law summarized in the RESTATEMENT (SECOND) OF TORTS Section 876.[474] However, the Supreme Court of the Virgin Islands has never issued an opinion adopting the principles set forth in Section 876. Plaintiffs have thus asserted a proposition of common law for which there is no binding precedent in this jurisdiction, and this Court must determine whether, and if so, the extent to which the common law of this jurisdiction embraces the principles of law summarized in Section 876.

 In the case of *Isaac v. Crichlow*,[475] the Superior Court of the Virgin Islands, Molloy, J., conducted the three-prong analysis mandated by *Banks v. International Rental & Leasing Corp.*[476] and determined that the provisions of law summarized in Section 876 represented the soundest rule for the Virgin Islands. Being satisfied that the principles of law

---

[473] Pls.' Resp. to Defs.' Mot. for Summ. J. and Br. in Supp. 27.

[474] *Id.* at 27-28 (quoting RESTATEMENT (SECOND) OF TORTS § 876). Plaintiffs do not identify a case where the Supreme Court of the Virgin Islands has addressed the legal foundations for a civil conspiracy claim.

[475] 63 V.I. 38 (V.I. Super. Ct. 2015).

[476] 55 V.I. 967 (V.I. 2011).

contained in Section 876 have not only been relied upon by courts in this jurisdiction,[477] but are also relied upon by a majority of other jurisdictions,[478] this Court agrees with the Honorable Judge Molloy's conclusion that the principles of law summarized in Section 876 represent the soundest rule for the Virgin Islands pertaining to liability for civil conspiracy. All portions of the *Banks* analysis in *Crichlow* not previously cited are incorporated herein by reference.

 As reasoned in *Crichlow* and reaffirmed in this Memorandum Opinion, the soundest rule for the Virgin Islands is that a person is subject to liability for harm resulting to a plaintiff from the tortious conduct of co-defendant when that person (1) does a tortious act in concert with the co-defendant pursuant to a common design with him; (2) knows that the co-defendant's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the co-defendant to so conduct him or herself; or (3) gives substantial assistance to the co-defendant in accomplishing a tortious result and his or her own conduct, separately considered, constitutes a breach of duty to the plaintiff. The existence of tortious conduct is a prerequisite for liability under this standard. Absent tortious conduct, there cannot be a generalized claim for civil conspiracy.[479]

### ii. *Plaintiffs' corporate law theories*

Plaintiffs have advance three distinct corporate law theories under which a corporate entity may be disregarded: traditional piercing of the corporate veil, reverse piercing of the corporate veil, and the single enterprise theory of liability.[480]

---

[477] *See* 63 V.I. at 64 n.11 (collecting cases from the Virgin Islands).

[478] *See id.* at 64-65 n.12 (collecting cases).

[479] *See Mieczkowski v. York City School Dist.*, 414 Fed. Appx. 441, 450 (3d Cir. 2011) (*citing Boyanowski v. Capital Area Intermediate Unit*, 215 F.3d 396, 407 (3d Cir. 2000)) (explaining that "[t]here is no liability for civil conspiracy where there is no liability for the act or acts underlying the conspiracy"). *Accord* 16 AM. JUR. 2D *Conspiracy* § 64 (2009) (same).

[480] *See* Pls.' Resp. to Defs.' Mot. for Summ. J. and Br. in Supp. 27 n.16 (citing to *Schwab v. McDonald*, 405 B.R. 555, 563 (Bankr. M.D. Pa. 2009) to illustrate the concept of reverse veil piercing, to *Gateco, Inc. v. Safeco Ins. Co. of Am.*, Civ. No. 05-2869, 2006 U.S. Dist. LEXIS 50313 (E.D. Pa. July 24, 2006) to illustrate the concept of traditional veil piercing in the context of parent and subsidiary corporations, and to *Hoffmann v. Dandurand*, 180 S.W.3d 340, 348 (Tex. Ct. App. 2005) to illustrate the single enterprise theory of liability).

## 1. Traditional veil piercing

"Piercing the corporate veil 'is an equitable remedy whereby a court disregards the existence of the corporation to make the corporation's individual principals and their personal assets liable for the debts of the corporation.' "[481] This Court must determine whether, and if so the extent to which this jurisdiction embraces such a remedy because the Supreme Court of the Virgin Islands has never issued an opinion discussing the extent to which the concept of piercing the corporate veil applies in this jurisdiction.

### a. Approaches taken by courts in this jurisdiction

In the case of *Matheson v. Virgin Islands Community Bank Corp.*,[482] the Appellate Division of the District Court of the Virgin Islands explained that this remedy should be applied "when the court must 'prevent fraud, injustice, or when recognition of the corporate entity would defeat public policy or shield someone from liability.' "[483]

*Matheson* concerned a motion for summary judgment filed by a defendant corporation and its sole shareholder on, among other things, whether it was appropriate to disregard the corporation's separate existence.[484] In granting summary judgment for the corporation on the veil-piercing issue, the Appellate Division considered eight factors upon which the United States Court of Appeals for the Third Circuit had previously relied:

(1) whether the corporation suffers from gross undercapitalization;

(2) a failure to observe corporate formalities;

(3) the non-payment of dividends;

(4) the insolvency of the debtor corporation;

(5) the siphoning of funds from the debtor corporation from the dominant stockholder;

---

[481] *Matheson v. V.I. Community Bank, Corp.*, 297 F. Supp. 2d 819, 833 (D.V.I. App. Div. 2003) (quoting *Trustees of the Nat'l Elevator Industry Pension, Health Benefit & Educ. Funds v. Lutyk*, 332 F.3d 188, 192 (3d Cir. 2003)).

[482] 297 F. Supp. 2d 819 (D.V.I. App. Div. 2003).

[483] *Id.* (quoting *Pearson v. Component Technology Corp.*, 247 F.3d 471, 484 (3d Cir. 2001)).

[484] *Id.* at 822-23.

(6) the presence of nonfunctioning officers;

(7) the absence of corporate records; and

(8) whether the corporation is merely a facade for the operation of the dominant stockholder.[485]

The Appellate Division concluded that "Plaintiff's claims amount to nothing more than conclusory allegations that [the sole shareholder] was involved in the [corporation]'s operations,"[486] and consequently, that veil piercing was not justified.

Quoting *Matheson* and the Third Circuit case law cited therein, the Superior Court has continued to follow this standard.[487]

### b. Approaches taken by other jurisdictions

A clear majority of jurisdictions recognize that corporate separateness may be disregarded when necessary to prevent fraud or injustice.[488] Although approaches vary by jurisdiction, most jurisdictions analyze a nonexclusive list of factors like those enumerated in *Matheson* in order to determine whether a defendant shareholder exercised sufficient domination and control over the corporation and used the corporate form to perpetrate fraud or injustice.[489] Any attempt to quantify the specific factors utilized by every jurisdiction would transform an already-lengthy opinion into a bona fide treatise on corporate law. However, several factors consistently present themselves in circumstances where courts find that the disregard of the corporate entity is appropriate: whether corporate formalities have been observed; whether the corporation was adequately capitalized; whether, and if so, the extent to which personal and corporate assets have been comingled; whether the corporate form

---

[485] *Id.*

[486] *Id.*

[487] *E.g., Balbo Corp. v. Enighed Condominiums, LLC*, Civil. No. ST-09-CV-399, 2011 V.I. LEXIS 11, at *5 (V.I. Super. Ct. Feb. 7, 2011) (citations omitted); *People of the Virgin Islands v. Alkhatib*, 53 V.I. 131, 136 (V.I. Super. Ct. 2010) (citations omitted).

[488] *See generally* Henn & Alexander, LAWS OF CORPORATIONS AND OTHER BUSINESS ENTERPRISES 344-56 (3d ed. 1988) (collecting authorities).

[489] *See, e.g., Mesler v. Bragg Management Co.*, 39 Cal. 3d 290, 216 Cal. Rptr. 443, 702 P.2d 601, 606-07 (1985) (identifying factors that indicate when a shareholder or group of shareholders has exercised sufficient domination and control over a corporation that the disregard of corporate separateness may be justified); *Morris v. State Dep't of Taxation & Fin.*, 82 N.Y.2d 135, 623 N.E.2d 1157, 1160-61, 603 N.Y.S.2d 807 (1993) (same).

has been used to promote fraud or injustice; and whether there is a causal connection between the shareholder's control and the malfeasance at issue.[490] There is no uniformity concerning the quantum of proof necessary to disregard the corporate existence; courts examine the facts of each case in order to determine whether to disregard the concept of limited liability that is a " 'bedrock' principle of corporate law."[491]

### c. The soundest rule of law for the Virgin Islands

 The soundest rule of law is to disregard corporate separateness and utilize the assets of a shareholder to satisfy a corporation's liability, but only in those circumstances where the shareholder has exercised such domination and control over the corporation that the corporation has become an alter ego of the shareholder, and where the shareholder has utilized the corporate form to perpetuate the fraud or injustice at issue in the litigation. Adopting this standard harmonizes the law of the Virgin Islands with well-established principles of corporate law while still providing equitable relief in appropriate circumstances. In determining whether a shareholder has exercised sufficient domination and control over the corporation to justify treating the corporation and the shareholder as a single entity, courts in this jurisdiction should consult the nonexclusive list of factors identified in *Matheson*, and any other factors that may be appropriate. By incorporating these factors into the Court's opinion, the Court ensures that the common law of this jurisdiction evolves in a manner that is mindful of the case law that existed before the creation of the Supreme Court of the Virgin Islands while also allowing courts the flexibility to consider the facts of each case.

By adopting this approach to piercing the corporate veil, the Court also recognizes that "the corporate form will be disregarded only in narrowly defined circumstances and only when the ends of justice so require."[492] The corporate form should not be disregarded lightly, especially because doing so threatens a company's ability to conduct business in this

---

[490] *See generally* Douglas G. Smith, *Piercing the Corporate Veil in Regulated Industries*, 2008 BYU L. Rev. 1165, 1169-82 (2008) (collecting and summarizing authorities).

[491] *Id.* at 1169 (quoting *Escobedo v. BHM Health Assoc., Inc.*, 818 N.E.2d 930, 933 (Ind. 2004)).

[492] *Mesler*, 702 P.2d at 607.

Territory.[493] The Virgin Islands, as in other jurisdictions, will respect corporate separateness unless presented with a compelling reason to disregard such a well-entrenched concept.

## 2. Reverse veil piercing

In the last several decades, some jurisdictions have developed a variation to the traditional corporate veil piercing doctrine known as reverse piercing.[494] Jurisdictions that apply this doctrine do so in two situations.[495] In the first, a dominant shareholder or other controlling insider attempts to have the corporate entity disregarded in order to avail him or herself of corporate claims against third parties, or to shield assets from claims asserted against the insider in his or her personal capacity.[496] Because the party seeking to disregard corporate separateness operates from within the corporation, commentators refer to this situation as 'inside reverse piercing.' The second situation under which a reverse pierce might occur arises when a third party seeks to disregard the corporate entity in order to hold the corporation liable for the debts of a corporate insider.[497] This is known as 'outside reverse piercing,' and more closely resembles the traditional concept of veil piercing. Because Plaintiffs argue that Redfield's actions are attributable to Daily News and VITELCO,[498] this case may represent an example of a situation where an outside reverse pierce of the corporate veil is appropriate.

■■ ■■ Despite Plaintiffs' representations, there is no binding authority in this jurisdiction that recognizes an outside reverse veil pierce

---

[493] *See* Smith, *supra* note 490, at 1182-88 (discussing the costs, externalities, and other implications of veil piercing).

[494] *E.g., In re Phillips*, 139 P.3d 639, 645 (Colo. 2006) (en banc) (recognizing the concept of outside reverse piercing in the state of Colorado); *State v. Easton*, 169 Misc. 2d 282, 647 N.Y.S.2d 904, 909 (1995) (recognizing the same concept in the state of New York). *See generally*, Gregory S. Crespi, *The Reverse Pierce Doctrine: Applying Appropriate Standards*, 16 CORP. L. J. 33, 34-37 (1990) (discussing the evolution of both traditional and reverse pierce claims).

[495] *See* Crespi, *supra* note 494, at 37 (classifying reverse pierce claims as either 'inside', or 'outside' reverse piercing).

[496] *Id.*

[497] *Id.* at 55-56.

[498] Pls.' Resp. to Defs.' Mot. for Summ. J. and Br. in Supp. 27-29.

as a remedy.[499] Consequently, this Court must determine whether the law of this jurisdiction embraces such a remedy.[500]

### a. Approaches taken by courts in this jurisdiction

Although there have been several cases in this Territory concerning traditional veil piercing,[501] no court in this Territory has addressed the concept of either inside or outside reverse veil piercing. As mentioned above, there is case law from other courts in the Third Circuit that addresses the concept of reverse piercing. However, because none of these cases concern the interpretation of Virgin Islands law, they are not relevant to this prong of the analysis.

### b. Approaches taken by other jurisdictions

A growing minority of other jurisdictions have allowed the creditors of a debtor to disregard the corporate entity owned or controlled by the

---

[499] In a related filing, Plaintiffs have argued that three cases demonstrate the applicability of the outside reverse veil pierce to this jurisdiction: *In re DiLoreto*, 266 Fed. Appx. 140 (3d Cir. 2008); *In re Blatstein*, 192 F.3d 88 (3d Cir. 1999); and *In re Mass*, 178 B.R. 626 (M.D. Pa. 1995). None of these three cases bind this Court. Ultimately appealed to the United States Court of Appeals for the Third Circuit, *DiLoreto* was filed in the United States Bankruptcy Court for the Eastern District of Pennsylvania, and the concept of reverse piercing was approached under both Pennsylvania common law and federal law. 266 Fed. Appx. at 143. Although *DiLoreto* constitutes persuasive authority as to when a court might decide to permit a reverse pierce, neither Pennsylvania common law nor federal law represents the law of this Territory. *See Malloy v. Reyes*, 61 V.I. 163, 176 (V.I. 2014) (stating that the Superior Court must conduct an independent analysis to determine the appropriate rule of law where the question has not been foreclosed by the Supreme Court of the Virgin Islands); *Najawicz v. People*, 58 V.I. 315, 327-28 (V.I. 2013) (observing that the Superior Court is only bound by decisions from the Third Circuit issued when the Third Circuit was sitting as the de facto court of last resort for the Virgin Islands). Importantly, in *Najawicz*, the Supreme Court of the Virgin Islands rejected the proposition that a Third Circuit case originating out of the Western District of Pennsylvania had any binding authority on the Superior Court. 58 V.I. at 327. Plaintiffs' reliance on *Blatstein* and *Mass* is similarly flawed. Like *DiLoreto*, both *Blatstein* and *Mass* originated in the bankruptcy courts of Pennsylvania. Although *Blatsein* was appealed to the Third Circuit and *Mass* to the district court, both cases approached the concept of reverse piercing under either Pennsylvania common law or federal law. Neither source of law binds this Court.

[500] *Malloy*, 61 V.I. at 176.

[501] *E.g.*, *Matheson v. Virgin Islands Community Bank Corp.*, 297 F. Supp. 2d 819, 833-34 (D.V.I. App. Div. 2003).

debtor in certain circumstances.[502] Many commonalities exist between the approaches applied by these jurisdictions. First, they all rely on the same "alter ego" metaphor that courts apply in traditional veil piercing cases,[503] explaining that the corporate existence will only be disregarded when the separation of the corporation and its shareholders ceases to exist. To determine whether the debtor and corporation are alter egos of each other, courts consult a nonexclusive list of factors similar to the one in *Matheson*, discussed above.[504] Courts that have adopted the concept of outside reverse piercing also acknowledge that its application is only

---

[502] *E.g., In re Phillips*, 139 P.3d 639, 645 (Colo. 2006) (en banc); *Litchfield Asset Management Corp. v. Howell*, 70 Conn. App. 133, 799 A.2d 298, 311 (2002); *Estudios, Proyectos, e Inversiones de Centro America, S.A. v. Swiss Bank Corporation (Overseas) S.A.*, 507 So. 2d 1119, 1120-21 (Fla. Dist. Ct. App. 1987); *Minich v. Gem State Developers, Inc.*, 99 Idaho 911, 591 P.2d 1078, 1083 (1979); *Lambert v. Farmers Bank, Frankfort, Indiana*, 519 N.E.2d 745, 747 (Ind. Ct. App. 1988); *Central Nat. Bank & Trust Co. of Des Moines v. Wagener*, 183 N.W.2d 678, 681-82 (Iowa 1971); *Dictoguard, Inc. v. Lopeo*, 948 So. 2d 305, 308-09 (La. Ct. App. 2006); *Clark v. United Technologies Automotive, Inc.*, 459 Mich. 681, 594 N.W.2d 447, 451-53 (1999); *Medlock v. Medlock*, 263 Neb. 666, 642 N.W.2d 113, 124 (2002); *LFC Marketing Group, Inc. v. Loomis*, 116 Nev. 896, 8 P.3d 841, 846 (2000); *State v. Easton*, 169 Misc. 2d 282, 647 N.Y.S.2d 904, 909 (1995); *Lifshutz v. Lifshutz*, 61 S.W.3d 511, 516-17 (Tex. App. 2001); *C.F. Trust, Inc. v. First Flight Limited Partnership*, 266 Va. 3, 580 S.E.2d 806, 810 (2003); *Olen v. Phelps*, 200 Wis. 2d 155, 546 N.W.2d 176, 181 (1996); *United Enterprises, Inc. v. King*, 4 N. Mar. I. 304, 307 (1995).

[503] *E.g., In re Phillips*, 139 P.3d at 644; *Dictoguard, Inc.*, 948 So. 2d at 308, *LFC Marketing Group, Inc.*, 8 P.3d at 846.

[504] *See, e.g., In re Phillips*, 139 P.3d at 644 (considering "a variety of factors, including whether (1) the corporation is operated as a distinct business entity, (2) funds and assets are commingled, (3) adequate corporate records are maintained, (4) the nature and form of the entity's ownership and control facilitate misuse by an insider, (5) the business is thinly capitalized, (6) the corporation is used as a 'mere shell,' (7) shareholders disregard legal formalities, and (8) corporate funds or assets are used for noncorporate purposes"); *United Enterprises, Inc.*, 4 N. Mar. I. at 307 (considering a nonexclusive list of factors, including "undercapitalization, failure to observe corporate formalities, nonpayment of dividends, siphoning of corporate funds by dominant stockholders, nonfunctioning of other officers or directors, absence of corporate records, use of the corporation as a facade for the operations of the dominant stockholders, and use of the corporate entity in promoting injustice or fraud," along with additional factors, such as "[w]hether the individual is in a position of control or authority over the entity; [w]hether the individual controls the entity's actions without need to consult others; [w]hether the individual uses the entity to shield himself from personal liability; [w]hether the individual uses the business entity for his or her own financial benefit; [w]hether the individual mingles his own affairs in the affairs of the business entity; [w]hether the individual uses the business entity to assume his own debts, or the debts of another, or whether the individual uses his own funds to pay the business entity's debts").

appropriate "to prevent fraud or achieve equity,"[505] and that it is only appropriately applied to one who owns or controls the corporation.[506]

A smaller number of jurisdictions have rejected the concept of outside reverse piercing.[507] These jurisdictions do not permit reverse outside piercing because the doctrine's application can harm innocent corporate shareholders and other corporate creditors.[508] Additionally, these courts recognize that there are other theories that protect judgment creditors without disturbing the corporate identity, such as agency law or vicarious liability.[509] Still other jurisdictions have not considered whether it would be appropriate to apply the principle of outside reverse piercing.

### c. The soundest rule of law for the Virgin Islands

 The soundest rule of law for the Virgin Islands is to permit outside reverse piercing in the extremely limited circumstances where a debtor's conduct is so indistinguishable from the debtor's corporation that the debtor and the corporation are essentially the same entity, where the debtor exercised sufficient ownership or control over the corporation to perpetrate the malfeasance at issue, where the corporation was used by the debtor to perpetrate the malfeasance at issue, and where exposing the corporation to liability would not injure innocent shareholders or creditors.

---

[505] *Easton*, 647 N.Y.S.2d at 909. *See also Estudios Proyectos*, 507 So. 2d at 1120 (observing that an outside reverse pierce is warranted when a controlling shareholder attempts to "deceive or defraud his personal creditors"); *Lambert*, 519 N.E.2d at 747 (finding an outside reverse pierce appropriate when an individual attempts to use the corporate form to fraudulently shield himself); *Clark*, 594 N.W.2d at 451 (observing that equity is the touchstone of the reverse pierce analysis).

[506] *See, e.g., In re Phillips*, 139 P.3d at 645 (holding that the doctrine applies to a "dominant shareholder or other corporate insider"); *Estudios Proyectos*, 507 So. 2d at 1120 (applying the doctrine to "a controlling shareholder"); *Lambert*, 519 N.E.2d at 747 (applying the doctrine to one who "own[s] and control[s] the corporation"); *Dictoguard, Inc.*, 948 So. 2d at 308 (applying the doctrine to "a corporate shareholder or officer"); *United Enterprises, Inc.*, 4 N. Mar. I. at 307 (stating that the doctrine apples to "a dominant stockholder").

[507] *E.g., Postal Instant Press, Inc. v. Kaswa Corp.*, 162 Cal. App. 4th 1510, 77 Cal. Rptr. 3d 96, 102-03 (2008) (California); *Acree v. McMahon*, 276 Ga. 880, 585 S.E.2d 873, 874 (2003) (Georgia); *Mathias v. Rosser*, 2002 Ohio 2772, at ¶ 35 (Ohio).

[508] *Postal Instant Press, Inc.*, 77 Cal. Rptr. 3d at 98.

[509] *Id. See also* Cathy S. Krendl & James R. Krendl, *Piercing the Corporate Veil: Focusing the Inquiry*, 55 DEN. L. J. 1, 2-4 (1978) (observing that other causes of action, such as agency, fraud, estoppel, unjust enrichment, and breach of fiduciary duty, might afford a plaintiff the same relief without the necessity of disregarding the corporate existence).

337

■ Following the example set by a majority of the courts that have accepted outside reverse piercing as a method of disregarding the corporate entity, courts in the Virgin Islands should first consider the following non-exclusive list of factors to determine whether the legal separateness of the debtor and the corporation is an illusion:

1. The degree to which the corporate entity is undercapitalized;
2. The degree to which the corporation has failed to observe corporate formalities;
3. Whether and to what extent the corporation has paid dividends, if required;
4. Whether and to what extent dominant stockholders have siphoned corporate funds for personal use;
5. The presence of nonfunctioning officers or directors;
6. Whether and to what extent the corporation has kept records of its business;
7. Whether and to what extent the corporation has been used as a facade for the operations of the dominant stockholders;
8. Whether the debtor mingles his own affairs in the affairs of the corporation;
9. Whether the debtor uses the corporation to assume his or her personal debts, or the personal debts of another; and
10. Whether the debtor uses his or her own funds to pay the corporation's debts.

■ Once a court has made the determination that the conduct of the debtor and the corporation justifies treating them as the same entity, the court must be satisfied that the individual exercised sufficient ownership or control over the corporation such that the actions complained of by the plaintiff could actually have been orchestrated by the debtor. By adopting this approach, the Court recognizes that stock ownership is not a prerequisite for outside reverse piercing. To illustrate, a board of directors may own 100% of a corporation's stock and elect a chief executive officer to run the corporation. The board may — through lack of diligence, willful neglect, or otherwise — turn a blind eye to how the CEO chooses to run the corporation. The CEO might then proceed to operate the company in such a manner to justify treating the CEO and the company as a single entity. Under such a scenario, it may be proper to hold the corporation liable for malfeasance committed by the CEO in his personal

338

capacity, despite the fact that the CEO did not own any stock in the corporation. However, when the debtor through whom the creditor seeks to reach does not have sufficient control or ownership to utilize the corporation as his or her instrument, it is inappropriate to impose the debtor's liability on the corporation.

 Once a court has determined that the corporation and the individual can be treated as the same entity and that the debtor has sufficient control over the corporation to have perpetrated the malfeasance at issue, the court must then determine whether the particular facts of the case merit imposing liability on the corporation. Courts that adopt outside reverse piercing inquire whether the debtor attempted to use the corporation to shield themselves from liability,[510] to avoid a personal obligation, to perpetuate a fraud or crime, to commit an injustice, or to gain an unfair advantage.[511] Conversely, even if the debtor and corporation can be treated as the same entity, a court should decline to disregard the corporate existence where the debtor's relationship to the corporation bears no relation to the causes of action raised in the case.

 Finally, and most importantly, a Court must determine that imposing liability on the corporation will not unjustly injure innocent shareholders or other creditors. The concerns raised by the courts that have rejected outside reverse piercing are well-placed, and a court's role as an institution of equity would be seriously compromised if innocent investors and creditors were injured in order to satiate a creditor of an individual that also owns and operates a corporation.

This test imposes a very heavy burden on the party seeking to hold a corporation liable for the debts of an individual. But because a rule to the contrary may jeopardize the ability of businesses to form and operate in this Territory, an individual who seeks to disregard the corporate existence should bear such a burden.

### 3. The single enterprise theory of liability

This theory is also referenced by the Plaintiffs as one of the several avenues by which one defendant may be held liable for the tortious

---

[510] *Lambert*, 519 N.E.2d at 747.

[511] *C.F. Trust, Inc. v. First Flight Limited Partnership*, 266 Va. 3, 580 S.E.2d 806, 810 (2003).

conduct of another.[512] The "single entity theory,"[513] also termed by courts as the "entity enterprise liability theory"[514] and the "single business enterprise theory,"[515] refers to a situation where "two or more corporations share common ownership and are, in reality, operating as a corporate combine."[516] Under this theory — referred to herein as the single enterprise theory for the sake of consistency — "when corporations are not operated as separate entities but rather integrate their resources to achieve a common business purpose, each constituent corporation may be held liable for debts incurred in pursuit of that business purpose."[517] No binding authority in this jurisdiction has opined on the applicability of the single enterprise theory in the Virgin Islands, and the concept of the single enterprise theory has not been addressed by courts in this jurisdiction. This Court must thus determine the soundest rule of law for the Virgin Islands.[518]

### a. Approaches taken by other jurisdictions

Only a small minority of jurisdictions have adopted the single enterprise theory. In the case of *Las Palmas Associates v. Las Palmas Center Associates*,[519] the California Court of Appeals observed that, while alter-ego liability is reserved for a parent-subsidiary relationship, the single enterprise theory allows liability to be found between sister companies.[520] The theory looks at two or more distinct corporate personalities and determines that "there is but one enterprise," and that the enterprise has been handled in such a way that it should respond as a

---

[512] Pls.' Resp. to Defs.' Mot. for Summ. J. and Br. in Supp. 27 n.16 (citing *Hoffmann v. Dandurand*, 180 S.W.3d 340, 348 (Tex. App. 2005)).

[513] *Miners, Inc. v. Alpine Equipment Corp.*, 722 A.2d 691, 695 (Pa. Super. Ct. 1998).

[514] *Id.*

[515] *SSP Partners v. Gladstrong Investments (USA) Corp.*, 275 S.W.3d 444, 452 (Tex. 2009).

[516] *Miners, Inc.*, 722 A.2d at 695.

[517] *Paramount Petroleum Corp. v. Taylor Rental Center*, 712 S.W.2d 534, 536 (Tex. App. 1986) (abrogated by *SSP Partners*, 275 S.W.3d at 453). *See also SSP Partners*, 275 S.W.3d at 453 (explaining that the Supreme Court of Texas does not suggest "that unity of enterprise alone would justify disregarding corporate structures").

[518] *Malloy v. Reyes*, 61 V.I. 163, 176 (V.I. 2014).

[519] 235 Cal. App. 3d 1220, 1 Cal. Rptr. 2d 301 (1991).

[520] *Id.* at 318.

whole for the debts of its component parts.[521] However, the California Court of Appeals later clarified that courts should use the same tests for determining whether to pierce the corporate veil as they would for determining whether to impose alter ego liability between affiliated corporations.[522]

Another jurisdiction to recognize the single enterprise theory is Louisiana. In the case of *Green v. Champion Insurance Co.*,[523] the Louisiana Court of Appeals explained that, like in veil-piercing cases, courts look to a nonexclusive list of factors to determine whether a group of corporations constitute a "single business enterprise."[524] Once a court makes such a finding, the court "may disregard the concept of corporate separateness to extend liability to each of the affiliated corporations to prevent fraud or achieve equity."[525]

At least four jurisdictions explicitly reject the theory,[526] and another

---

[521] *Id.*

[522] *See Toho-Towa Co., Ltd. v. Morgan Creek Productions, Inc.*, 217 Cal. App. 4th 1096, 159 Cal. Rptr. 3d 469, 480 (2013) (explaining that, "[i]n California, common principles apply regardless of whether the alleged alter ego is based on piercing the corporate veil to attach liability to a shareholder or to hold a corporate liable as part of a single enterprise"). *See also id.* at 480-81 (explaining that courts should consider factors such as "the commingling of funds and assets of the two entities, identical equitable ownership in the two entities, use of the same offices and employees, disregard of corporate formalities, identical directors and officers, and use of one as a mere shell or conduit for the affairs of the other," but that no one factor governs and courts must consider the circumstances of each case).

[523] 577 So. 2d 249 (La. Ct. App. 1991).

[524] *Id.* at 259. *See also id.* at 257-58 (listing the factors trial guide a court's inquiry into whether multiple corporations are functioning as a single business entity).

[525] *Id.* at 259.

[526] *See Hart Holding Co., Inc. v. Drexel Burnham Lamber, Inc.*, 18 DEL J. CORP. L. 700, 718 (Del. Ch. 1992) (observing that, in the context of personal jurisdiction, the enterprise theory "certainly does not represent the law of Delaware"); *Restaurant of Hattiesburg, LLC v. Hotel & Restaurant Supply Co.*, 84 So. 3d 32, 42 (Miss. Ct. App. 2012) (observing that Mississippi "has never adopted the 'single business enterprise' theory to justify holding affiliated LLCs jointly liable for each other's debts"); *SSP Partners v. Gladstrong Investments (USA) Corporation*, 275 S.W.3d 444, 456 (finding that the single business enterprise theory is "fundamentally inconsistent" with Texas' approach to corporations law, and holding that the theory "will not support the imposition of one corporation's obligations on another"); *Assisted Living Concepts, Inc. v. Siegel Gallagher, Inc.*, 2012 WI App 52, ¶ 24 n.6, 813 N.W.2d 247 (declining to adopt the single business enterprise theory without further discussion).

four have issued opinions mentioning the of single enterprise theory without adopting it.[527]

### b. The soundest rule of law for the Virgin Islands

██ The soundest rule of law for the Virgin Islands is to reject the adoption of the single enterprise theory. The single enterprise theory is accepted in very few jurisdictions, and has been rejected in more jurisdictions than it has been accepted. As the Supreme Court of Texas observed, "[t]here is nothing abusive or unjust" about the "sharing of names, offices, accounting, employees, services, and finances."[528]

Criticisms of a related theory advanced by Plaintiffs in a separate filing — the theory of triangular veil piercing — are illustrative of the problems created by adopting the single entity theory. In the case of *Minno v. Pro-Fab, Inc.*,[529] the Supreme Court of Ohio held that a corporation could not be held liable for the debts of its sister corporation due to their common ownership by a parent company. The *Minno* Court reasoned that control is a fundamental element in determining whether to disregard separate corporate personalities.[530] The *Minno* Court then observed that a debtor corporation had no ownership interest in its sister corporation, and thus had no way of controlling the sister corporation's actions.[531] Federal courts to address the concept of triangular piercing have similarly focused

---

[527] *See Island Tobacco Co., Ltd. v. R. J. Reynolds Tobacco Co.*, 63 Haw. 289, 627 P.2d 260, 274 (1981) (rejecting plaintiff's attempts to circumvent the proposition that corporations and their subsidiaries generally cannot conspire for purposes of violating the Sherman Antitrust Act because they constitute a single entity); *Wood v. McDonald's Corporation*, 166 N.C. App. 48, 603 S.E.2d 539, 547-48 (2004) (rejecting plaintiff's attempt to disregard the corporate form based on the theory that the corporation and the owner were engaged in a joint venture); *Walkovszky v. Carlton*, 18 N.Y.2d 414, 223 N.E.2d 6, 10, 276 N.Y.S.2d 585 (1966) (finding that plaintiff's complaint failed to plead facts that, if true, would permit the court to disregard the separate existence of multiple corporations all owned by the same individual); *Advanced Telephone Systems, Inc. v. Com-Net Professional Mobile Radio, LLC*, 846 A.2d 1264, 1266 n.9 (Pa. Super. Ct. 2004) (observing that the single entity theory still has yet to be adopted in Pennsylvania).

[528] *SSP Partners*, 275 S.W.3d at 454.

[529] 121 Ohio St. 3d 464, 2009-Ohio-1247, 905 N.E.2d 613.

[530] *Id.* ¶ 11, at 617.

[531] *Id.* ¶ 12, at 617.

on the lack of control that one sister corporation exercises over another.[532] One court has observed that the concept of triangular piercing "is plainly out of harmony with both the traditional piercing doctrine and the more novel 'reverse piercing' doctrine" because it disregards the corporate existence without regard to ownership or control.[533]

To the extent that the theories are distinct, the single enterprise theory works the same harms as the concept of triangular veil piercing by threatening to impose liability on sister corporations by virtue of ownership by a common parent corporation without a showing that one sister corporation controlled the other. At its most fundamental level, the purpose of any corporate structure is to pursue the common purpose of its owners.[534] There are many legitimate reasons why a holding company would choose to operate through a number of subsidiaries, not the least of which is to hedge against the possibility that the business of one subsidiary might fail. The ability of entrepreneurs to manage multiple ventures through a single holding company encourages investment because it allows the entrepreneur to minimize costs while diversifying investments. But common ownership does not imply that subsidiaries exercise any degree of control over one another. A rule that permits the debtor of one entity to reach to other entities solely by virtue of common ownership and a shared business purpose discourages the use of a fundamental business strategy and, in turn, signals to potential investors that the Virgin Islands has little respect for the risks undertaken by

---

[532] *See S.E.C. v. Hickey*, 322 F.3d 1123, 1128 (9th Cir. 2003) (observing that ownership is a prerequisite to alter ego liability, and consequently rejecting the argument that that an individual need not own any part of a corporation for an alter ego relationship to exist); *Johnson v. Medisys Health Network*, No. 10-CV-1596 (ERK)(WP), 2011 U.S. Dist. LEXIS 156828, *73-74 (E.D.N.Y. June 1, 2011) (dismissing a complaint that requested direct, reverse, and triangular piercing — without discussing these theories — because the plaintiff failed to allege how the defendants controlled the entities, undercapitalized the entities, or ignored the corporate formalities of the entities); *Nursing Home Consultants, Inc. v. Quantum Health Services, Inc.*, 926 F. Supp. 835, 840 n.12 (1996) (rejecting the concept of triangular piercing because it allows for the imposition of liability absent control) *aff'd*, 112 F.3d 513 (8th Cir. 1997).

[533] *Nursing Home Consultants, Inc.*, 926 F. Supp. at 840 n.12.

[534] *Accord Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2771-72, 189 L. Ed. 2d 675 (2014) (explaining that the proper use of the corporate form depends on the law of the state of incorporation, and observing that states generally permit corporations to be formed for "any lawful purpose or act").

investors. Such a result does not serve the Virgin Islands in the slightest, and mandates the rejection of the single enterprise theory of liability.

### iii. Plaintiffs' employment law theories: 'single employer' and 'joint employer' liability

Citing to the case of *N.L.R.B. v. Browning-Ferris Industries of Pennsylvania, Inc.,*[535] Plaintiffs refer to the theory of " 'joint' or 'co-employer' liability in employment cases."[536] The single employer and joint employer concepts are separate theories utilized by the National Labor Relations Board ("NLRB") to determine for whom an individual works.[537] Plaintiffs have provided no argument as to why this Court should apply principles utilized by the NLRB in this case, and this case does not involve disputes between any of the corporate defendants and the individually-named defendants in this case. Because these theories have no application to this case, the Court has no need to determine the extent to which the common law of the Virgin Islands embraces similar concepts.

### b. Plaintiffs' allegations of conspiracy do not save their putative causes of action against Daily News and Redfield from summary judgment.

In order for the jury to consider whether either Daily News or Redfield is liable as part of a civil conspiracy with the other Defendants, Plaintiffs must demonstrate the existence of genuine disputes of material fact concerning any of the following scenarios: (1) whether any of the allegedly-tortious acts committed by Daily News or Redfield were done in concert with the other Defendants pursuant to a common design; (2) whether either Daily News or Redfield knew that their co-defendant's action constituted a breach of duty and gave substantial assistance or encouragement to the co-defendant so to perform that action; or (3)

---

[535] 691 F.2d 1117 (3d Cir. 2001).

[536] Pls.' Resp. to Defs.' Mot. for Summ. J. and Br. in Supp. 27 n.16.

[537] *See* 691 F.2d at 1122-23 (discussing the distinction between the theories). *Compare Radio & Television Broadcast Technicians Local Union v. Broadcast Service of Mobile, Inc.,* 380 U.S. 255, 85 S. Ct. 876, 13 L. Ed. 2d 789 (1965) (providing the conceptual justifications for the single employer theory), *with Boire v. Greyhound Corp.,* 376 U.S. 473, 84 S. Ct. 894, 11 L. Ed. 2d 849 (1964) (providing the conceptual justifications for the joint employer theory).

whether either Daily News or Redfield gave substantial assistance to a co-defendant in accomplishing a tortious result, and the conduct of Daily News or Redfield, separately considered, constitutes a breach of duty to the Plaintiffs. The second and third scenarios each require Plaintiffs to introduce evidence of a duty and a breach of that duty. No such allegations appear anywhere in Plaintiffs' Complaint or Plaintiffs' Opposition to Daily News' Motion. Consequently, the Court confines its inquiry to the first scenario only.

■ Tortious conduct is a prerequisite for civil conspiracy. As discussed in analysis sections I through V above, Plaintiffs have not introduced evidence from which a reasonable jury could find either Daily News or Redfield liable for any of the tortious conduct attributed to them in Plaintiffs' Complaint or Plaintiffs' Opposition. Because no reasonable jury could reach such a conclusion, it follows that no reasonable jury could conclude that either Daily News or Redfield committed their allegedly-tortious conduct in concert with the other Defendants. Consequently, Plaintiffs' civil conspiracy allegations cannot justify holding Daily News or Redfield liable for the conduct of the remaining Defendants.

### c. Plaintiffs' veil-piercing theories do not save their putative causes of action against Daily News and Redfield from summary judgment.

■ The traditional concept of piercing the corporate veil is utilized to impose liability on a shareholder for acts undertaken by a corporation. Here, Plaintiffs have introduced no evidence that either Daily News or Redfield owned any portion of VITELCO. To the contrary, Plaintiffs pled that VITELCO was wholly owned by ICC during the operative periods of this lawsuit. Consequently no reasonable jury could find that either Daily News or Redfield exercised sufficient control over VITELCO to justify holding either Daily News or Redfield accountable for any liability that VITELCO may incur.

Benta is being sued as an individual and not as a corporate defendant. Consequently, the theory of traditional corporate veil piercing has no bearing on the question of whether Daily News and Redfield can be held liable for Benta's alleged misconduct.

An outside reverse veil pierce is used to hold a corporation liable for the debts of one of its shareholders or controlling officers. Plaintiffs have

345

not introduced any evidence that either VITELCO or Benta owned any portion of Daily News, or occupied a position from which they could exercise control over Daily News' operations. Rather, Plaintiffs have pled that Daily News was owned by ICC for all relevant periods to this suit. Consequently, no reasonable jury could determine that either Daily News or Redfield exercised the necessary level of control over VITELCO to justify holding Daily News or Redfield accountable for any liability that VITELCO may incur.

Redfield is being sued as an individual, not as a corporate defendant. Consequently, the theory outside reverse corporate veil piercing has no bearing on the question of whether Redfield may be held liable for the alleged misconduct of VITELCO and Benta.

## CONCLUSION

Plaintiffs have advanced a number of theories under which they contend Daily News and Redfield may be held liable. Plaintiffs have attempted to support their arguments with hundreds of pages of documents, including affidavits, entire deposition transcripts, newspaper articles, and copies of investigation reports. Despite the voluminous evidence offered in support of their positions, Plaintiffs have not demonstrated that genuine issues of material fact exist concerning any of the claims brought by Plaintiffs against either Daily News or Redfield that would justify submitting those claims to a jury. Consequently, both Daily News Publishing Co. Inc. and Lowe Davis are entitled to summary judgment in their favor on all counts of Plaintiffs' Complaint. Likewise, Redfield is entitled to summary judgment in his favor on all counts of Plaintiffs' Complaint. An appropriate order shall follow.